# In the United States Court of Federal Claims

### No. 97-579C
### (Filed Under Seal: December 4, 2006)[1]
### (Reissued: January 19, 2007)

```
* * * * * * * * * * * * * * * * * * * * * * * * * * *
                                      *
SGS-92-X003,                          *       Drug Enforcement Administration
                                      *       Confidential Informant; Implied-
           Plaintiff,                 *       In-Fact Contract; Actual Authority;
                                      *       Implied Actual Authority;
      v.                              *       Ratification; Summary Judgment;
                                      *       Subject Matter Jurisdiction; Tortious
THE UNITED STATES,                    *       Breach of Contract.
                                      *
           Defendant.                 *
                                      *
* * * * * * * * * * * * * * * * * * * * * * * * * *
```

Michael L. Avery, Sr., 1331 H Street, N.W., Washington, D.C., for Plaintiff.

Jonathan Reid Prouty, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, 1100 L Street, N.W., Washington, D.C., for Defendant.

---

### OPINION AND ORDER DENYING
### CROSS-MOTIONS FOR SUMMARY JUDGMENT

---

**WILLIAMS**, Judge.

Plaintiff, a confidential informant known as Princess, claims that the Government breached a contract to pay her 25 percent of the value of seizures made by the Drug Enforcement

---

[1] The Court issued this opinion under seal on December 4, 2006, and directed the parties to file any proposed redactions to the opinion by December 11, 2006, consistent with the Court's Protective Order issued March 25, 2004, governing the Drug Enforcement Administration (DEA) Agent's Manual. On December 11, 2006, Defendant filed proposed redactions to this Court's opinion, deleting portions of the DEA Manual. The Court ordered Defendant to show cause by December 29, 2006, why the referenced portions of the DEA Manual were confidential and why the proposed redactions were warranted. On January 18, 2007, after receiving an enlargement of time, Defendant filed its response to the Court's show cause order stating that it withdrew the request for redactions and no longer opposed the public release of the Court's opinion in its entirety.

Administration (DEA) as a result of information she provided, up to a limit of $250,000 per seizure.[2] Plaintiff seeks $33,900,000 in damages. The head of DEA's Fort Lauderdale, Florida, District Office promised Princess the 25 percent "commission," and Princess performed as an undercover informant in a high profile, high risk operation for almost four years, yielding the arrests of drug traffickers and seizures of drug proceeds.[3] The Government denies that there was a contract, claiming the head of DEA's Fort Lauderdale office lacked the authority to enter such a contract.

While the head of DEA's Fort Lauderdale office did not have express authority to promise Princess this commission, there are genuine issues of material fact as to whether this DEA official had implied actual authority to make this promise and whether his promise was ratified by officials who did have such authority. As such, the parties' cross-motions for summary judgment are denied.[4]

## Background[5]

## Overview of Operation Princess

Plaintiff served as a confidential informant for DEA from December 1991 until August

---

[2] Plaintiff is designated as Princess or Confidential Informant SGS-92-X003, her DEA code number, for purposes of confidentiality.

[3] The parties limited their motions to liability, and Plaintiff did not specify the amounts seized as a result of information she provided.

[4] Plaintiff also claims that Defendant failed to maintain the secrecy of her identity, aid her in dangerous situations, and protect her from harm or injury. Defendant has moved to dismiss these claims for lack of jurisdiction on the ground that they sound in tort. This motion is denied because these claims arise from agreements Defendant allegedly made as part of her implied-in-fact contract. As such, Defendant's failure to honor these purported agreements are claims for breach of contract, not tort.

[5] This background is derived from the pleadings, the Corrected Appendix to Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction and, in the Alternative, for Summary Judgment (Def.'s App.), Appendices to Plaintiff's Cross-Motion for Summary Judgment (Pl.'s Mot. App.), Opposition to Defendant's Motion to Dismiss or for Subject Matter Jurisdiction (Pl.'s Opp'n. App.), and Plaintiff's Motion to Compel (Pl.'s Mot. to Compel), Depositions of Douglas Wankel (Aug. 17, 2004) (Wankel Dep.), Thomas A. Constantine (Oct. 27, 2004) (Constantine Dep.), Joseph P. Salvemini (Mar. 3, 1999) (Sal. Dep. I), and (Aug. 22, 2002) (Sal. Dep. II), Rick Morris (Aug. 2, 2002) (Morris Dep.), Thomas J. Tiderington (Dec. 5, 2002) (Tiderington Dep.), Plaintiff (Feb. 5, 2004) (Pl.'s Dep.), Greg Lees (Feb. 5, 2004) (Lees Dep.), and James Hughes (Feb. 5, 2004) (Hughes Dep.), and Declarations of Thomas V. Cash (Oct. 28, 2003) (Cash Decl.), Mary Lee Warren (Oct. 31, 2003) (Warren Decl.), Janet Reno (Oct. 29, 2003) (Reno Decl.), Christinia Sisk (Dec. 11, 2000) (Sisk Decl.), and James Whetstone (Oct. 27, 2003) (Whetstone Decl.).

1995.[6]  Princess had no arrest record, but her former husband had been arrested for narcotics trafficking.  Sal. Dep. II at 13-14, Pl.'s Mot. App. Tab 4.  During Plaintiff's tenure with DEA, she was supervised by the agent who promised her the commission, the Assistant Special Agent in Charge (ASAC) of DEA's Fort Lauderdale, Florida field office, Joseph P. Salvemini, now retired.[7] Sal. Dep. I at 3, Pl.'s Mot. App. Tab 3.

Operation Princess was a long-term money laundering operation directed at developing viable cases against major Colombian drug trafficking and money-laundering organizations.  Def.'s App. at 7.   This investigation was a high profile case -- "[o]ne that headquarters had a continued and regular interest in that would require routine and frequent briefings."  Sal. Dep. II at 59, Pl.'s Mot. App. Tab 4.  According to ASAC Salvemini, high profile cases were regularly brought to the attention of the Attorney General.  Id. at 61; Wankel Dep. at 55, Pl.'s Mot. App. Tab 5.  ASAC Salvemini traveled to Washington, D.C. as often as twice a month to discuss this operation with high level DEA and Department of Justice (DOJ) officials including representatives of the Attorney General.

ASAC Salvemini and DEA obtained an Attorney General's exemption to use laundered money to fund this operation to enable DEA and the Princess to "run with the traffickers," "do what the bad guys do and pursue the investigations."  Sal. Dep. I at 15, Pl.'s Mot. App. Tab 3.

Toward the end of the operation, Plaintiff was kidnapped and held captive in Columbia, and ultimately was released.  Sal. Dep. I at 19, 22, Pl.'s Mot. App. Tab 3.  In 1995, shortly after Plaintiff's release, her activity as an informant ceased.  Id. at 22.

Due to Plaintiff's efforts, DEA received "significant intelligence on activities of several Targeted Kingpin Organizations," arrested at least 10 individuals, and seized at least $23 million. Def.'s App. at 7-9, 12; Wankel Dep., Ex. 6; Pl.'s Mot. App. Tab 5.  ASAC Salvemini characterized Plaintiff as the best informant he ever encountered in his 31-year tenure with DEA "from the standpoint of value to the Agency . . . her abilities to follow direction, to be innovative and to infiltrate the very highest levels of the criminal element."  Sal. Dep. I at 4, Pl.'s Mot. App. Tab 3. The Deputy Assistant Attorney General for the Criminal Division (DAAG), Mary Lee Warren, also considered what Princess did in this operation to have "certainly" been of significant value to DEA. Warren Dep. at 21.   In addition, DEA's Deputy Assistant Administrator for Operations (DO) Douglas Wankel testified that Operation Princess yielded significant seizures for the United States. Wankel Dep. at 84, Pl.'s Mot. App. Tab 5.

---

[6]  DEA initially contacted Plaintiff in December 1991.  Plaintiff agreed to cooperate with DEA in early 1992, and although Plaintiff's role as a CI effectively ended in August 1995, DEA made award payments to her in 1997.

[7]  ASAC Salvemini was one of two ASACs who reported to the Special Agent in Charge of the DEA's Miami Field Division.  Cash Decl. ¶¶ 1-3., Def.'s App. at 90.

**ASAC Salvemini's Duties**[8]

  In his position as head of the Fort Lauderdale District Office (FLDO), ASAC Salvemini created the "Southeast Florida Regional Task Force," a group of local police chiefs from different counties in South Florida intended to focus on high echelon cases. Sal. Dep. II. at 11-12, Pl.'s Mot. App. Tab 4; Lees Dep. at 5. The Task Force worked on Operation Princess under ASAC Salvemini's direction. Once the local Florida police officers joined the Task Force, they were sworn in as federal agents, told they would have the same status as any federal DEA agent and followed the same guidelines as the federal agents. Morris Dep. at 9. James Hughes and Rick Morris were members of the Task Force and case agents on Operation Princess.[9]

  Agent Morris testified about the Task Force protocol as follows:

> [A]ll decisions were made by Joe Salvemini. . . .  At that point, he had an assistant who was a Fort Lauderdale sergeant, Tom Tiderington. And Tom Tiderington was probably in charge. His status was in charge of the day-by-day operation of the task force. . . But Salvemini was the, you know, head of DEA, the highest ranking DEA official and he made all the decisions.

Morris Dep. at 17-18; <u>see also</u> Pl.'s Dep. at 39-43.

**ASAC Salvemini's Promise to Plaintiff**

  Agents Morris and Hughes initially approached Plaintiff at her home "to solicit additional information and/or assistance with potential drug traffickers" based on information given to them by Plaintiff's ex-husband. Hughes Dep. at 9 -11. During one of her initial meetings with Agents Morris and Hughes, Agent Morris told Plaintiff that she "would meet the boss Salvemini and . . . that they would pay [her] 25 percent of money seized." Pl.'s Dep. at 22; Morris Dep. at 20-23 and 39-40. Plaintiff testified that ASAC Salvemini corroborated what Agent Morris had told her -- that she "would get 25 percent of the money seized." Pl.'s Dep. at 39. Agent Hughes testified that Plaintiff expected to receive a reward or an award, stating "that would have been her reason to provide information to the Government." Hughes Dep. at 41.

  ASAC Salvemini orally promised to pay Plaintiff 25 percent of the value of all confiscated

---

  [8] There is no position description or other document which describes an ASAC's duties in the record. According to records maintained by the Office of Acquisition Management of DEA, ASAC Salvemini was not granted a delegation of procurement authority by DEA between 1991 and 1994. Sisk Decl. ¶ 4, Def.'s App. at 92-93.

  [9] The case agent was responsible for preparing any necessary reports and attending court proceedings. Hughes Dep. at 16.

or seized funds or property, limited to $250,000 per seizure.[10]  Sal. Dep. I at 5-8, Pl.'s Mot. App. Tab 3; Pl. Dep at 40; Morris Dep. at 23; Lees Dep. at 46; Hughes Dep. at 41.  ASAC Salvemini testified:

> She was promised 25 percent of all seizures with a limit of a quarter of a million dollars per individual seizure.

> And if I may explain that.  If, let's say, we made a case on a particular individual and there was a $2 million seizure on that one case, the limitation would be a quarter of a million dollars.  Which would be the same limitation if we made a $1 million seizure.

Sal. Dep. I at 5-6, Pl.'s Mot. App. Tab 3.  ASAC Salvemini made these promises based upon his "practices and experiences in conducting investigations for DEA."  Id. at 8.

ASAC Salvemini understood that he had the authority to promise Plaintiff the 25 percent commission in his capacity as head of DEA's Fort Lauderdale District office.  He testified:

> Q.  Did you have the authority in [the Princess' case] to promise her the 25 percent?

> A.  I did promise her.  I mean, I'm not a lawyer and I'm not an expert in the statutes.  I did what I thought was right and what I understood to be the accepted practice in these situations as head of the Fort Lauderdale District Office and what was being done in other agencies.

>> You are asking me for a legal – I don't know.

> Q.  I was trying to see if there was one person that you cleared it through, someone who was higher.

> A.  Oh, in the sense that everything I did in this case was brought to the attention of the DEA Operations Division and Department of Justice attorneys.

> I mean, when you say "cleared it," did I go to the Department of

---

[10]  ASAC Salvemini placed the limitation on his promise because of a "statutory limitation," but he did not identify the statute to which he was referring.  Sal. Dep. I at 8; Pl.'s Mot. App. Tab 3.

ASAC Salvemini also promised Princess 10 percent of indirect seizures and anywhere from three to seven percent of the amount of money laundered.  Sal. Dep. I at 5-7, Pl.'s Mot. App. Tab 3.  An "indirect seizure," is a seizure that stems from a spinoff investigation.

Justice and say, "May I please do this"?  No, I did not.  But every time I paid her I sent a Teletype requesting authority and they sent me a Teletype back saying go ahead and do it.

Every time I came to Washington, D.C. for the Attorney General exemption meetings -- and I was required to come up here on a regular basis -- I would tell them what I was doing.

Id. at 17-18; see also Morris Dep. at 39-40.

## The Involvement of High Level DEA and DOJ Officials

### The Sensitive Activities Review Committee Meetings

In conjunction with its objective of reducing the flow of drugs into the United States, DEA established a committee, the Sensitive Activities Review Committee ("SARC"), to review activities that DEA viewed as warranting special attention, including drug-related money laundering activities. Warren Decl. ¶¶ 2-3, Def.'s App. at 81-82.  ASAC Salvemini, as lead agent on Operation Princess, traveled to Washington D.C. as often as twice a month to attend SARC meetings in which Operation Princess was the only topic on the agenda. Sal. Dep. II at 32, Pl.'s Mot. App. Tab 4; Wankel Dep. at 37-38, Pl.'s Mot. App. Tab 5; Tiderington Dep. at 29-30.  The SARC meetings involved discussion of the budget and expenses incurred during the investigation.  ASAC Salvemini and others would make a presentation regarding the investigation, and senior DEA and DOJ personnel would decide how the investigation would proceed.  Sal. Dep. II at 32, 34, Pl.'s Mot. App. Tab 4; Warren Dep. at 32; Tiderington Dep. at 29-30.

ASAC Salvemini testified that his promise to pay Plaintiff would have been brought up during these meetings. Sal. Dep. II at 38, Pl.'s Mot. App. Tab 4.  He explained:

A.  I would tell them everything I was doing and what we had planned on doing.  I mean, these were formal briefings.  And DEA attorneys were there.  People from Chief Counsel and DEA Operations Division people were there.  And Domestic Operations people were there.  And Foreign Operations people were there.  Lawyers were there from the Department of Justice.

[DAAG] Mary Lee Warren was there on occasions.  And if she wasn't there whoever was acting in her stead would be there.  I mean, there would be a room full of lawyers . . . .  And then there would be Intelligence people and this and that.

And we would tell them everything we were doing.  And nobody ever told me not to do it.  In fact, what they would do is come

6

back and say, okay, we approve you for another six months, or whatever the period of time was.

Q.  And that included the 25 percent promise, of course?

A.  Well, I certainly articulated it.  They didn't specifically come back and say it doesn't include the 25 percent.  They just told me to proceed.

Q.  And they gave you the green light to go ahead and continue?

A.  Well, I continued.  It's all a matter of record.  We did it.

Sal. Dep. I at 29-31, Pl.'s Mot., App. Tab 3; see Wankel Dep. at 34, Pl.'s Mot. App. Tab 5.  ASAC Salvemini testified that during the SARC meetings none of the high level DEA or DOJ officials advised him that he was not authorized to make this promise to Princess:

Q.  In a response to your informing the [SARC] group what your promises were - - and I'll assume that they were the 25 percent up to $250,000 for the sake of this question - - did anyone in that meeting say what are you doing, why did you make that promise, you're not allowed or authorized to do that?

A.  No.

Q.  At any time wherein you informed a superior of the arrangement you made with the Plaintiff, did any superior ever say to you you're not allowed to do that, you must rescind that offer or agreement?

A.  It didn't happen that way.

Q.  Okay.

A.  I never specifically informed a superior of something that we knew.  In other words, everybody knew what the caps were - -

Q.  Okay.

A.  - - so I - - it would be like me telling you when you go see Judge Jones tomorrow in court you must wear a jacket and tie.  Well, we all know that we wear jackets and ties in court.

So it - - during the course of the dialogue, well, she's expecting this

7

or she's expecting that.  But it wouldn't be oh, I want to advise you, Mr. Deputy Administrator, that I have - - because those were the caps. We knew what the policies were - -

. . . .

Q.  So it's your understanding that that was an acceptable policy that was enforced and was allowed to be utilized in terms of numbers when you made the agreement?

A.  I wouldn't say acceptable policy.

Q.  Okay.

A.  I would say my understanding of those commitments were they were within the parameters of what was done in cases like this.

Sal. Dep. II at 38-39, Pl.'s Mot., App. Tab 4.  Plaintiff believed that ASAC Salvemini obtained clearance from officials in Washington D.C. for compensating her.  She testified:

Q.  Do you know who Mr. Salvemini's boss was or supervisor?

A.  No.  It was always high-scaled Washington authority.  I do know that he never made a decision, as far as I know, without consulting to -- I don't know who in Washington.  Every time I was going to take a plane to anywhere, it was clearance from Washington.   So everything that I was doing, I know it was approved by Washington. . . .

Q.  Do you remember Mr. Salvemini ever giving you money without getting clearance from Washington?

A.  I don't think so.  He always got clearance . . . because even for my check every month, there were times that it was late, very late, because Washington hasn't given the authorization.  Never, never gave me money without authorization from Washington.

Id. at 39-44.

## DEA Officials

DEA's Special Agent in Charge (SAC) of the Miami Field Division at this time, Thomas Cash, was aware of Princess' activities.  He testified in a declaration:

I never received a proposal from Mr. Salvemini that DEA commit itself in advance to pay plaintiff, or any other confidential informant, a percentage of future cash forfeitures or of future monies laundered.

A proposal such as that, described in the preceding sentence, could not have been presented to the Sensitive Activities Review Committee by Mr. Salvemini or the Ft. Lauderdale field office without my approval.  I never approved such a proposal.

I would have remembered such a proposal because I was responsible for the budget for the Miami office (and for the Offices that reported to it) and because such an arrangement would be fraught with hazards for the prosecution of criminal cases.

Decl. of Thomas V. Cash (Dec. 28, 2003) (Cash Decl.) ¶¶ 5-7; Def.'s App. at 41-42.[11]

Douglas Wankel, DEA's Deputy Assistant Administrator for Operations during the Princess Operation, was Chairman of the SARC and regularly attended the SARC meetings regarding Plaintiff's operations, but has no recollection of learning about the promise for the 25 percent commission. Wankel Dep. at 14, 20, 34, Pl.'s Mot. App. Tab 5.[12]  Deputy Assistant Administrator Wankel testified:

> Q.  During the time that you were directly involved, at any time did you inquire to [Salvemini] or whomever was bringing the proposal what the compensation agreement was, if any, with the Princess?

---

[11] SAC Cash was not deposed and did not explain why such a "proposal" would have been necessary, and it is unclear how the requirement for such a proposal squares with ASAC Salvemini's testimony that his promise to Princess "was within the parameters of what was done in cases like this." Sal. Dep. II at 39, Pl's Mot. App. Tab 4.  Further, the record suggests that a proposed operational plan may have been circulated to SAC Cash and others.  A request for an Attorney General's exemption dated November 10, 1994, from ASAC Salvemini to Gregory Passic, Chief, DEA Headquarters, "through SAC Thomas V. Cash and Associate SAC Paul C. Higdon," referenced an "FLDO proposed operational plan for Operation Princess," but that plan is not in the record.  Pl. Mot. App. Tab 5, Ex. 10.  Further, a request for an award payment for Plaintiff was submitted by Agent Hughes through SAC Cash.  Pl. Mot. App. Tab 5 Ex. 3.

[12] James Whetstone, the Deputy Assistant Administrator for the Office of Acquisition Management of DEA during the pertinent time period, supervised and monitored contract activities of DEA headquarters and field offices.  Whetstone Decl. ¶ 2.  Mr. Whetstone stated that he "did not ratify any unauthorized commitments to make an award or commission payment to the informant designated SGS-92-X003 on behalf of DEA."  Whetstone Decl. ¶ 3.

> A.  I don't recall that I ever discussed that with [Salvemini], no.
>
> Q.  Why not?
>
> A.  Because like I said, [Salvemini], first of all, reported to the special agent in charge, Cash, most of the time, I'm not sure it came out -- and also dealt with Bobby Navus[13] who was the senior executive service official reporting to me who had the oversight for all of those investigations and all of that stuff.  So he had direct contact with Mr. [Salvemini], he and his staff.  So, I would not have seen necessary for me to usurp or to second guess Mr. Navus' determinations and judgment in that regard.

Id. at 39.[14]

Deputy Assistant Administrator Wankel also testified that ASAC Salvemini had the authority to pay informants up to a certain limit:

> Q.  Now, it is my understanding that the ASAC in Fort Lauderdale at the time, and it was Joe [Salvemini], had certain authority where he could up to a certain limit pay informants for purchase of evidence, purchase of information?
>
> A.  That's my recollection, yes.
>
> Q.  And then if there was a request for -- or if he exceeded that or was going to exceed that authority, he would have to go to headquarters to request permission to exceed that amount?
>
> A.  Yeah, probably through his ASAC in Miami to headquarters.
>
> Q.  Did that ultimately come to you as the deputy administrator for operations for approval or denial? . . . Using an excess amount over the $25,000 -- at that time $25,000 limit?

---

[13]  There is no testimony from Bobby Navus in the record.

[14]  However, DEA records indicate that DO Wankel approved an award of $100,000 to Princess on August 23, 1994 and that DEA Administrator Constantine approved an award of $966,000 to Plaintiff on June 27, 1996, after a briefing by DO Wankel.  (Memorandum from Harold D. Wankel, Chief of Operations, on Award Payment to SGS-92-X003 to James Milford, SAC, Miami Field Division, July 8, 1996.  This memo is not in the record, but is discussed in DO Wankel's deposition.).  Deposition of DO Wankel at 65.

> A.  I don't know if those were -- I don't recall if they would have all come to me or not.  At some level it would have, but it could be that this gentleman I referred to as Bobby Navus would have had some authority too, but I just don't recall.

Id. at 22-23.

Thomas Constantine, the Administrator of DEA during Operation Princess, received reports from Deputy Administrator Wankel, who would brief him on major cases, but does not remember hearing about Plaintiff's investigation until after Plaintiff had been kidnapped, near the end of her tenure with DEA.  Constantine Dep. at 17, 30, Pl.'s Mot. App. Tab 7.[15]

Administrator Constantine asked DAAG Mary Lee Warren to draft an "analysis of what types of money had been paid to confidential sources in other cases and in other places."  Constantine Dep. at 35, Pl.'s Mot. App. Tab 7.  DAAG Warren authored a memorandum dated Nov. 15, 1995, indicating that the Princess Operation was "in the category of the larger DEA investigations at the time."  Warren Dep. at 10-11.  Although this memorandum was discussed during Administrator Constantine's and DAAG Warren's depositions, it is not in the record.  See, Constantine Dep. at 35, Pl.'s Mot. App. Tab 7; Warren Dep. at 10.

## DOJ Officials

During Operation Princess, DAAG Mary Lee Warren attended at least one SARC meeting regarding Plaintiff's investigation, and she recalled a presentation with an overhead projector showing a list of drug dealers with whom plaintiff allegedly had contacts.  Warren Dep. at 5-6; Warren Decl. ¶¶ 6-8; Def.'s App. at 34-35.; Tiderington Dep. at 29; Lees Dep. at 32.   DAAG Warren did not recall hearing about Plaintiff's financial arrangements and thought she would have recalled a promise to pay Plaintiff a percentage of future cash seizures and money laundered because such a commitment could complicate or compromise prosecutions and "would have been a departure from DEA's standard practice, which was to wait to determine whether the CI should be paid an award (and, if so, how much he/she should be paid) until an operation is concluded and all relevant information gathered."  Warren Decl. ¶¶ 6-8, Def.'s App. at 34-35.  She testified further:

> Q.  So it's fair to say that in the SARC meetings, to the best of your recollection, the issue of compensation was never brought up with regard to what was either promised or expected by the Princess?
>
> A.  No.  I'm not saying that.  Typically a compensation or other arrangement would be discussed.  I just don't recall that here.

---

[15]   After learning about Plaintiff's kidnapping, Administrator Constantine's concerns involved the safety of Plaintiff, the issue of Plaintiff working in Columbia and the policy of the Government not to pay a ransom for hostages.  Constantine Dep. at 34, Pl.'s Mot. App. Tab 7.

Warren Dep. at 14; see also Warren Decl. ¶¶ 6-8, Def.'s App. at 83-84.[16]

The Attorney General was briefed on drug enforcement matters by Administrator Constantine and DAAG Warren.  Reno Decl. ¶ 6, Def.'s App. at 38-39.  Attorney General Reno did not recall learning about Plaintiff during the Princess Operation, except that she "may have been informed … that a confidential informant had been kidnapped" but did "not have a clear memory on the point." Id. ¶ 9; see also Warren Decl. ¶¶ 9-10, Def.'s App. at 35; Warren Dep. at 8.  ASAC Salvemini testified that he was told repeatedly that Attorney General Reno was briefed on the Princess operation by a number of people "at the associate SAC level down in Miami, also at . . . the desk chief's level." Sal. Dep. II at 36, Pl.'s Mot. App. Tab 4.

**The DEA Agents Manual**[17]

According to the DEA Agents Manual Section 6612.43, there were three circumstances in which payments to an informant could be made:

---

[16]   DAAG Warren was unaware of the provision in the DEA Manual Section 6612.43 allowing DEA to pay an informant a commission based upon some percentage of the monetary value of the seizures.  Warren Dep. at 18.

[17]   Defendant objected to producing portions of the DEA Agents Manual, arguing first that the Agent's Manual was confidential and then that the manual in effect at the time pertinent to this action could not be located.  Tr. (Mar. 3, 2004) at 3,8; Def.'s Notice Concerning Agents Manual, at 1.  The Court ordered Defendant to search for the Manual and to provide affidavits from the appropriate custodians of records, stating:

> Defendant shall treat Plaintiff's Request for Production of Documents . . .as interrogatories, and identify the custodian of the records or employee who produced the records, and comply fully with RCFC 33(b). . . . Because Defendant has had difficulty ascertaining whether any portions of the DEA Agent's Manual in effect during the operation at issue still exist, Defendant shall request a sampling of DEA's field offices to search for such manuals, and investigate whether the agency's archives or record retention facility possess the Manual.  Counsel for Defendant will report on this at the next telephonic conference.

Order of June 22, 2004.

Excerpts from the Manual in effect during the years 1991 through 1997 were produced under protective order.  Pl's Mot. for Sum. Judg. at ii ¶ 7; Def.'s Mot. to Amend Court's March 4, 2004 Order, Att. A; Order of July 30, 2004.

1)   Payments for information and/or active participation

2)   SAC-approved payments of up to $25,000 per informant per quarter

3)   Payments for Informant Protection

Pl.'s Ex. 2 at 219.

The first provision, DEA Manual Section 6612.43(A), "Payments for Information and/or Active Participation," stated:

> When an informant assists in developing an investigation, either through supplying information or actively participating in it, he may be paid for his services either in a lump sum or in staggered payments.  As well, <u>DEA can pay an informant a commission based upon some percentage of the value of cases he provides</u>.  However, because such payments are highly unusual, the following precautions are required:
>
> 1.  Informants paid on a commission basis should be instructed in advance concerning the Law of Entrapment;
>
> 2.  The fee arrangement should be discussed with the informant in detail; there should be no gaps in understanding the terms of the arrangement;
>
> 3.  The usual instructions to the informant, the details of the fee arrangement and the Entrapment instructions should be provided to the informant in writing at the beginning of the operation;
>
> 4.  Every effort should be made to maximize the control and supervision of the informant;
>
> 5.  Every effort should be made to corroborate the informant's statements concerning his activities;
>
> 6.  Payments should be completed before the informant testifies;
>
> 7.  We should be prepared to give reasons why it is necessary to use informants in this unusual manner.

13

Pl.'s Ex. 2 at 219.

Second, Section 6612.43(B) addressed SAC-approved payments as follows:

> The SAC . . . is authorized to approve payments up to $25,000 per informant per quarter. Amounts beyond $25,000 must be approved by the Deputy Assistant Administrator for Operations (DO). Requests and responses will be documented via teletype.

> Payments for information leading to a seizure, with no defendants should be held to a minimum.

Pl.'s Ex. 2 at 219.

Third, Section 6612.43(c) authorized payments for informant protection and permitted DEA to "absorb the expenses of relocation" if an informant could not enter the witness protection program. Pl.'s Ex. 2 at 219-20.

A separate provision of the DEA manual, Section 6612.44 governed award payments from the DOJ Asset Forfeiture Fund. Pl.'s Ex. 2 at 220. Subsection A, Type of Awards, provided for payments of two types of awards reimbursable from the DOJ's AFF: 1) payments of up to $250,000 for information or assistance directly relating to violations of federal criminal drug laws, and 2) payments for information or assistance leading to a civil or criminal forfeiture in amounts based upon the value of the forfeiture. Id. at 220-21. Subpart B of this Section delineated the process for applying for and calculating awards f rom the AFF. Id. at 221-23. Subpart C of this Section, entitled Award Payments from the AFF, contained the following prohibition against promising awards:

> Offices must not promise any awards in any amount to an individual. The statutory authority provides that the payment of such awards is purely discretionary. In preparing the recommendation for award, the SAC or Country Attache should ensure that proper discretion is exercised. Similar circumstances should warrant similar awards. Therefore, special attention should be given to the factors stated in Agents Manual Section 6612.41(B) and 6612.44(B)(2) as a means of recommending an award consistent with the total circumstances of the involvement of the individual.[18]

---

[18] The referenced Sections required that the amount of payment be commensurate with the value of services and information provided, taking into consideration the level of the targeted operation, the amount of the seizure and the significance of the informant's contribution. Pl.'s Ex. 2 at 218.

Id. at 223.

The DEA Agents Manual also stated that investigations directed against the same targeted group, in which it was anticipated that projected expenditures would exceed $500,000 "through any combination of PE/PI and operating costs" could only be continued with prior Headquarters approval. DEA Manual 6134, Pl.'s Mot. App. Tab 2.   The record does not establish whether such prior Headquarters' approval was sought or obtained here.

**The Attorney General's Exemption**

DAAG Warren explained the Attorney General's exemption in general as follows:

> The term "Attorney General's exemption" refers to the approval by the Attorney General or his/her delegatee of a proposal by DEA for authority to engage in certain activities in support of an undercover operation.   Congress, in annual appropriations legislation, has typically provided that DEA, with the approval of the Attorney General, may use appropriated funds for activities in furtherance of undercover operations such as leasing office space and establishing and operating business entities.   Congress has also typically provided that DEA, with the approval of the Attorney General, may deposit proceeds from undercover operations in bank accounts and may expend such proceeds for the necessary and reasonable expenses of the undercover operation.   In early 1999, the Attorney General delegated final exemption authority to me.   Thus, from at least mid-1993 to the present, I have had either final authority over DEA's requests for Attorney General exemptions or authority to make recommendations to the Attorney General.

Warren Decl. ¶ 11, Def.'s App. at 35-36; see also Warren Dep. at 23-24.

ASAC Salvemini explained how the Attorney General's exemption worked in this case:

> I had what's called an Attorney General's exemption.   We had gone to DEA Headquarters with the Department of Justice and gotten an exempt account.   And I had a large pool of money that I also could access for the specific case that I was working on.
>
>               . . . .
>
> Well, when you get into certain areas, very high-echelon type activities in the money laundering field, it becomes problematic to – and I'll use my parlance here – run with the traffickers, if you will,

because of financial constraints.  The government simply doesn't have the money to do what the bad guys do and to pursue the investigations.

So what we do is, we write [it] up and we request an exemption from the Attorney General, which permits us to conduct certain activities which would normally be considered illegal activities; that is, flushing money through bank accounts and washing money, if you will, laundering money.

And it also permits us to take some of the money we handle as part of the money-laundering process and use it for law enforcement purposes.  And there were a lot of things that I was permitted to do in that regard.

Q.  What [were] they?

A.   Well, they ranged from payments that I would make to the informant, in this case [the Princess].  They range from my being able to purchase equipment that was necessary for the investigation, for example, special surveillance cameras, audio equipment.   They ranged from travel that any of us who were involved in the investigation would do.

. . . .

In other words, I could go beyond what my normal budget would be.  And how I would go beyond it would be by using trafficker funds.  And I had to go to the Attorney General for permission because she's the only one that could give that.

Sal. Dep. I, 12-17, Pl.'s Mot. App. Tab 3.

The grant of an Attorney General's Exemption was memorialized in a memorandum from ASAC Salvemini to Gregory Passic, Chief, DEA Headquarters, through SAC Thomas V. Cash and Associate SAC Paul C. Higdon, dated November 10, 1994, stating:

Subject: Request for Attorney General's Exemption
Operation Princess

During the meeting of the Special Activities Review Committee (SARC) held on August 25, 1994 at DEA Headquarters, a decision was made to grant a new exemption for subject case, independent of

16

that previously in existence for Operation [PICES].

As instructed by the SARC, forwarded herewith is the FLDO proposal/operational plan for Operation PRINCESS.

Pl.'s Mot. App. Tab 5 Ex. 10.  This memorandum suggests that an Attorney General's exemption had previously been granted for Operation Pices, but the referenced exemption for Operation Pices is not in the record.  Id.  Warren Dep. at 26-27.  Nor is the referenced "FLDO proposal/operational plan for Operation Princess" in the record.  Id.

## Plaintiff's Salary and Expenses

According to DEA records, Plaintiff's salary and expenses were paid pursuant to DEA Manual Section 6612.43(B), and Headquarters granted authority to the FLDO to pay Plaintiff's monthly salary and expenses when they exceeded the quarterly limit of $25,000.  Pl.'s Opp'n. App. at 1-50, 115-16.

## Plaintiff's "Reward" Payments

DEA paid Plaintiff "rewards," citing DEA Manual Section 6612.43(B), which allowed quarterly payments to informants of up to $25,000 approved by the SAC and larger sums approved by the DO.  Specifically, payment vouchers in the record and the Informant Payment Record indicate that Plaintiff received six reward payments as follows:[19]

---

[19]  There is no accounting in the record of award or reward payments made to Plaintiff, and the records of payments to Plaintiff are unclear.  The Informant Payment Record, DEA Form 356, contains handwritten entries under four columns which list the date of payment, amount of payment, reason for payment, and last name of the individual who entered the information in the record.  Pl.'s Mot. for Sum. J., Ex. 9.  The Informant Payment Record is not consistent with the payment vouchers and teletype communications in the record.  Some of the payment vouchers reflect payments not listed in the Informant Payment Record, and the Informant Payment Record lists one payment which does not correspond to any teletypes or payment vouchers in the record.  Pl.'s Opp'n. App. at 65-66; Pl.'s Mot. App. Tab 5.

| Date | Amount | Description | Fund | Approving Supervisor |
|---|---|---|---|---|
| 3/12/92 | $15,000 | reward for seizure of 397 kilograms cocaine, 1 ounce heroin and the arrest of 3 class one violators | Imprest Fund[20] | G/S Tiderington |
| 8/28/92 | $8,000 | reward for 8/21/92 money pick-up | Pices Fund | G/S Tiderington |
| 10/6/92 | $20,000 | voucher illegible | Pices Fund | illegible |
| 10/28/92 | $5,000 | reward for money pick-ups | Pices Fund | illegible |
| 7/14/93 | $10,000 | reward for information leading to the seizure of $766,133 on 6/23/93 | Pices Fund | ASAC Salvemini |
| 9/30/93 | $25,000 | reward for information leading to seizure of $400,000 US currency on 9/23/93 and 9/24/93. | PE/PI - O.C. 2534 | G/S Tiderington |

Pl.'s Opp'n. App. at 59, 110, 121; Pl.'s Mot. Compel App. Tab 3 at 192, 196, 197, 200.

**Plaintiff's "Award" Payments**

Three requests were submitted to DEA Headquarters seeking award payments for Plaintiff.[21] Pl.'s Mot. App. Tab 6.; Sal. Dep. I at 23, Pl.'s Mot. App. Tab 3. Pl.'s Mot. App. Tab 6. The first, submitted in October 1993, recommended an award of $250,000, and DO Wankel granted partial approval for an award of $100,000. Pl.'s Mot. App. Tab 3, Ex. 3

---

[20] The appropriation section of this payment voucher is redacted. Pl.'s Opp'n. App. at 110. The term "imprest fund" is stamped across this voucher. Pl.'s Opp'n. App. at 110. The Imprest Fund is referenced in the DEA Manual as follows: "Offices having approval to make award payments from the Fund will be issued a fund cite by OMGB in the amount of the approved award. Payments may be made from the office's Imprest Fund or funds for payment may be wire transferred utilizing the Federal Reserve Bank system." DEA Manual 6612.44(B)(7), Pl.'s Mot. App. Tab 2.; Pl.'s Opp'n. App. at 122, 90.

[21] One request was submitted by James Hughes, one of the Task Force agents who worked under ASAC Salvemini, through SAC Cash. A second request (December 1993) did not indicate the name of the requesting agent.

18

In December 1993, another request for an award payment in the amount of $250,000 was made for Plaintiff.[22]  Pl.'s Mot. App. Tab 6.  As of February 22, 1995, this request remained pending, and ASAC Salvemini sent a letter dated February 22, 1995, to the Assistant DO at DEA Headquarters asking for immediate approval of the $250,000 award payment:

> Now, two years since this case's inception, the success of this investigation in meeting with its goals and objectives in this regard is measurable, and has been said to be unparalleled.  The accomplishments that have been realized to date are well documented and have been the subject of countless briefings of both DEA and DOJ officials at the highest levels.
>
> Simplistically recounted, however, efforts in this case over the last two years have thus far led to the arrest of five major Columbia based, TKO related traffickers including one DEA fugitive; the development of viable, prosecutable cases against approximately 30 other major Columbia based, TKO related traffickers; the development of viable, prosecutable cases against an additional 50+ cellheads and couriers in the United States, Europe and Canada; the seizure of approximately 23 million dollars of drug proceeds from traffickers; and the initiation of over 20 "spin-off" investigations, netting drug seizures and. . . additional arrests and potential arrests; notwithstanding the invaluable intelligence of an operational, strategic, and national security nature, that has been consistently developed and disseminated throughout the course of this case.
>      . . . .
>
> As of February 13, 1995, [the Princess] has been paid the following:

| | |
|---|---|
| Salary | $270,000.00 |
| Operational Expenses | 196,951.58 |
| Rewards | 183,000.00 |

>      . . . .
>
> In view of the above, it is requested that immediate approval be granted by [DEA] Headquarters for the $250,000.00 award to SGS-92-X003 that currently remains pending, and that favorable action be taken on subsequent requests for awards for this CI as fair and just

---

[22]  ASAC Salvemini's February 22, 1995 letter to the DO stated that both the October 1993 and December 1993 award requests for Plaintiff were "reviewed and approved by the FLDO Group Supervisor, the FLDO ASAC, the Miami Associate SAC, and the Miami SAC prior to submission." Pl.'s Mot. App. Tab 6.

compensation for services rendered.

Id.

The vouchers in the record reflect that Plaintiff received three "award" payments from DEA, -- the first two awards for $100,000 and $249,000 were paid from the Asset Forfeiture Fund.  Pl.'s Mot. to Compel Tab 3 at 55, 68.  The third and final award to Plaintiff totaled $966,000 and was made in ten installments from either the AFF or the Operation Pices fund.  ASAC Salvemini testified that although he recommended a payment of $2 million dollars based on Plaintiff's overall performance as a CI, representatives of DOJ and the Attorney General's Office determined that Plaintiff deserved an award of just under a million dollars based on the amount of money seized, the arrests made in the course of the investigation, and various other factors.  Sal. Dep. I at 23-24, Pl.'s Mot., App. Tab 3; Sal. Dep. II at 44, Pl.'s Mot. App. Tab 4.  In a letter to the SAC of the Miami Field Division, James Milford, Douglas Wankel, DEA's Chief of Operations, stated:

> On June 27, 1996, after a briefing by myself and Chief of Domestic Operations Donnie Marshall, Administrator Constantine approved an award payment of $966,000 for [Plaintiff].  This payment will be accomplished over a two-year period.  I have been advised that Operation [Pices] is capable of allocating $350,000 to this award at the present time.  Please consider this memo as Headquarters approval for the payment of $350,000 to this CS . . .

Memo from Wankel to James Milford, SAC, Miami Field Division (Jul. 8, 1996).

The following is a summary of award payments Plaintiff received between August 23, 1994, and April 17, 1997, including the installments comprising the $966,000 award:

| Date | Amount | Fund | Approving Supervisor[23] |
|------|--------|------|----------------------|
| 8/23/94 | $100,000 | Asset Forfeiture Fund | G/S Tiderington |
| 5/1/95 | $249,900 | Asset Forfeiture Fund | G/S Tiderington |
| 7/12/96 | $350,000 | Operation Pices Fund | ASAC Salvemini |
| 10/31/96 | $ 15,000 | Asset Forfeiture Fund | ASAC Salvemini |
| 10/31/96 | $ 10,000 | Asset Forfeiture Fund | ASAC Salvemini |
| 10/31/96 | $ 10,000 | Asset Forfeiture Fund | ASAC Salvemini |

---

[23] The Approving Supervisor is indicated by signature on the payment voucher, but it is not clear from the record what the role of the Approving Supervisor was.

20

| 11/14/96 | $    4,200 | Asset Forfeiture Fund | ASAC Salvemini |
| 11/14/96 | $  50,000 | Asset Forfeiture Fund | ASAC Salvemini |
| 12/20/96 | $139,200 | Asset Forfeiture Fund | ASAC Salvemini |
| 12/20/96 | $139,200 | Asset Forfeiture Fund | ASAC Salvemini |
| 4/17/97 | $139,200 | Asset Forfeiture Fund | ASAC Salvemini |
| 4/17/97 | $139,200 | Asset Forfeiture Fund | ASAC Salvemini |

Pl.'s Oppn. App. at 51-112.

## Plaintiff's Abduction

On August 31, 1995, Plaintiff was kidnapped in Columbia and held until December 15, 1995. Pl.'s Dep. at 35. Plaintiff testified that she was told that the Attorney General declined to pay the ransom demand but she could not remember by whom. Id. Agent Lees testified that he and other agents "were essentially trying to establish a fund that could be used" to pay Plaintiff's ransom or for Plaintiff upon her return. Lees Dep. at 34-37; see also Tiderington Dep. at 49-51.

## Discussion

## The Alleged Contract For Commissions

### Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rules of the United States Court of Federal Claims 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). A fact is material if it may affect the outcome of the suit. Anderson, 477 U.S. at 248. The moving party bears the initial burden of proof and may discharge its burden by demonstrating an absence of evidence to support the opposing party's case. Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562-63 (Fed. Cir. 1987); Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970). When considering cross-motions for summary judgment, courts evaluate each motion on its own merits and resolve any reasonable inferences against the moving party. Mingus, 812 F.2d at 1390-91. Denial of both motions is warranted if genuine disputes exist over material facts. Id. at 1391 ("The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts."). Cross-motions for summary judgment are not an admission that no material facts remain at issue. See Massey v. Del Labs., Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997) (citations omitted). "Each party carries the burden on its own motion to show entitlement to judgment as a matter of law after demonstrating the absence of any genuine disputes over material facts." Id.

Summary judgment is also inappropriate if the factual record is insufficient to allow the Court to determine the salient legal issues.  Mansfield v. United States, 71 Fed. Cl. 687, 693-94 (2006); Statesman II Apts., Inc. v. United States, 66 Fed. Cl. 608, 624 (2005) (denying summary judgment because record was insufficient for Court to construe term "material differences"); H.N. Wood Prods., Inc. v. United States, 59 Fed. Cl. 479, 486 (2002) ("the better course is to proceed to trial because the Court lacks a sufficient factual record to determine whether or not the Forest Service's suspension of H.N. Wood's Contract violated the implied duty to cooperate and not hinder or was otherwise per se unreasonable").

## Implied-in-Fact Contract

Plaintiff alleges that ASAC Salvemini entered into an oral implied-in-fact contract binding on the Government agreeing to pay her 25 percent of the value of all funds or property she assisted DEA in confiscating.  "An agreement implied in fact is 'founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'"  Hercules Inc. v. United States, 516 U.S. 417, 424 (1996)(quoting Baltimore & Ohio RR. Co. v. United States, 261 U.S. 592, 597 (1923)); see also Flexfab, L.L.C. v. United States, 424 F.3d 1254, 1259 (Fed. Cir. 2005); La Van v. United States, 382 F.3d 1340, 1346 (Fed. Cir. 2004).  In order to prove an implied-in-fact contract with the Government, Plaintiff must demonstrate: (1) mutuality of intent; (2) consideration; (3) lack of ambiguity in the offer and acceptance; and (4) actual authority to bind the Government in contract on the part of the Government representative whose conduct is relied upon.  Flexfab, 424 F.3d at 1258; see Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947).

The Government bases its motion for summary judgment solely on the issue of authority.  Specifically, the Government argues that ASAC Salvemini lacked express or implied actual authority to obligate DEA to the alleged agreement and that no DEA or DOJ officials with contracting authority ratified ASAC Salvemini's promise.  Therefore, in determining whether the alleged contract existed, the Court will  focus on whether ASAC Salvemini possessed the requisite authority to bind the Government and whether ASAC Salvemini's promise was ratified.  See H. Landau & Co. v. United States, 886 F.2d 322, 324 (Fed. Cir. 1989) (limiting inquiry to whether government officials possessed binding authority); see also Roy v. United States, 38 Fed. Cl. 184, 187-88 (1997) ("A finding of lack of authority would render the purported contract at issue unenforceable.  Rather than focusing on the alleged offer, acceptance, and intent to be bound, the court therefore concentrates on the existence vel non of authority.").

## Express Authority

Actual authority may be express or implied.  Anderson v. United States, 344 F.3d 1343, 1353 n.3 (Fed. Cir. 2003).  A Government agent possesses express actual authority to bind the Government in contract only when the Constitution, a statute, or a regulation grants it to that agent in unambiguous terms.  Tracy v. United States, 55 Fed. Cl. 679, 682 (2003) (citing McAfee v. United States, 46 Fed. Cl. 428, 435 (2000); Starflight Boats v. United States, 48 Fed. Cl. 592, 598 (2001); Roy, 38 Fed. Cl.

at 188); <u>accord</u>, <u>City of El Centro v. United States</u>, 922 F.2d 816, 820 (Fed. Cir. 1990) ("The issue is not whether some authority exists which prohibits [the agent] from binding the Government in contract; rather, the issue is whether [the agent] has been granted the authority to affirmatively obligate the Government.").

In the present case, Plaintiff claims that an implied-in-fact contract exists based on ASAC Salvemini's promise to her to pay her 25 percent of seizures made by DEA as a result of information she provided, up to a limit of $250,000 per seizure.  However, Plaintiff has failed to identify any statutory or regulatory authority which grants ASAC Salvemini such authority in unambiguous terms.

In contrast, the law is clear that ASAC Salvemini lacked the authority to promise Plaintiff a commission paid from the Asset Forfeiture Fund (AFF).  The statute governing the AFF during the relevant timeframe, 28 U.S.C. § 524, provided:

> <u>Any award paid from the [Asset Forfeiture] Fund for information . . .</u>
> <u>shall be paid at the discretion of the Attorney General or his delegate</u>,
> under existing departmental delegation policies for the payment of
> awards, except that the authority to pay an award of $250,000 or more
> shall not be delegated to any person other than the Deputy Attorney
> General, the Associate Attorney General, the Director of the Federal
> Bureau of Investigation, or the Administrator of the Drug Enforcement
> Administration. Any award for information pursuant to paragraph
> (1)(B) shall not exceed $250,000. Any award for information pursuant
> to paragraph (1)(C) shall not exceed the lesser of $250,000 or one-
> fourth of the amount realized by the United States from the property
> forfeited.

28 U.S.C. § 524(c)(2).  <u>See</u> <u>Salles v. United States</u>, 156 F.3d 1383, 1384 (Fed. Cir. 1998) ("stating that the Comprehensive Forfeiture Act of 1984, 28 U.S.C § 524(c) "does not authorize payment promises providing for a percentage of all seizures"); <u>Brunner v. United States</u>, 70 Fed. Cl. 623, 641 (2006); <u>Khairallah v. United States</u>, 43 Fed. Cl. 57, 63-64 (1999) (determining that DEA field agents lacked implied actual authority to promise an award to an informant based on the outcome of a mission based on the procedure "set out in Section 524 [of Title 28]"); <u>Cruz-Pagan v. United States</u>, 35 Fed. Cl. 59-60 (1996) (refusing to enforce an alleged promise to pay an award of 25 percent of the value of any property seized or forfeited from the Asset Forfeiture Fund, 28 U.S.C. § 524 because the "statutory authority provided that the payment of such award is purely discretionary.").  Recognizing this obstacle, Plaintiff does not seek payment of her promised commission from the Asset Forfeiture Fund.  Instead, Plaintiff seeks payment pursuant to Section 6612.43 of the DEA Manual,  which provides that "DEA can pay an informant a commission based upon some percentage of the value of cases he provides."  Unlike Section 6612.44 of the DEA Manual which addresses payments from the AFF, this Section does not prohibit an "office" or an agent from promising such a commission.

However, the Section of the DEA Manual authorizing payment of commission is silent with

regard to what level DEA official may pay an informant such a commission. The provision characterizes commissions as "highly unusual" and contains eight precautions for dealing with the informant in this circumstance, -- relating to instructions regarding entrapment and putting the fee arrangement in writing at the outset -- but does not shed any light on who within DEA is authorized to enter into an arrangement for such a commission.[24]  Because this provision of the DEA Manual is unclear as to whether ASAC Salvemini was authorized to promise a commission to Plaintiff, it certainly does not constitute an unambiguous grant of express actual authority to bind the Government even if the Court were to accept the DEA Manual as a "regulation."[25]  Because Plaintiff has failed to cite a statute or regulation which unambiguously grants the authority to ASAC Salvemini to promise Plaintiff the commission, Plaintiff failed to establish that he had actual authority to enter into this contract.

### Implied Actual Authority

Plaintiff argues that ASAC Salvemini possessed implied actual authority to contract on behalf of the Government with Princess based upon his position as an ASAC and his status as the director of Operation Princess.

A government official with implied actual authority can bind the government "when such authority is considered to be an integral part of the duties assigned to a government employee." H. Landau & Co., 886 F.2d at 324 (quoting Cibinic & Nash, Formation of Government Contracts 43 (1982)); see also Leonardo v. United States, 63 Fed. Cl. 552, 557 (2005), aff'd, 424 F.3d 1254 (Fed. Cir. 2005); Roy, 38 Fed. Cl. at 189; Cruz-Pagan, at 63 (stating that contracting authority must be "necessary or essential" to carrying out those assigned duties to be "integral"); Doe v. United States, 58 Fed. Cl. 479, 485 (2003).

Contracting authority is integral to an employee's duties when the employee cannot perform his assigned tasks without such authority and when the relevant agency's regulations do not grant the authority to other agency employees. See Leonardo, 63 Fed. Cl. at 557, aff'd, 424 F.3d 1254 (Fed. Cir. 2005) (citing Flexfab, LLC v. United States, 62 Fed. Cl. at 148; see also Roy, 38 Fed. Cl. at 189; at 190 n.18 (noting that express actual authority to make and approve payments could be the predicate for the implied authority to contract).

In the instant case, the record does not permit a finding of whether ASAC Salvemini had implied actual authority. A genuine issue of material fact exists as to what ASAC Salvemini's duties

---

[24]  This provision of the Manual is curious in that it purports to be both mandatory and discretionary at the same time by providing that the eight precautions are "required," but then stating in each precaution what "should" be done. Pl.'s Ex. 2 at 218-19.

[25]  The Brunner Court recognized that the DEA Manual was not a published regulation. Consistent with the view that the Manual is not public information, Defendant in this case sought a Protective Order covering the provisions of the DEA Manual. 70 Fed. Cl. at 645.

were.  The job description for an ASAC is not in the record.  The record is unclear as to whether the ability to promise an undercover informant commissions was essential to ASAC Salvemini's duties as head of DEA's Ft. Lauderdale Office, director of Operation Princess, and head of the South Florida Drug Task Force.  Further, it is unclear whether or how the grant of an Attorney General's exemption impacted his duties with respect to Operation Princess.  On one hand, agents who worked under ASAC Salvemini on the Task Force believed he had the authority to promise the commission; ASAC Salvemini believed that this authority was within his job duties as head of the Ft. Lauderdale office and director of Operation Princess and that his commitment to Princess was "within the parameters of what was done in cases like this."  Salvemini Dep. II at 38-39.  On the other hand, high level officials at DEA and DOJ did not believe that ASAC Salvemini could have promised Plaintiff commissions of this magnitude on his own.  DO Wankel, SAC Cash and DAAG Warren testified that they had no recollection of a promise of a commission.  SAC Cash testified that he would have had to approve ASAC Salvemini's "proposal" to pay Plaintiff a percentage of future cash forfeitures or monies laundered before such a proposal could have been presented to the SARC, and he never granted such approval.  Cash Decl. ¶¶ 5-7; Def.'s App. at 90-91.  DAAG Warren and DO Wankel testified that such a promise would have been highly unusual and could have compromised criminal prosecutions.[26]  This divergent testimony raises a genuine issue of material fact as to whether the ability to promise Plaintiff the commission was essential to ASAC Salvemini's day-to-day job functions in supervising informants and running the Task Force and Operation Princess with an Attorney General's exemption.  See Philadelphia Suburban Corp. v. United States, 217 Ct. Cl. 705, 707 (1978) (finding that a trial was necessary to determine the authority of government personnel and whether an implied-in-fact contract arose).

The level of ASAC Salvemini's duties here -- his status as head of a DEA office, head of a Regional Drug Task Force, head of Operation Princess, and as the apparent recipient of an Attorney General's exemption and his concomitant ability to tap into funds other than the AFF, distinguish this case from cases in which this Court has summarily held that DEA agents lacked authority to promise an informant a commission as a matter of law.  See e.g.,Cruz-Pagan, 35 Fed. Cl. at 61-62; Tracy, 55 Fed. Cl. at 683-84; Doe v. United States, 48 Fed. Cl. 495, 503 (2000); Khairallah, 43 Fed. Cl. at 62-63.  In Gary v. United States, 67 Fed. Cl. 202, 214 (2005) the Court stated: "Generally . . . contracting authority is not an integral part of the duties of federal law enforcement officers when dealing with confidential informants or cooperating witnesses since such officers can obtain authority from higher ranking officers via established procedures to pay informants and witnesses for their services, with the result that contracting authority is not needed for the agents to perform their jobs."  67 Fed. Cl. at 214 (citations omitted).  In the instant case, the "procedures" for promising and paying Princess appear to have been anything but "established" for ASAC Salvemini, with the evidence suggesting that ASAC Salvemini's promise of a commission to Princess was "within the parameters of what was done in cases like this," but with no clear indication as to whether he "obtained authority from a

---

[26] DEA documents reflect that SAC Cash appears to have received notification of a "proposal/operational plan for Operation Princess" and that DEA Administrator Constantine, after a briefing by DO Wankel, approved a $966,000 award to Plaintiff.  However, none of these individuals were requested to testify about these documents during discovery.

higher ranking official." <u>See</u>, Sal. Dep. II at 38-39.

Further, due to the lack of information in the record regarding the different sources of funds and the interplay between the funds and the Attorney General's Exemption, the Court cannot determine whether the promise to Plaintiff was prohibited as a matter of law.  While ASAC Salvemini lacked authority to promise the commission out of the AFF, it is unclear whether he was legally prohibited from promising such commissions from other sources, such as the trafficker proceeds made available via an Attorney General's exemption in Operation Pices fund a/k/a the Michael Shephard account.[27]  The <u>Brunner</u> Court recognized that the provision of the DEA Manual prohibiting promises of awards paid from the AFF, "is clearly limited to awards from that fund and is no constraint on promises of salary or expense reimbursement."  70 Fed. Cl. at 78.  Here, it is unclear whether there is any legal constraint on the promise of a commission from funds other than the AFF. While ASAC Salvemini testified that the had an Attorney General's exemption allowing him to access a large pool of the proceeds of the operation to pay Princess, this exemption is not in the record, and it is unclear what the parameters of ASAC Salvemini's authority were vis-a-vis that exemption.

Because genuine issues of material fact exist as to the duties of ASAC Salvemini, his perceived authority to promise the commission, and the legality of such a promise, the Court denies the cross-motions for summary judgment on the issue of implied actual authority.

## Ratification

Plaintiff claims that a DEA official with the authority to contract ratified ASAC Salvemini's promise to pay Plaintiff 25 percent of seizures up to a limit of $250,000 per seizure.  "Ratification is 'the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him.'" <u>Schism v. United States</u>, 316 F.3d 1259, 1289 (Fed. Cir. 2002), <u>cert. denied</u> 539 U.S. 910 (2003), (quoting Restatement (Second) of Agency § 82 (1958)).  Individual ratification requires that a superior not only "(1) have possessed authority to contract, but also (2) have fully known the material facts surrounding the unauthorized action of her subordinate, and (3) knowingly confirmed, adopted, or acquiesced to the unauthorized action of her subordinate." <u>Leonardo</u>, 63 Fed. Cl. at 560; <u>see also Doe</u>, 48 Fed. Cl. at 503-04. As the Supreme Court explained, "[w]here an agent has acted without authority and it is claimed that the principal has thereafter ratified his act, such ratification can only be based upon a full knowledge of all the facts upon which the unauthorized action was taken." <u>United States v. Beebe</u>, 180 U.S. 343, 354 (1901); <u>Harbert/Lummus Agrifnels Projects v. United States</u>, 142 F.3d 1429, 1433 (Fed. Cir. 1998); <u>Schism</u>, 316 F.3d at 1294 ("[F]ull . . . knowledge or awareness of the conduct being ratified is necessary for ratification.") (citations omitted).  There are genuine issues of material fact regarding whether high level DEA or

---

[27] It appears that Operation Pices funds and the Michael Shepherd account were one and the same -- presumably resulting from the Attorney General's exemption and containing trafficker-generated funds.

DOJ officials with authority to contract ratified ASAC Salvemini's promise of a commission based upon full knowledge of all the facts underlying that promise.  ASAC Salvemini believed that his promise was both understood and approved by DOJ and DEA officials at SARC meetings, but these officials themselves testified they did not recall hearing about the promise and that approving such a promise would have been fraught with problems for prosecution.  Thus, the Court cannot grant summary judgment on individual ratification.

Institutional ratification might also pertain here.  This type of ratification occurs when the Government seeks and receives the benefits from an otherwise unauthorized contract.  See Janowsky v. United States, 133 F.3d 888, 891-92 (Fed. Cir. 1998) (reversing grant of summary judgment where the FBI, by allowing a sting operation to continue and receiving benefits from it, could have ratified a contract with those running the sting and ratification presented an issue of fact); Silverman v. United States, 679 F.2d 865, 870-71 (Ct. Cl. 1982) (stating that "[b]y accepting the benefits flowing from the senior FTC official's promise of payment, the FTC ratified such promise and was bound by it."); see also Gary, 67 Fed. Cl. at 216; Digicon Corp. v. United States, 56 Fed. Cl. 425, 426 (2003).  However, "officials with ratifying authority must know of the unlawful promise, and such knowledge is a key element of an institutional ratification."  Gary, 67 Fed. Cl. at 216.  In the instant case, while DEA sought and received benefits from Plaintiff's work as an informant, genuine issues of material fact exist as to whether DEA or DOJ officials with ratifying authority knew about ASAC Salvemini's promise to Plaintiff, and whether their acceptance of the benefits was incident to such promise, and whether they ratified such promise.  As such, summary judgment is inappropriate on institutional ratification.

**Genuine Issues Regarding the Terms of the Contract**

Further, as in other cases of this ilk, "[c]onfusion abounds over several material facts relating to the formation of the alleged contract."  Roy, 38 Fed. Cl. at 188 n.11.  It appears that ASAC Salvemini -- even though he claims to have promised Princess a 25 percent commission up to $250,000 per seizure -- had himself requested less, thus calling into question what the promise was. In his February 22, 1995 letter asking for an additional payment to Princess, ASAC Salvemini wrote:

> [The Princess'] efforts in this case have thus far netted the U.S. Government nearly 23 million dollars.  Although technically the law provides for an entitlement to twenty-five per cent of this amount in reward, in this case over five (5) million dollars, the FLDO has at present, requested awards for the CI amounting to a total of only $500,000, a nominal amount considering the benefits reaped by the Government from the CI's activities to date.

Pl.'s Mot. App. Tab 6.  Further, one payment voucher indicates that DEA paid Plaintiff a $10,000 reward payment for information leading to the seizure of $766,133 on June 23, 1993.  Another voucher indicates that DEA paid Plaintiff a $25,000 reward from the Operation Pices funds for information leading to the seizure of $400,000 on September 23 and 24, 1993.  It is unclear why

27

Plaintiff did not receive a 25 percent commission on these seizures as allegedly promised by ASAC Salvemini.  Not only are the parameters of ASAC Salvemini's authority and the questionable ratification of his alleged promise indiscernible on this record, the terms of the alleged promise are also open to debate.  As such, trial is also required on the issue of what any agreement between Princess and ASAC Salvemini or the Government entailed.[28]

**Plainitff's Claims Regarding Confidentiality and Safety**

          In the Complaint, Plaintiff alleges that her contract with the Government included promises to maintain the secrecy of her identity, aid her when in danger, and protect her from harm or injury, and that the Government breached this contract by carelessly disclosing her identity, failing to take reasonable measures to secure her release when she was kidnapped, and failing to protect her from physical and psychological torture. Compl. ¶¶ 17-19, ¶ 10.  Defendant argues that these claims should be dismissed for lack of subject-matter jurisdiction because they assert negligence by the Government and therefore sound in tort.  Def.'s Mot. at 21-22.  While this Court lacks jurisdiction over tort claims, Plaintiff's complaint is framed as a breach of contract action, not a negligence or intentional tort action.  The complaint alleged:

>          The United States breached its contract with the Plaintiff when it failed its duty to maintain the secrecy of the Plaintiff's identity, a failure which was the result of careless agents of the DOJ who disclosed the identity of the Plaintiff; the United States has not since restored the secrecy of Plaintiff's identity.

>          The United States breached its contract with Plaintiff when it failed its duty to come to the aid of Plaintiff when she was captured and held against her will in a foreign country while in performance of her contractual performance, nor did the United States take any reasonable and appropriate measures in a prompt and timely manner to secure the prompt release of the Plaintiff, although the United States benefitted from her performance of her contractual duties.

>          The United States breached its contract with the Plaintiff when it failed its duty to protect the Plaintiff from injury or harm; the United States allowed the Plaintiff to be continuously tortured and otherwise injured both physically and psychologically for months while she was being held against her will in a foreign country.

Compl. ¶¶ 17-19.

---

          [28]   Here, the question of the quantum of damages is also intertwined with the question of liability, given the amounts Plaintiff has already been paid and the uncertainty of what any agreement might have been.

The Court of Claims held in <u>Bird & Sons, Inc. v. United States</u>, 420 F.2d 1051, 1054 (Ct. Cl. 1970), "where an alleged 'negligent' act constitutes a breach of a contractually created duty, the Tucker Act does not preclude relief."  The Court explained, "[A]n action may be maintained in this court which arises primarily from a contractual undertaking regardless of the fact that the loss resulted from the negligent manner in which defendant performed its contract."  <u>Id.</u> (quoting <u>Chain Belt Co. v. United States</u>, 115 F. Supp. 701, 711-12 (Ct. Cl. 1953)).  Here, Plaintiff's claims regarding Defendant's failure to maintain her confidentiality and ensure her safety sound in contract and are not subject to dismissal for lack of jurisdiction.

## Conclusion

1.    Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction is **DENIED**.

2.    Defendant's Motion for Summary Judgment is **DENIED.**

3.    Plaintiff's Cross-Motion for Summary Judgment is **DENIED**
.
4.    The Court will convene a telephonic status conference to discuss further proceedings in this action on **December 14, 2006 at 11:00 a.m.**  The Court will initiate the teleconference.

5.    Proposed redactions to this opinion, consistent with the Court's Protective Order governing the DEA Manual, shall be filed by **December 11, 2006.**

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**