# In the United States Court of Federal Claims

**No. 97-579C**
**(Filed Under Seal: January 27, 2009)[1]**
**(Reissued: February 9, 2009)**

* * * * * * * * * * * * * * * * * * * * * * * * *

|  |  |
|---|---|
| **SGS-92-X003,** | **Breach of Implied-In-Fact Contract;** |
| | **Confidential Informant;** |
| **Plaintiff,** | **Jurisdiction; Tortious Breach of** |
| | **Contract; Breach of Implied Duty of** |
| **v.** | **Good Faith and Fair Dealing.** |
| **THE UNITED STATES,** | |
| | |
| **Defendant.** | |

* * * * * * * * * * * * * * * * * * * * * * * * *

    <u>Michael L. Avery, Sr.</u>, 1331 H Street, N.W., Washington, D.C., for Plaintiff.

    <u>Jonathan Reid Prouty</u>, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, 1100 L Street, N.W., Washington, D.C., for Defendant.

------

## OPINION AND ORDER

------

**WILLIAMS**, Judge.

    This breach-of-contract action comes before the Court after a trial on liability. Plaintiff claims that she had an implied-in-fact contract with the Drug Enforcement Agency (DEA) to work as an undercover informant and alleges that DEA breached its contract with her in two respects. First, Plaintiff -- who is also known as the Princess -- claims she was promised but not paid a commission of 25 percent of all property or funds that were seized as a result of her efforts. Second,

------

[1] The Court issued this opinion under seal on January 27, 2009, and directed the parties to file any proposed redactions to the opinion by February 6, 2009. The opinion issued today incorporates the parties' proposed redactions, correcting errata. This redacted material is represented by brackets "**[]**."

the Princess claims that DEA failed to protect her while she was working undercover and that DEA's lapse led to her abduction and kidnapping in Colombia, causing her to endure over three months in captivity.

The evidence at trial established that Plaintiff had an implied-in-fact contract with DEA but not for a set commission. Rather, the head of DEA's Ft. Lauderdale office promised to pay the Princess her salary, expenses, and rewards or commissions of "up to" 25 percent of her seizures subject to the approval of high level government officials. Under this contract, which was demonstrated by the parties' course of performance, Plaintiff's supervising DEA agent could pay her up to $25,000 per quarter but only <u>recommend</u> rewards or commissions above that amount, and higher-ups at DEA and/or the Department of Justice (DOJ) had to approve additional payment. In the almost four years that the Princess worked as a confidential informant, she was paid approximately $1.85 million. Given the nature of the agreement, Plaintiff is entitled to no more commissions, rewards, or awards. As such, the Court enters judgment for Defendant on this element of liability.[2]

The landscape is different however with respect to Plaintiff's claim that DEA failed to protect her in the line of duty. The evidence at trial -- primarily the Government's own evidence including detailed documentation and the testimony of two former DEA Administrators and the Deputy Attorney General -- established that DEA sent the Princess on a mission to Colombia without following its own procedures. During this mission, the Princess was captured by a guerilla organization, transported in the trunk of a car, and held for over three months in a windowless, dirt-floor room where she slept on a straw mattress. The Princess was ultimately released after the Government facilitated the payment of a ransom to her captors.

The evidence is uncontroverted that the head of DEA's Fort Lauderdale Office, who supervised the Princess, sent her on this undercover operation without advising DEA Headquarters or the Colombian attache -- in violation of established DEA procedures. In short, in the words of a former DEA administrator, DEA sent the Princess into "harm's way," in the course of performing its implied-in-fact contract. As such, the Court enters judgment for Plaintiff on liability for this aspect of her claim.[3]

---

[2] Plaintiff also claimed she was promised a percentage of money that the agency earned through a money-laundering operation, but she failed to prove that there was a meeting of the minds on this aspect of the contract.

[3] Upon request of the parties, the Court bifurcated proceedings on liability and damages, and will schedule further proceedings on damages.

### Findings of Fact[4]

**Overview**

Plaintiff served as a confidential informant for DEA from December 1991 until August 1995.[5]  While the Princess herself was not involved in illegal drug trafficking, she had been married to a high echelon Colombian drug trafficker.  Unlike many confidential informants, the Princess was motivated to cooperate with DEA, not to avoid or minimize potential criminal liability, but to assist in combating illegal drug trafficking and reap financial benefits.

The Princess was the key informant in a long-term money-laundering operation directed at developing cases against major Colombian drug trafficking and money-laundering organizations.  During Plaintiff's tenure with DEA, she was supervised by the head of DEA's Fort Lauderdale, Florida field office, Assistant Special Agent in Charge (ASAC) Joseph P. Salvemini, now retired.  ASAC Salvemini and DEA obtained an Attorney General's exemption to use laundered money to fund this operation, and kept high level DEA and Department of Justice (DOJ) officials apprised of its progress.[6]  Toward the end of the operation, Plaintiff was kidnapped, held captive in Colombia, and ultimately released.

Due to Plaintiff's efforts, DEA received significant intelligence on the activities of several drug kingpin organizations throughout the world, made many arrests, and seized at least $23 million.

**ASAC Salvemini and the Regional Task Force**

In his position as head of DEA's Fort Lauderdale District Office (FLDO),  ASAC Salvemini created the "Southeast Florida State and Local Task Force," a group of local police from different areas in South Florida, to focus on high echelon cases involving narcotics and money laundering.  Tr. at 244-55, 270.  Once the local Florida police officers joined the Task Force, they were sworn in as federal agents, told they would have the same status as any federal DEA agent, and were obligated to follow the guidelines which governed federal agents.  Id. at 264-69.  Task Force members James Hughes, Rick Morris, and Greg Lees worked on Operation Princess under ASAC Salvemini's direction.  Id. at 264-68.  Tom Tiderington was the Task Force's Group Supervisor, and

---

[4]  These findings of fact are based upon the record developed during a two-week trial held in Palm Beach, Florida and Washington, D.C.

[5]  DEA initially contacted Plaintiff in December 1991.  Plaintiff agreed to cooperate with DEA in early 1992, and Plaintiff's role as a confidential informant effectively ended with her abduction in August 1995.  She did not resume her duties upon her release in December 1995.

[6]  An Attorney General's exemption grants an agency permission to undertake certain otherwise prohibited acts in furtherance of a criminal investigation.  Tr. at 775.

Agents Hughes, Morris, and Lees were his immediate subordinates.[7] Id. at 268-69, 566-67.  ASAC Salvemini was Tiderington's direct supervisor.  All members of the Task Force reported to ASAC Salvemini.  Id. at 268, 567.

### The Princess' Decision to Become A Confidential Informant

Task Force Agents Morris and Hughes originally approached the Princess at her home to solicit information and seek her assistance with the investigation of potential drug traffickers.  Id. at 567-68, 641-42, 683. These agents approached Plaintiff based on information from Plaintiff's ex-husband, an incarcerated drug trafficker.  Id.  Agents Morris and Hughes did not make contact with Plaintiff with the intention of arresting her, nor was their visit related to any incriminating evidence pertaining to her.  Id. at 642, 682-83.  Rather, the agents approached Plaintiff because Plaintiff's ex-husband told them that she could substantiate the activities in which he had been involved.  Id. at 682.

Ultimately, the Princess agreed to work as a confidential informant for DEA.  Agent Morris testified about the Princess' first operation for DEA as follows:

> [I]t's kind of a strange situation.  We were asking her at that point to gain our confidence by doing a small cocaine deal.  We were looking for possibly one or two or three or four, five kilograms of cocaine.  And this is why I remember pretty clearly.  And she basically kept on telling us she couldn't do that.  And we kept on saying, 'Well, why?'  We were getting ready to say okay, we're going to forget about this whole thing, it's not worth the aggravation, because if she can't do five kilos, what's she going to do for us.
>
> And what we didn't realize at the time was actually what she was capable of doing. . . . [W]e asked her for five, she said no, she can't do it.  And then she said, 'Because I'm much bigger than that.  People think that it would be disrespecting for me to ask for five kilos.'  Well, we felt that, you know, she wasn't telling us the truth; she couldn't have been that big.
>
> And basically, within a couple weeks we found out that she was, she was very substantial to the Agency.
>
> Q And after that first operation, do you recall the amount of drugs that was involved?

---

[7] Tom Tiderington was a sergeant with the Ft. Lauderdale Police Department during his tenure on DEA Task Force.  Tr. at 558.  Agent Hughes, a sergeant with the Sunrise Police Department, was a narcotics detective while assigned to the Task Force.  Id. at 638-39.  Agent Morris, a sergeant with the Palm Beach County School District Police, joined the Task Force in 1992.  Id. at 678.  Agent Lees was an officer with the Broward County Sheriff's Office while assigned to the Task Force.  Id. at 730.

A   Was supposed to be 500 kilos and a kilo of heroin.  It ended up being 400 or 397 or odd number of kilos of cocaine.  The heroin was the most important thing we were after.  The heroin was really what we were interested in.

Q   With regard to -- so I can gain a little perspective, and I have none, what is the difference between five kilos and 400 kilos in terms of volume?
Is that significant?

A   Yes.  At that time in dollar value, if that's what you're looking for, at that time you're probably talking about $60,000,000.00.

Id. at 691-92.

Agent Morris described his understanding of the Princess' reasons for agreeing to cooperate as follows:

Basically, . . . she was tired of the life that she led, . . . she knows she was involved with a lot of things in her life that weren't right.  She had found that – I believe at that time she was conveying to us that she had got involved with religion very heavy, the Catholic church very heavy and she wanted to right a few wrongs.

Id. at 689.  The Princess' DEA Personal History Report, prepared on December 12, 1991, stated that she was motivated to cooperate with DEA because she was "trying to get out of the drug business" and was "looking for monetary gain."  Def.'s Ex. 5 at 1-2.  DEA's Deputy Chief of Operations Douglas Wankel testified that:

[The Princess was] probably the only [informant] that I had knowledge of or dealt with that was a voluntary, if you will, cooperating individual. . . .   It was my understanding that there were no charges and [she] was not under investigation.

Tr. at 1037.

## DEA's Promise to Plaintiff Regarding Commissions

Agent Hughes explained that when he and Agent Morris initially met with the Princess, they told her that "there was a reward program case specific where she could earn up to 25 percent [per] case with a cap," and receive a salary and expenses related to the investigation  Id. at 646, 650.[8]

---

[8]  The distinction between "award" and "reward"was described at trial by Task Force Group Supervisor Tiderington: "I guess the distinction based on my understanding is that the reward money was coming out of maybe general fund money, money that was not seized, and an award would be from money that we seized that there would ultimately be a forfeiture proceeding against."  Tr. at 605; see also Pl.'s Ex. 9; Pl.'s Ex. 41.

ASAC Salvemini orally promised to pay Plaintiff 25 percent of the value of all confiscated or seized funds or property up to a limit of $250,000 per seizure.  Tr. at 100, 332, 577.  ASAC Salvemini testified:

> I had made promises to her that I would reward her in the form of a certain percentage of the seizures that we were making in the investigation within, and I was very specific about this, within Statutory limits. It was my understanding that if we seized, for example, $2,000,000.00 in Chicago, she wasn't going to get 25 percent of the $2,000,000.00 . . . there was a Statutory . . . $250,000.00 limit that could not be exceeded.

Id. at 332. [9]   ASAC Salvemini explained that seizures "only referred to the assets that were seized, nothing else. . . .  [T]he overwhelming majority of what we took down was currency. . . .  United States currency."  Tr. at 473.  ASAC Salvemini made these promises based upon his "position as head of the Ft. Lauderdale District Office and practices that [he] had been engaged in for some 30 odd years that [he] was in that position."  Id. at 481.

ASAC Salvemini also promised to pay the Princess 5 to 8 percent of the commission she received on money laundered.  Tr. at 332-35.  He explained that this was different from the 25 percent of currency seized in that it was:

> [A] percent of a percent . . . [I]t would be a piece of what we were using to operate. It's off the same pool.  It's a far lesser amount because let's say we picked up a contract that said we're going to get paid five percent in New York, okay, and we were going to pay [the Princess] eight percent.  It would be eight percent of the five percent.  It would be relatively nominal.

Id. at 474.

Agent Morris understood that ASAC Salvemini had the authority to make promises to the Princess, "through the Justice Department."  Tr. at 718.  Agent Morris clarified what he meant by "through the Justice Department," as follows:

> I believe Joe Salvemini would have authority to pay, to make the payments and to – he's got the authority to get the authority, basically.  We put our request in through him and he would go through the appropriate channels in the chain of command to get the authority for the payments that she needed.

Id. at 728.

---

[9]  ASAC Salvemini identified this statutory limitation as 29 U.S.C. § 524, but the Asset Forfeiture Statute containing this limitation is 28 U.S.C. § 524.  Tr. at 497; Pl's Ex. 9.

The Princess testified that ASAC Salvemini promised her a salary of $10,000 per month, 25 percent of the currency seized with a cap of $250,000, a percentage of the money that she laundered, and "ten percent of the indirect" seizures made as a result of the information she provided.  Id. at 98-101; see also Tr. at 204-05.  While operating her money laundering operation, the Princess would charge her customers a fee in the form of a percentage of the money that they sought to launder.  Id. at 116-17.  This commission, along with any additional money that was inadvertently given to the Princess by her clients, was deposited in the "Michael Shepherd account."  Id. at 420-21, 469, 751.  The Michael Shepherd account was a bank account opened by DEA which contained drug trafficker proceeds from Operation Pisces -- a predecessor operation to Operation Princess -- and was drawn upon for operational expenses related to Operation Princess.  Id. at 399-400, 420-21, 780; Def.'s Ex. 4 at 4.[10] ASAC Salvemini testified that if he sought to pay the Princess with money from the Michael Shepard account, any payments that exceeded $25,000 per quarter had to be approved by DEA headquarters.  Tr. at 426-27, 431-32.  ASAC Salvemini also had access to purchase of evidence/purchase of information ("PE/PI") funds.  Tr. at 432-33, 926-27.  These funds are appropriated by Congress for DOJ and are used by the field divisions of DEA, as well as other divisions within DOJ, to fund ongoing investigations.  Id. at 927.[11]  However, ASAC Salvemini opted not to expend PE/PI funds on Operation Princess because he had other sources of funding for Princess and used PE/PI funds for other "narcotics enforcement ventures" under his control.  Tr. at 433-34.

ASAC Salvemini acknowledged that he could not make payments to the Princess above $25,000 per quarter regardless of the source of funding absent the approval of Headquarters.  Tr. at 481-84.  He testified:

THE COURT: We had testimony, and this confused me, earlier about the limitation on you that required you to get approval if you were going to pay an informant anything above $25,000.00 per quarter. . . .

On the one hand I think I heard you say that that $25,000.00 per quarter limitation did not apply to rewards.  On the other hand I thought you said that it applied to everything.  So would you please clarify that for me?

---

[10] Operation Pisces was described by ASAC Salvemini, Group Supervisor Tiderington, and Chief Wankel as a major money laundering activity that was headquartered in Miami.  Tr. at 260-61, 563, 981-82.  This Operation was an umbrella operation with its own confidential informants and its own Attorney General's exemption, under which Operation Princess fell, at least at the inception of the Princess' tenure as an informant.  Id.  at 260-61, 773-780.

[11] See Henke v. United States, 43 Fed. Cl. 15, 19 (1999) ("PE/PI funds were Congressionally authorized funds used by the DEA to cover expenses in connection with purchasing evidence or paying for information. Each division office received an annual PE/PI allowance apportioned on a quarterly basis.").

THE WITNESS: It applied to everything.  In other words, no matter what the informant was due, if it exceeded that $25,000.00 I would have to get permission to actually do it. . . . So in this case I had made a commitment, but it still had to be funded in some fashion, whether it was funded -- they could have funded it through asset forfeiture, they could have decided -- Headquarters could have decided, 'You know what, we're going to pay it out of -- we've got a surplus of PE/PI in Washington, D.C. this year.  We're going to pay it out of PE/PI' they could have chosen to do that if they wanted to.

THE COURT: Let's go back to my question.  Did the $25,000.00 per quarter limitation on you, the requirement that you had to get approval for any payment . . . above $25,000.00 per quarter apply to reward?

THE WITNESS: It would have applied to the reward, of course.  In other words --

THE COURT: Yes.

THE WITNESS: It applied for anything.

THE COURT:  So as I'm understanding this, and correct me if I'm wrong, you had the authority to make the promise, but somebody else was going to make the payment?

THE WITNESS:  Yes.  I didn't have the money in my Shepherd account.  I mean I had PE/PI but I wouldn't spend it in that fashion.

. . . .

THE COURT:  And who had the authority to make the payment?

THE WITNESS:  I had the authority to make the payment if Headquarters gave me the money to make the payment.

Id. at 482-84.  See also Tr. at 431-32 (Salvemini acknowledging that he sought Headquarters approval before paying the Princess more than $25,000 per quarter and that he would not pay her before he obtained such approval).

According to the DEA Agents Manual, there were three circumstances in which payments to an informant could be made:

1) Payments for Information and/or Active Participation;
2) SAC-approved payments of up to $25,000 per informant per quarter; and
3) Payments for Informant Protection.

Pl.'s Ex. 20 at 219.

The first provision, DEA Manual Section 6612.43(A), "Payments for Information and/or Active Participation," stated:

> When an informant assists in developing an investigation, either through supplying information or actively participating in it, he may be paid for his services either in a lump sum or in staggered payments. As well, DEA can pay an informant a commission based upon some percentage of the value of cases he provides. However, because such payments are highly unusual, the following precautions are required:
>
> 1. Informants paid on a commission basis should be instructed in advance concerning the Law of Entrapment;
>
> 2. The fee arrangement should be discussed with the informant in detail; there should be no gaps in understanding the terms of the arrangement;
>
> 3. The usual instructions to the informant, the details of the fee arrangement and the Entrapment instructions should be provided to the informant in writing at the beginning of the operation;
>
> 4. Every effort should be made to maximize the control and supervision of the informant;
>
> 5. Every effort should be made to corroborate the informant's statements concerning his activities;
>
> 6. Payments should be completed before the informant testifies; and
>
> 7. We should be prepared to give reasons why it is necessary to use informants in this unusual manner.

Id. [12]

Second, Section 6612.43(B) addressed SAC-approved payments as follows:

The SAC (or Country Attache) is authorized to approve payments up to $25,000 per

---

[12]   ASAC Salvemini admitted that he failed to comply with the requirements of Section 6612.43(A)(1) and 6612.43(A)(3) of the DEA Agents Manual which controlled the "highly unusual" circumstance under which an informant was paid a commission "based upon some percentage of the value of cases he provides." See Tr. at 437-39.

informant per quarter.  Amounts beyond $25,000 must be approved by the Deputy Assistant Administrator for Operations (DO).   Requests and responses will be documented via teletype.

Payments for information leading to a seizure, with no defendants, should be held to a minimum.

Pl.'s Ex. 20 at 219.

Third, Section 6612.43(c) authorized payments for informant protection and permitted the DEA to "absorb the expenses of relocation" if an informant could not enter the witness protection program.  Id. at 219-20.  Furthermore, the section explained that "[t]he SAC has the authority to approve payments of up to $5,000 for informant security expenditures from his established PE/PI funds.  He should, however,  coordinate the payment with the appropriate Headquarters drug section chief."  Id. at 220.[13]

A separate provision of the DEA Manual, Section 6612.44, governed award payments from the DOJ Asset Forfeiture Fund.  Pl.'s Ex. 20 at 220.  Subsection A, Type of Awards, provided for payments of two types of awards reimbursable from the Asset Forfeiture Fund: 1) payments of up to $250,000 for information or assistance directly relating to violations of federal criminal drug laws, and 2) payments for information or assistance leading to a civil or criminal forfeiture in amounts based upon the value of the forfeiture.  Id. at 220-21.  Subpart B of this Section delineated the process for applying for and calculating awards from the Fund.  Id. at 221-23.  Subpart C of this Section, entitled Award Payments, contained the following prohibition against promising awards from the Fund:

Offices must not promise any awards in any amount to an individual.  The statutory authority provides that the payment of such awards is purely discretionary.   In preparing the recommendation for award, the SAC or Country Attache should ensure that proper discretion is exercised.  Similar circumstances should warrant similar awards.  Therefore, special attention should be given to the factors stated in Agents Manual Section 6612.41(B) and 6612.44(B)(2) as a means of recommending an award consistent with the total circumstances of the involvement of the individual.

---

[13]  Section 6612.72 reiterated that PE/PI funds could be used to protect a witness who did not qualify for the witness protection program.  The relevant section stated:

Individuals who warrant some measure of protection but do not meet the criteria for inclusion in [the witness protection] program may be provided financial assistance from DEA PE/PI funds.  The cost of relocation may be considered in determining the amount of reward paid to an informant witness (see 6612.43).

Pl.'s Ex. 20 at 227.

Id. at 223.  These Manual Sections required that the amount of payment be commensurate with the value of services and information provided, taking into consideration the level of the targeted operation, the amount of the seizure, and the significance of the informant's contribution.  Id. at 218, 221-22.

ASAC Salvemini testified that money seized through Operation Princess went to the Department of Justice asset forfeiture account.  Id. at 470-71.  ASAC Salvemini could not pay the Princess 25 percent of the seized funds because he did not have access to those funds.  Id. at 471-72.

Task Force agents Hughes, Lees, Morris and Tiderington never made any specific promises to the Princess aside from relating to her that she could receive "up to" 25 percent of all seizures with a cap of $250,000 per seizure.  Tr. at 630-31, 648-650, 716, 750, 768-69.  The Princess testified that she "understood [that] it was Mr. Salvemini" who had the authority to make promises concerning how she would be compensated for her work as a confidential informant.  Tr. at 220.

The Princess believed that her receipt of any compensation above $25,000 per quarter was dependent on ASAC Salvemini's ability to obtain clearance from officials in Washington D.C.  Id. at 203-04.  She testified:

> Q  . . . Did you recognize that Mr. Salvemini did not have the authority to make the promises he gave to you by himself?
>
> A  How would I know?
>
> Q  I think you said that you believed that he had to go to Washington to get authority to make his promises; do you recall that?
>
> A  No, I said to get clearance.
>
> Q  Clearance for what?
>
> A  For every movement we were going to make.
>
> Q  What about clearance to pay you money?
>
> A  I don't know what he had to do because I never ask.
>
> Q  Do you recall that you had to wait for clearance from Washington to get your payments?
>
> A  To get the payments when they reach a ceratin amount of money, yes.
>
> Q   And that was essentially for your salary.   Whenever you would go over

11

$25,000.00 per quarter, you would have to wait for clearance from Washington?

A  Exactly.

Q  Okay.  And therefore, you recognized that to get more than $25,000.00 per quarter, Mr. Salvemini needed to get authority from Washington, D.C.?

A  That was my understanding, yes.

. . . .

Q  Well, you knew you had to wait for authorization to get the payments, yes?

A  Yes, but I mean it doesn't mean that a person doesn't have authority, because why would he have authority to do something and something not?  I mean in my eyes Washington won't put a person in charge of such operation without any authority, because what was the point then to do the operation?

Id. at 203-05.

ASAC Salvemini testified that he was given the authority to contract on behalf of the United States Government.  Id. at 246- 47.  When asked at trial if he was a contracting officer as part of his duties and responsibilities as ASAC of the FLDO, ASAC Salvemini responded affirmatively and stated: "[That] meant that I could engage in signing contracts and make up contracts on behalf of the United States Government."  Id. at 246.  Mr. Salvemini testified that he had taken a special contracting officer class as a requirement for his position.  Id.  However, according to Thomas Cash, the Special Agent in Charge (SAC) of the Miami Field Division from 1988-1994, ASAC Salvemini did not have the authority to make promises concerning specific amounts of money to be paid to confidential informants.  Id. at 864-65.  According to Christina Sisk, the Deputy Assistant Administrator for the Office of Acquisition Management of DEA, ASAC Salvemini was not granted a delegation of procurement authority during the period of 1991 to 1994.  Def.'s Mot. For a Protective Order that the Dep. Of Former Attorneys General William Barr and Janet Reno Not be Taken, Declaration of Christina Sisk, Dec. 11, 2000 at 1-2.  Ms. Sisk also testified that the authority granted to certain DEA employees to expend funds for award purposes, or for the discretionary payment to informants for information, or for reimbursement of the expenses of informants does not constitute a delegation of authority to contract on behalf of the United States. Id.[14]

Robert Nieves, the Chief for Foreign Operations for DEA, testified that during all of the

---

[14]  Based upon the record as a whole, the Court credits the testimony of SAC Cash and Deputy Assistant Administrator Sisk on this matter and finds that ASAC Salvemini was not a contracting officer and did not possess a delegation of procurement authority.

briefings and meetings pertaining to Operation Princess he was never informed of any specific promise to pay the Princess for her work as an informant:

> Q And during all the briefings that you received, were you ever informed that there was any promise to pay a particular amount of money to the Princess?
>
> A No. My recollection is there was not, and certainly I would have objected to that.
>
> Q Okay. Why would you have objected?
>
> A As I said, I think we can only be fair with an informant. I don't believe we can enter into a contract with an informant that's "dollarized" or "percentized." Informants by their nature with that information would go back and do the calculation and say hey, I was promised X, Y, Z, ergo I'm owed X, Y, Z, and that's not a good situation to be in with an informant.
>
>   It's a very poor situation to be in because you've contracted, you've written a check that you cannot cash that you have to rely on others to cash for you. . . . It's not a practice I would have condoned . . . .

Tr. at 1395.

SAC Cash testified as to DEA's policy regarding an ASAC's authority to make promises to confidential informants:

> [SACs and ASACs] can promise to do their best to assist and aid [confidential informants] in every way possible. . . . [C]an they make promises to pay a specific amount of money? The answer to that is no. The reason they can't is because they don't have the decision authority.
>
> . . . .
>
> It's not that I wouldn't like to make a promise. I'd love to make a promise to an informant, but I can't make a promise to an informant. It's not my decision, and I'm a Special Agent in Charge.

Id. at 864-65; see also id. at 855, 873. SAC Cash was not aware of any specific promises that were made to the Princess with respect to her compensation. Id. at 866-67. SAC Cash acknowledged that per the DEA Agents Manual, ASAC Salvemini had the authority to authorize expenditures up to $25,000 per informant quarter during Operation Princess. Id. at 950; Pl.'s Ex. 21 at G-80.

DEA's Former Deputy Chief of Operations Wankel testified that although ASAC Salvemini was delegated the authority to pay informants up to $25,000 per quarter, he did not have authority

13

to make specific promises for commissions:

> An agent could discuss and would discuss, and I did this myself on others, the fact that okay, this is what's going to happen. You're going to get paid for your expenses, okay? We're going to pay for this and that.

> You are eligible for reward, stuff like this, but what the agent didn't do was to give specific amounts or guarantee things like this because the agent did not have the authority to do that and did not know if the funding would be available. . . .

> . . . .

> . . . . It's my understanding, . . . as a manager . . . that the agent could discuss with the informant that it would be possible to apply for a percentage -- call it commission or what you will -- of the award or whatever, but the agent should not be saying it will be four percent or five percent or whatever amount that it could be, but say yes, we will work to do this.

> The agent was always careful, or should have always been careful, about putting limits on what he or she was committing to. Yes, the rules do allow for us to seek a percentage of assets seized or a commission from what's done on trafficker directed funds.

Tr. at 1033-34.

Administrator Constantine was not aware of any promises that had been made to the Princess regarding her compensation as a confidential informant. Id. at 1334. As the head of DEA, Mr. Constantine expected that the SAC – a senior executive appointee – was the individual responsible for oversight of any such compensation promises. Id. at 1332-33.

Deputy Assistant Attorney General (DAAG) Mary Lee Warren testified as follows regarding promises to compensate the Princess for her work as a confidential informant:

> A  The only promises were as I understood it there would be a consideration at the close of a case of the value of the case, and that would be the only promise if it were a financial arrangement. . . .

> Q  Directing your attention to Princess did you ever hear that she was promised a particular amount of the proceeds from the operation?

> A  No. Absolutely not. I'm sure that would have rested in my mind because that would affect a later prosecution. I think [such a promise] would render the witness less valuable. That was the kind of thing that I concentrated [on], the effect on a later

14

prosecution of the operation, and I was somewhat of a pit bull about things like that.

Q   Would you have kept those concerns to yourself?   Would you have said something?

A   I'm not known for being quiet.   I would have.   The purpose of the SARC [Sensitive Activities Review Committee] was to bring out these kinds of concerns, and I often participated very vocally in the SARC reviews.

Id. at 1513-14.

## The Sensitive Activities Review Committee

In conjunction with its objective of reducing the flow of drugs into the United States, DEA established the Sensitive Activities Review Committee ("SARC") to review activities that DEA viewed as warranting special attention, including drug-related money laundering activities and operations utilizing Attorney General exemptions.  Id. at 510-11.  A SARC meeting would often consist of a six-month review of an existing operation, and decisions would be made regarding whether to continue the investigation.  Id. at 514.  DEA's Deputy Chief of Operations from 1992-1994 and Chairman of the SARC, Harold Douglas Wankel, regularly attended the SARC meetings regarding Plaintiff's operations, and testified that ASAC Salvemini was involved in one or more SARC meetings.  Id. at 967, 982-84.  According to Mr. Wankel, compensation to informants would be discussed  at SARC meetings, but solely as an ancillary matter.  Id. at 987.

ASAC Salvemini, as lead agent on Operation Princess, traveled to Washington D.C. on several occasions to attend SARC meetings where Operation Princess was the central topic on the agenda.  Id. at 363-69.  According to Salvemini, the SARC meetings involved, among other things, discussion of whether the investigation was headed in a "direction that was acceptable to the Agency," as well as the expenses incurred as a result of the investigation.  Id. at 366-69.  ASAC Salvemini and others would make a presentation regarding the investigation, and senior DEA and DOJ personnel would then decide how the investigation would proceed.  Id.

ASAC Salvemini testified that his promise to pay Plaintiff was routinely brought up during these meetings.  Id. at 367.  He stated:

Q   And you've told us that compensation to the informant was an agenda item.  Do you have any recollection of it being discussed at a SARC meeting involving The Princess?

A   Yes

Q   And what do you recall the discussion being with regard to compensation?

A   Routinely, cause there were times that someone would come in there that hadn't been at a previous meeting, for example.  So I recall being asked on a number of

15

occasions what the motivation for her was, and I always articulated that it was financial and I always articulated the commitments that I had made to her; namely, that she was working for a percentage, 25 percent of the value of the -- I shouldn't say value because that implies houses and stuff like that and we never addressed that; but of the currency seized.

Q  Did you articulate to the SARC the same compensation types that you testified to here earlier with regard to salary, payment of expenses, reward monies?

A  Yes.  I recall even on a number of occasions voicing my frustration at the way we were doing things and why we had been asked to, you know, stop paying the legitimate bills of the [Princess], but it had nothing to do with anything; just created more of a headache for us.

Q  What sort of response did you get to voicing your frustration?

A  I don't recall them in any way being in agreement that I could go back to the old way of doing business.  But they were always very pleased with the activity.

Id. at 367-68.[15]

ASAC Salvemini testified that during the SARC meetings none of the high level DEA or DOJ officials advised him that he was not authorized to make this promise to Princess and that it was "always [his] understanding that she was to get a reward for her services for what she had done for us."  Tr. at 368-69.

The record contains the minutes of two SARC meetings in August of 1994 and March of 1995.[16]  The minutes of the August 25, 1994 meeting state:

---

[15]  ASAC Salvemini did not explain what the "the old way of doing business" was.  However, he testified that when he dealt with confidential informants, he did not receive guidance from DEA and that "there were no restrictions, other than the timing of payments, . . . and clearances as far as amounts that [he] could pay during certain periods of time."  Tr. at 258.

[16]  These two sets of SARC minutes were not produced until December 10, 2007 -- approximately six months after trial ended.  On July 2, 2007, after trial, this Court issued an order requiring a renewed search for documents, including "'SARC Committee' minutes" referenced at trial which had been requested but not located during discovery.  Order, July 2, 2007 and Order, July 9, 2007.  Defendant represented that "the additional documents were discovered in files that were long-forgotten and not known to contain documents relevant to the Princess case" as they were located in a "dormant 'classified documents' file drawer."  Def.'s Status Report Regarding Additional Documents at 1.  When the former secretary to Administrator Constantine, Pattie Hoffman, discovered the files while cleaning, she immediately contacted DEA counsel.  Id. at 1, Attach. A. ("Hoffman Decl.").

On August 25, 1994 a meeting of the Sensitive Activities Review Committee (SARC) was convened to conduct a six–month review of Ft. Lauderdale's proposal for the continuation of . . . (Operation Princess) for which Attorney General Exemptions were originally obtained under Operation Pisces.

Operation Princess is a Ft. Lauderdale based DEA/Task Force money laundering investigation which targets the highest level of Cali, Colombia based narcotics traffickers and money launderers.

Messrs. Tiderington and Lees, and Ms. Neal provided a verbal presentation of the operation, including a discussion of the informant's background, money transactions effectuated since August, 1992, and arrests/seizures since 1993.
. . .

Mr. Tiderington anticipated that the final phase of this investigation would culminate in 1995 with the arrests of some 80 to 100 defendants.  To date, total seizures approximate 22.9 million dollars and commissions earned total about 1.7 million dollars.

After a discussion of various issues it was the recommendation of the committee that this operation be approved for an additional period of six months.  The committee also recommended that no more than ten million dollars be laundered within this period without the express approval of the SARC.  A three month informal SARC review will be held in three months.  Further, separate Attorney General exemptions will be requested for this case.  In addition, the Ft. Lauderdale D.O. is to secure a written commitment from the U.S. Attorney, himself, to the effect that he is prepared to prosecute this case should sufficient evidence be developed with the operational plan.

These minutes, with attachments, will be forwarded with a recommendation for approval to the administrator.

PX 251.[17]

---

In addition, for the first time at trial, Defendant produced other documents -- a memorandum written by the Colombian country attache concerning the Princess, a memorandum to Robert Nieves regarding the internal events of the Colombian country office concerning whether the Princess' travel was approved, and a November 29, 1995 memorandum concerning the Princess' kidnapping containing questions directed to various DEA officials. Id. at 1532-34.  On December 10, 2007, the parties agreed that 11 exhibits produced by Defendant after trial should be included in the record. See Joint Notice of Filing, Dec. 10, 2007.

[17] Exhibits PX 243 to PX 253 were filed with the Court after trial.   Although designated as Plaintiff's Exhibits (PX), the documents are joint exhibits.

According to the minutes of a subsequent six-month SARC Review of Operation Princess held on March 30, 1995, ASAC Salvemini told the SARC that $3.5 million had been laundered since the August 25, 1994 SARC review and that the Grand Jury phase of the operation had been ongoing for about six months, complete with individual arrest packages and the analysis of numerous bank accounts.  PX 252.  From the inception of Operation Princess to the time of the March 1995 meeting, "in excess of twenty million dollars in cash [had] been seized, excluding banks and real estate assets," and "numerous arrests and drug seizures" were made.  Id.  Furthermore, at this March 1995 meeting, ASAC Salvemini "anticipated approximately sixty to seventy . . . [potential] defendants in the United States . . . " would be identified as a result of Operation Princess.  Id.  The March 30, 1995 meeting concluded with the recommendation of another six-month extension for Operation Princess using the Operation Pisces Attorney General exemption.  Id.

**The Attorney General's Exemption**

DAAG Warren explained the Attorney General's exemption in general:

DEA is required just to use money appropriated by the Congress for its operations except, and that's the Attorney General's exemption, when the Attorney General decides that money collected, for example, in an undercover operation, a money laundering operation, can be put back into the operation for rental of space, for other services of the operation.

It is the unusual circumstance and not the norm of an operation.

Q  Was it a simplistic process to apply for and be granted an Attorney General's exemption?

A  . . . No.  The DEA had to make an application usually in some detail, the Narcotic and Dangerous Drug Section would review it, would draft another memo that I would then review and sign off, it would go to the Deputy Attorney General and from there to the Attorney General sometimes with further memos required.

Tr. at 1511-12.

ASAC Salvemini explained how the Attorney General's exemption worked in this case:

Basically, it was permission from the Attorney General of the United States to do a number of things which would normally be considered criminal activities. Laundering the money is a criminal activity.  Not filing the IRS forms when you make a transaction of $10,000.00 or more is a criminal activity.  There's a Congressional prohibition against budget augmentation.  In other words, I was in essence augmenting the established Congressional budget for the Agency by doing what I was doing.

I had the permission to do all of these things, which normally would have landed me in jail.

Tr. at 354.

In a letter dated September 20, 1994, from SAC Thomas Cash to the United States Attorney for the Southern District of Florida, the grant of an Attorney General's exemption for Operation Princess was confirmed.  Pl.'s Ex. 94A; PX 253; see also Tr. at 1512.  The grant of an Attorney General's Exemption for Operation Princess was also memorialized in a memorandum from ASAC Salvemini to Gregory Passic, Chief of Financial Investigations at DEA Headquarters, through SAC Thomas V. Cash and Associate SAC Paul C. Higdon, dated November 10, 1994, stating:

> Subject: Request for Attorney General's Exemption Operation PRINCESS
> . . . .
>
> During the meeting of the Special Activities Review Committee (SARC) held on August 25, 1994 at DEA Headquarters, a decision was made to grant a new exemption for subject case, independent of that previously in existence for Operation PISCES.
>
> As instructed by the SARC, forwarded herewith is the FLDO proposal/operational plan for Operation PRINCESS.

Pl.'s Ex. 4 at G-56.  The FLDO proposal/operational plan referenced by the November 10, 1994 memo stated, inter alia, that "[t]rafficker funds will continue to be utilized to fund the entire operation as has been done successfully in Phase I of Operation PISCES."  Pl.s Ex. 4 at G-59.

### The Statement of Understanding

On April 8, 1994, the Princess and DEA signed a document entitled "Statement of Understanding."  Pl.'s Ex. 1.  The "Statement of Understanding" recited that DEA "is involved in long term criminal investigations involving drug traffickers and money launderers, and . . . [the Princess] is a cooperating individual involved in obtaining confidential information for the DEA and has voluntarily undertaken this role for compensation. . . ."  Id.  In furtherance of the investigation, the Princess "obtained false financial reports, Profit & Loss statements, income reports, bank statements and other related documents. . . ."  Id.  The Princess was to use "manufactured financial documents solely for the purpose of adding legitimacy to [her] role as a Cooperating Individual."  Id.  The Statement of Understanding was signed by the Princess and Task Force Agent Greg Lees.  Id.; Tr. at 148-49, 738-39.  Agent Lees described the Statement of Understanding as "a document which says [that DEA] might be creating a certain financial profile during the course of investigation that should [not] be used by the informant for their [sic] own benefit."  Tr. at 739.  He could not recall another instance where a similar document was signed by other confidential informants.  Id.  SAC Cash also testified that during his 24-year career with DEA he never saw a document similar

to this Statement of Understanding.  Id. at 936-38.

## Protection of Confidential Informants

ASAC Salvemini discussed security with the Princess.  He testified:

I talked in terms of her security and I promised her that I would do everything within my power to make sure that she was never injured or placed in harm's way. . . . I told her I'd be fair and honest with her and aboveboard in all our dealings and I expected the same from her. . . .  We talked in terms of the types of assistance I would afford her.

Tr. at 290-91.  When asked if he had any concerns with regard to safety of the Princess when she was working as an informant, ASAC Salvemini explained that "[t]here was always that concern. . . . I had concerns on a daily basis with her safety."  Id. at 306.

On December 10, 1993, ASAC Salvemini sent a memorandum to Associate SAC Paul Higdon concerning the promises that were made to the Princess regarding her safety when it appeared that her confidentiality would be compromised in connection with a separate investigation that was run by the Chicago DEA field office.  Pl.'s Ex. 99; Tr. at 312-313.  In that memorandum, ASAC Salvemini stated:

When the informant first began supplying information . . . to the Fort Lauderdale District Office it was with the condition and understanding that her informant status would not be revealed and that [neither] she nor any law enforcement officer that she introduced to [redacted] would have to testify in any court proceedings.  This understanding was, according to [the Princess], reconfirmed to her by DEA Special Agents (Chicago) and by AUSA . . . during their debriefing of her in July of 1992.

Pl.'s Ex. 99 at 4-5.  ASAC Salvemini testified that if the Princess' identity was discovered, "her life and her family's lives [would] be in real and immediate danger."  Id. at 4.[18]

## The Princess' Abduction

On or about August 28, 1995, with ASAC Salvemini's concurrence, the Princess traveled to Colombia and met with known narcotic traffickers.  Pl.'s Ex. 94 at 7.[19]  However, no prior

---

[18]  Section 6612.36 of the DEA Agents Manual stated "[t]he disclosure of an informant's identity, even when no prior guarantee of confidentiality was made, will be avoided whenever possible." Pl.'s Ex. 20 at 218.

[19]  Plaintiff's Exhibit 94 is a document entitled "Memorandum for the Administrator" and was written by ASAC Michael F. Kane subsequent to the conclusion of the Princess' tenure as a

notification had been made to DEA's Bogota Office or Headquarters. Pl.'s Ex. 94 at 7. Former DEA Administrator Donnie R. Marshall, who was Chief of Domestic Operations at the time, testified that ASAC Salvemini did not coordinate with the Colombian Office when he sent the Princess to Colombia. Tr. at 1059-60. Former Administrator Constantine explained his understanding of agency procedures to be followed when an informant is sent to a foreign country:

> [F]or an individual working with or being involved in any DEA investigation to go to a foreign country, especially a place as volatile as Colombia was during that period of time, there are certain key people at headquarters that have to be notified and approve that.
>
> . . . .
>
> In addition to that, the head of the DEA contingent in the country involved would have be notified. I think that's an established protocol, and I think we can all understand it. So that if you're in Colombia, and you're responsible for 40 or 50 DEA agents, you want to know what's occurring as another DEA investigation in your area of responsibility and maybe can provide some type of safety or cover or contact.

Id. at 1338-39. With respect to the Princess' trip to Colombia, Administrator Constantine testified:

> Virtually all of the DEA supervisors in Washington and in Bogota said they didn't recall or didn't have any notice or any knowledge of this individual [the Princess] being in country, and then the supervising DEA official, Mr. Salvemini, said that he had gotten approval. He thought he had tacit approval to do what he wanted to do with that.
>
> I don't know whether that was ever pursued inside DEA as an OPR investigation or not.
>
> THE COURT: As I understand your testimony, you testified that neither high-up DEA officials in Washington or Bogota knew that she was in country?
>
> THE WITNESS: That was my recollection. I mean, that was my big concern. I said how in God's name did this happen that somebody is placed in jeopardy, and it's a problem, and I get hot about things like that because I don't like to see people get hurt.
>
> THE COURT: And should that information have been provided to both D.C. and Bogota in writing?
>
> THE WITNESS: I can't tell you, Judge, exactly what their protocol is. It could be a teletype-type of approval, but it's pretty substantial policy within DEA if you're

_____

confidential informant. Pl.'s Ex. 94; see Tr. at 1548-50.

going to conduct an investigation in another country that headquarters approve that investigation. In essence, the head of DEA in country also knows that somebody is coming in to conduct an investigation so he can tell the ambassador. I mean, this whole thing has very serious international implications if it's done inappropriately.

Id. at 1339-40.

On August 31, 1995, the Princess was in Cali, Colombia meeting with the Major of the police in order to determine the names of individuals who were handling the money of a known drug trafficker for whom the Major worked as security. Id. at 167. The Princess was not accompanied by any DEA employees or by any of ASAC Salvemini's task force. Id. at 215. After a meeting between the Princess, the Major, and the drug trafficker, the Princess took a taxi with the Major to return to her family's home. Id. at 168. After the Major left the cab, the Princess was left alone, and the car was immediately attacked. Id. at 169. The Princess testified: "there were two men with hand grenades and then another one with one of those machine guns . . . I felt like I was going to be killed up in here, put [with] stones . . . and a plastic bag into the river." Id. at 169-70.

The abductor then put the Princess in the trunk of the car and took her to an unknown location 45 minutes away. Id. at 170. She testified: "I couldn't see anything. It was dark and there were three people. So finally they uncovered my face. They put a rope around my neck." Id. at 171. At that time, her captors identified themselves as members of a Colombian guerilla group. Id. The Princess' kidnappers apparently were unaware of her status as a DEA informant and had abducted her because they thought she was wealthy. Id. at 171-73. The kidnappers told the Princess to contact someone to negotiate her ransom. Tr. at 173. Fearing that her captors would learn of her informant status and contacts, the Princess ate her address book. As she testified:

They left me with the phonebook and it took me like one day, one day and a half to eat it, because I had to eat those pages. But I had all the information . . . . So I had to eat all of that so that nobody would get to the information because I figure they better kill me but no information is going to be released.

Id. at 173.

The Princess was placed in a room with a dirt floor with a bed made of hay or straw. Id. at 172. She further described the conditions:

They gave me . . . two pairs of shorts, two underwear, two t-shirts, a toothbrush, toothpaste, toilet paper, a bucket because there was no bathroom, a bucket. That was it. Oh, and a small T.V. . . . I needed to watch the Sunday mass. So they gave me a little T.V.

. . . .

It was every day the same thing. I mean I woke up, 5:00 they gave me a cup of tea, then the breakfast, very simple breakfast. . . . I was like in panic, to be honest with

you, because I did not know what they knew, why did they kidnap me. . . . I had no communication with the world.

. . . .

I kept asking, 'What are you going to do with me if nobody pays?' . . . [A]nd they will tell me, 'We will have to kill you.' . . . .

. . . .

       Q  When you would go out to take the shower on the third day, were you able to see what your environment looked like?

       A  Nothing, because they covered my face.  I went with a cover completely. So I never saw anything.  And it was dark, cause you know, when I was in a shower that I took that thing off, I had to touch to see where the soap was or how to turn on the water or anything like that.  The only thing I saw was a man with a weapon standing outside of the curtain there, but that was it.  I never saw anything.  I mean I was in a little room with no windows, only a metal door, with chains.  I mean no way to see or go anywhere.

Id. at 172-77.  The Princess was not physically abused during her abduction.  Id. at 177.

During cross-examination the Princess testified:

Q  . . . When you were in Colombia is it fair to say that you were often there on a mix of personal business and also some business for the DEA?

A  If it was for me to go on a pleasure trip, I will go any place but Colombia.  So the answer is no.  I was there strictly for business.

. . . .

Q  Okay.  When you were in Columbia [sic] is it true that you spent money to appear to be a person who had the money launderer's lifestyle?

A  Of course.  I paid for the Major to be elected as a Major.  I brought a $3,000.00 dog for one of the drug dealers.  I bought him a pair of glasses.  I mean you had to buy them and you buy them as gifts.

. . . .

Q  Okay. And is it true that people with money were often kidnaped in Columbia [sic]?

23

A  Very often.  That's why they walk around with body guards.

Q  And when you were in Columbia [sic] did you ask the DEA to provide you with body guards?

A  They'd laugh at me.  That's why I asked them to put that thing in my arm,[20] because I knew they couldn't provide me -- then they would give me two Americans and I would be shot in the next corner either way.  So no.

. . . .

Q  And in fact, ultimately your being freed was due to the DEA having money paid to kidnapers; isn't that true?

A  I'm sure that's what happened.  Nobody else was going to pay.

Id. at 214-16.

### The Payment to the Princess' Abductors

The Princess was told by the kidnappers that her release from captivity was negotiated by her brother and somebody from the United States who eventually came to an arrangement with her captors about money.  Id. at 178.  The Princess' release was effected on December 15, 1995, three-and-a-half months after the date of her capture.  Id. at 184.

According to a memorandum from ASAC John Costanzo of the Miami Field Division to Chief of Operations Harold Wankel, the Princess' release "was effected through a highly confidential source of the Bogota [office]."  Pl.'s Ex. 18 at G-113.[21]  ASAC Costanzo further explained that "[t]his [confidential source] risked and utilized numerous associates and personal assets to aid DEA in getting [the Princess] back," and recommended that DEA use Operation Pisces funds to reimburse the confidential source for some of the expenses incurred in obtaining the Princess' release.  Pl.'s Ex. 18 at G-113.

While the Princess was being held captive, a meeting was convened on October 10, 1995,

---

[20]  The Princess testified that she asked Tom Tiderington if DEA could implant some type of tracking device in her arm so that DEA would always be aware of her whereabouts, but there is no evidence that this was ever done.  Tr. at 134.

[21]  This memorandum was prepared after the Princess' kidnapping on January 28, 1996, and included a request to pay the Princess an award of $1.25 million.  Pl.'s Ex. 18 at G-112, G-113; Tr. at 1097.

at FBI headquarters to investigate her kidnapping. Pl.'s Ex. 95 at G-98.[22] [

]

Id. at G-100.

Ultimately, another cooperating source working out of the Bogota Office negotiated with the guerilla organization which had abducted the Princess in an attempt to secure her release. Pl.'s Ex. 94 at 7. The transaction between this cooperating source and the kidnappers was described in a memorandum for the DEA Administrator from SAC Michael F. Kane:

> [The CS] was advised by the Bogota CO that it was against policy and regulation for the United States to negotiate the release of any U.S. citizen from a terrorist organization and that any efforts on [the CS'] part were strictly of his own volition. On December 15, 1995, [the CS] paid . . . approximately $350,000.00 of his own money to the abductors, thus securing [the Princess'] release. The CS was reimbursed $49,000.00 by the Bogota CO for expenses he/she incurred during the negotiations. . . . The Fort Lauderdale D.O. issued [redacted], a DEA employee in Bogota, $50,000.00 from its commission account as a partial repayment to the CS for the $350,000.00 expended. This transaction is documented by a signed DEA 103 . . . funded by the OPERATION PISCES commission account. No other monies have

---

[22] This meeting is recounted in a Secret Memorandum for the file, which is in the process of being declassified. Tr. at 7.

been paid to this CS.

Pl.'s Ex. 94 at 7-8.

## **Approval Of Payments To The Princess**

In the file memorandum concerning the investigation of the Princess' kidnapping, ASAC Costanza explained that the Princess had been paid awards and expenses in excess of $1 million and that "[i]f [the] Princess was able to complete the operation she was active in before her kidnapping, DEA Miami would have submitted a request for a $1m award for her." Pl.'s Ex. 95 at G-99. In response to this assertion, Chief Wankel directed a DEA official to "pay [the] award to Princess through her family from the Asset Forfeiture Fund." Id.

After the Princess' return from her abduction, then DEA Chief of Domestic Operations Marshall recommended to DEA Chief Wankel that the Princess be awarded $996,000, contingent on her continued cooperation with DEA in pursuing indictments and convictions. Pl.'s Ex. 93 at G-33; Pl.'s Ex. 94 at 8.

Chief Marshall's request came after his consideration of an informal study of federal agencies' informant awards conducted by DAAG Warren at the behest of DEA Administrator Constantine. Pl's Ex. 93 at G-25 to G-32. DAAG Warren memorialized the study in a November 15, 1995 memorandum stating:

> Using the scale that emerges from the recent history of the Department of Justice awards made in similar, but, of course, not the same, circumstances (to include term of work, level of violators targeted, quality of information provided and undercover work preformed, personal risk, agreement to testify if called, as well as some consideration of number and amount of seizures and potential prosecutions), I would estimate that this informant's total award should fall in the $750,000 to $800,000 range. . . . The $750,000 to $800,000 range is a total award estimate and it must be noted that this informant has already received $432,900 in payment of awards from DOJ for this work, thus reducing the amount that might now be payable.

Id. at G-31. Administrator Constantine testified as to his determination that Plaintiff should be compensated, stating:

> Q  After being briefed about the kidnapping and any compensation that was discussed in the memorandum that you just talked about, was it your understanding that the DEA owed the Princess any money?
>
> A  It might have been in my sense or my mind that there was money in essence owed. It was something attributable to a previous case and investigations, but I wanted somebody else to take a look at that and see what would be the appropriate amount

of money that an informant would get for certain types of investigations.

Tr. at 1326-28.

> The Administrator elaborated:
>
> Well, it really goes back to the fundamental reason why I was so concerned about this was the safety of the individual involved and limitations of national policy, and being told the source of information had been working with DEA for a long period of time. And what's the appropriate amount of money that would be connected with that?
>
> In essence, I was trying to find a way somewhere along the line to get that person back safely without violating the law, and so that's why I wouldn't know who owed what to whom. . . .[W]hat I wanted to do was to have the Justice Department be an independent arbiter of what would be the appropriate amount of money that could safely be given to the . . . [Princess'] family and that also hopefully that would lead to her release.

Tr. at 1337.

DAAG Warren clarified why DEA paid the Princess additional compensation after her abduction:

> THE COURT: . . . You were searching for as you testified a suitable level of compensation for the Princess.  What was that compensation for?
>
> THE WITNESS:  For past services rendered using the same criteria that DEA would use often in consultation with a prosecutor in the case about the value of the informant's work based on the level of violator, the risk to the individual, whether the cooperator testified at trial.  That was important to me.
>
> Important to DEA were numbers of kilos seized and maybe dollars seized. I credited that less than the level of the violator, whether a prosecutable case was made and if indeed a person testified.
>
> THE COURT:  So as I understand your testimony that you just gave that compensation was for her past actions and was not related to her kidnapping?
>
> THE WITNESS: Correct. . . .

Id. at 1517-18.

Having taken into account DAAG Warren's study, DEA Chief of Domestic Operations Marshall ultimately stated:

> Ms. Warren's assessment resulted in an award estimate in the $750,000 to $800,000 range. Ms. Warren's assessment . . . pointed out that informants in money laundering cases could be paid awards "equal to 10 percent of the amount seized (although 5 percent is more typical) or the informant may be entitled to moiety, that is, up to 25 percent of the amount recovered." Utilizing this formula, [the Princess] could legitimately be paid between $1,350,000 (5 percent) and $6,750,000 (25 percent moiety) in connection with the $22,000,000 seizures alone. An additional amount could be justified on the basis of the considerable drug seizures and the past and future arrests resulting from the [Princess'] work.

Pl.'s Ex. 93 at G-32. Chief Marshall recommended $996,000 "based on the total seizure of $12,395,795" and was "8.03 percent of the total amount seized, well within the acceptable range for this type of award." Id. Administrator Constantine approved payment of $966,000 for the Princess after meeting with Chief Marshall on June 27, 1996. Id. at G-35.

## The Investigation of the Princess' Abduction

Subsequent to the kidnapping and return of the Princess, Chief Marshall, head of DEA's Domestic Operations, and Chief Chretien, head of DEA's International Operations, conducted an investigation of ASAC Salvemini's actions, and in a memorandum to DEA Administrator Constantine, reported that in August of 1995 ASAC Salvemini sent the Princess to Colombia, but failed to monitor the exact date she was planning to travel. Pl.'s Ex. 92 at G-19. ASAC Salvemini said the purpose of this particular operation was "to bolster her position as a money launderer and to make contacts in the money laundering business." Id. Thereafter, the Princess returned home to Florida for a short time for personal reasons, but was then asked by the DEA Fort Lauderdale office to return to Colombia, which Salvemini viewed as a continuation of the original trip. Id. Chiefs Marshall and Chretien asked ASAC Salvemini whether and to whom notification was made concerning the August 1995 trips:

> He [ASAC Salvemini] was asked whether he made notification to the Miami SAC or Associate SAC. His response initially was "no" but he then said that he told the Associate or Acting Associate, but did not remember specifically who it was. He was asked whether he notified [the Bogota Country Office]. ASAC Salvemini answered that . . . he had told [the Country Attache] that the [Princess] would be traveling "sometime in the next 10 weeks." ASAC Salvemini was asked whether he notified anyone in DEA [headquarters]. He answered that he did not specifically remember, but that there was "constant contact" with DEA Hqs on all trips.

Id. at G-20.

Over the course of an interview with DO Chief Marshall and Chief of International Operations Chretien, ASAC Salvemini stated "that throughout the operation utilizing [the Princess], he 'begged' DEA [Headquarters] for direction, and none was provided." Id. Therefore, ASAC Salvemini said,

he "'made [his] own direction.'"   <u>Id.</u>

After their review, Chiefs Marshall and Chretien concluded that ASAC Salvemini did not adhere to DEA procedures with respect to the Princess' travel to Colombia the month she was abducted stating:

In summary, the review revealed the following facts:

1. The Fort Lauderdale Office did, in fact, sponsor the [Princess'] travel to Colombia in August 1995.

2. It cannot be demonstrated that the Fort Lauderdale Office obtained either written or verbal approval from DEA [Headquarters] or [Bogota Country Office] for this trip.

3. ASAC Salvemini's contention that there was blanket authority for the [Princess] to travel at will is not corroborated by any of the other officials named by ASAC Salvemini as party to this arrangement.

4. Review by DO and OF staffers revealed no current official policy regarding interoffice travel by DEA [confidential sources].  DO Marshall consulted with OM Deputy Chief Don Sturn, who confirmed this to be accurate.

Pl.'s Ex. 92 at G-21-22; <u>see also</u> Tr. at 1058-60.  Furthermore, the Chiefs determined:

1. There is substantial evidence indicating that ASAC Salvemini was well aware of the accepted principle of coordinating interoffice investigations with all concerned offices, and he did not ensure that such coordination took place.

2. It appears that ASAC Salvemini either fabricated a non-existent agreement regarding the [Princess'] travel arrangements or grossly misinterpreted conversations with various people in arriving at the alleged "travel at will" arrangement.

3. In spite of the lack of coordination this [confidential source] substantially contributed to some significant investigations and accomplishments . . . .

Pl.'s Ex. 92 at G-22.  In light of ASAC Salvemini's conduct with respect to the Princess' travel arrangements, Chief Marshall and Chief Chretien recommended:

1. . . . that the Chief of Operations, through the Miami SAC, ensure that supervisory control measures which were implemented following the incident are adhered to,

2. . . . that Miami Field Division Management strongly [counsel] ASAC Salvemini, with documentation of counseling, regarding his failure to properly coordinate the

[confidential source's] activities,

3. . . . that OM include in the DEA Agents Manual language outlining requirements for coordination of interoffice investigations, including interoffice travel and activities by [confidential sources].

Id.

Chief Marshall testified as to his concerns regarding ASAC Salvemini's actions with respect to the Princess:

I was concerned that Mr. Salvemini was operating very loosely and not always in compliance with rules and regulations.

He was stretching the limit, if not out and out violating policies, and . . . fairly soon after I became chief of Domestic Operations, I came to look at his activities or I came to be very cautious about his activities, and I would caution division management to really watch him very closely.

Q   And what specific policies was he stretching, if you recall?

A   Pretty much you name it.

Tr. at 1058-59.  SAC Cash of the Miami Field Division, and Salvemini's supervisor, testified that ASAC Salvemini "had trouble being in compliance with policies and procedures," and that "[t]he administrative results . . . were his weaknesses."  Id. at 922.

With regard to the protocol that should have been followed when sending an informant to Colombia, Administrator Constantine stated that key individuals at DEA headquarters in Washington should have been notified before the informant traveled to such a volatile area.  Id. at 1338-39. Administrator Constantine's primary concern following the kidnapping was not whether the Princess was owed money, but "that the individual had been placed in harm's way without proper authorization from DEA supervisors at the appropriate levels."  Id. at 1335.

DAAG Warren testified "that when an individual [who] was part of an operation goes to a foreign country there has to be notice within the supervisory chain as well as notice to the embassy that someone is coming in" and that such notice had not been given in this instance. Tr. at 1521.

ASAC Salvemini described his understanding of the standard procedure for sending an informant to Colombia:

[I]f I was sending someone down to Columbia, I would have to get country clearance

30

from the Columbia -- from the Ambassador of Columbia.  I would also have to get clearance from Foreign Operations . . . [i]n addition to getting my clearances through, you know, my own [the DEA] . . . [a]nd sometimes the U.S. Attorney. . . .

Tr. at 243.  ASAC Salvemini testified "[e]very time she went down there we got country clearance." Id. at 353.  ASAC Salvemini believed that he was authorized to send the Princess to Colombia and that the notifications had been carried over from her previous trip.  Id. at 353-54.

### The Princess' Other International Travel As a Confidential Informant

Throughout the Princess' time working as a confidential informant, she and DEA executed numerous operations in Colombia and several other international locations including Switzerland, Costa Rica, Ecuador, Spain, Italy, and Canada.  Tr. at 128-29, 138-39.  The Princess testified that operations in Rome and Geneva had resulted in risks to her safety as a result of conduct by DEA agents.  Tr. at 165-66, 134-38, 163-66.  In an operation in Rome, the Princess lost business and her facade as a money launderer was weakened when an undercover DEA agent was identified by a Colombian drug dealer during a money drop.  Tr. at 165-66.[23]  In a different operation involving an Italian mafia organization utilizing the Princess' money laundering services, the Princess arranged to pick up $1 million in Geneva and deliver it to Bogota as a test of her skill as a money launderer. Tr. at 134-35.  After completing the pick-up and flying to Bogota with the money, the Princess was notified that she had to immediately flee her hotel because DEA had seized the $1 million, and the Italian mafia knew her location.  Id. at 136.  The Princess stated that the only reason "they didn't kill me [is] . . . because they didn't find me.  But I mean they kill you for $100,000.00 with not a problem."  Id. at 136.  Eventually, the Princess was able to re-establish a relationship with the Italian mafia, but only by acquiescing when they threatened to "cut [her] throat" unless she returned $350,000 of the $1 million seized.  Id. at 138.  The Princess testified:

Q . . . Would you describe how [the agents' actions] made you feel in terms of your security when these situations were arising that you described for us earlier?

. . . .

A   Well, obviously I was just a number working for them and producing for them. There was no feelings or no anything.  So whatever happened to me happened.  I mean it was like throwing to the wolves.  So it wasn't -- I was very afraid, obviously, because everybody has fear when the situation's like that and when it's death or life. . . . [F]or me it was like a non-caring situation. . . . [T]hat's why things -- mistakes like

---

[23]   In the memorandum to DEA Administrator Constantine concerning the Princess' kidnapping, Chiefs Marshall and Chretien acknowledged that while serving as the Country Attache for Italy, ASAC Costanzo cleared the Princess' trips to Italy via telephone.  Pl.'s Ex. 92 at G-17 to G-18.

that happened, because it showed that nobody or not everybody knew what was going on.

> To seize $1,000,000.00 coming from Geneva, first operations with the biggest, biggest mafia people in Italy, that doesn't make sense.  You do it the second or third time, but not the first time.  You put my life in danger, my family in danger, and you lost the business on top of everything.

Id. at 163-64.

## The Success Of Operation Princess

ASAC Salvemini sent a letter dated February 22, 1995, to the Assistant DO at DEA Headquarters in conjunction with pending requests for award payments to be made to The Princess. Pl.'s Ex. 10.  In an effort to justify these award requests, Salvemini described the success of Operation Princess up to that point as follows:

> Now, two years since this case's inception, the success of this investigation in meeting with its goals and objectives in this regard is measurable, and has been said to be unparalleled.  The accomplishments that have been realized to date are well documented and have been the subject of countless briefings of both DEA and DOJ officials at the highest levels.

> Simplistically recounted, however, efforts in this case over the last two years have thus far led to the arrest of five major Colombia based, TKO related traffickers including one DEA fugitive; the development of viable, prosecutable cases against approximately 30 other major Colombia based, TKO related traffickers; the development of viable, prosecutable cases against an additional 50+ cellheads and couriers in the United States, Europe and Canada; the seizure of approximately 23 million dollars of drug proceeds from traffickers; and the initiation of over 20 "spin-off" investigations, netting drug seizures and. . . additional arrests and potential arrests; notwithstanding the invaluable intelligence of an operational, strategic, and national security nature, that has been consistently developed and disseminated throughout the course of this case.

Pl.'s Ex. 10 at G-36.  ASAC Salvemini characterized the award requests as "nominal" in light of the Princess' contributions:

> [The Princess'] efforts in this case have thus far netted the U.S. Government nearly 23 million dollars.  Although technically the law provides for an entitlement to twenty-five per cent [sic] of this amount in reward, in this case over five (5) million dollars, the [Fort Lauderdale District Office] has at present, requested awards for the CI [confidential informant] amounting to a total of only $500,000, a nominal amount

32

considering the benefits reaped by the Government from the CI's activities to date. Further, although it is anticipated that additional award requests for [the Princess] will, in fact, be submitted in the future, they will in no way even near that amount allowable by law to be paid, and will represent a "small investment" considering the return yielded.

In view of the above, it is requested that immediate approval be granted by Headquarters for the $250,000 award to [the Princess] that currently remains pending, and that favorable action be taken on subsequent requests for awards for this CI as fair and just compensation for services rendered.

Id. at G-38.

## **Plaintiff's Salary and Payment of Operational Expenses**

As of February 13, 1995, [the Princess] has been paid the following:

| | |
|---|---|
| Salary | $ 270,000.00 |
| Operational Expenses | $ 196,951.58 |
| Rewards | $ 183,000.00 |
| [Total | $ 649,951.58] |

Operational expenses include extensive travel to South America and other countries, purchases made by [the Princess] on behalf of documented traffickers and other likewise expenses over the three year course of this investigation, all of which have been deemed necessary to and/or in furtherance of the case. All expenditures have been fully supported by appropriate justifications, documentation and receipts. [The Princess] has realized no personal financial gain from these monies.

The salary that is paid to [the Princess], $10,000.00 per month, takes into consideration the fact that [the Princess] has, over the last several years, had to provide sole support to his/her mother, brother, sister-in-law, and two children, who, in view of the inherent risks involved in [the Princess'] undertaking of the role in this case, were relocated to the United States from Colombia at the onset of the investigation as a precautionary measure, and who still remain totally dependent upon [the Princess] for support to date, since DEA has yet to be able to gain the cooperation of Immigration in granting them work authorization.

Further, the deep cover role in which [the Princess] was placed in this investigation, namely, that of a successful money launderer, is one that requires [the Princess] to demonstrate an affluent lifestyle and open his/her personal life to traffickers, which places [the Princess'] day to day life under close scrutiny by traffickers who frequently visit him/her in the U.S. and often stay with [the Princess] at [the

Princess'] home.

In view of these factors, the $10,000.00 per month salary being paid to [the Princess] is considered conservative.

Pl.'s Ex. 10 at G-37. [24]

## Plaintiff's "Reward" Payments

DEA paid Plaintiff "rewards," citing DEA Manual Section 6612.43(B), which allowed quarterly payments to informants of up to $25,000 approved by the SAC and larger sums approved by the DO. Specifically, payment vouchers and the Informant Payment Record indicate that Plaintiff received reward payments as follows:

| Date | Amount | Description | Fund | Approving Supervisor |
|------|--------|-------------|------|----------------------|
| 3/12/92 | $15,000 | reward for seizure of 397 kilograms cocaine, 1 ounce heroin and the arrest of 3 class one violators | Imprest Fund | Tiderington |
| 8/28/92 | $8,000 | reward for 8/21/92 money pick-up | Pisces Fund | unknown |
| 10/6/92 | $20,000 | reward for money pick-ups | Pisces Fund | Tiderington |
| 10/28/92 | $5,000 | reward for money pick-ups | Pisces Fund | Tiderington |
| 7/14/93 | $10,000 | reward for information leading to the seizure of $766,133 on 6/23/93 | Pisces Fund | Salvemini |
| 9/30/93 | $25,000 | reward for information leading to seizure of $400,000 US currency on 9/23/93 and 9/24/93 | Pisces Fund | Tiderington |

---

[24] These payment are detailed in DEA's record of payments made to the informant. Pl.'s Ex. 22; see also Tr. at 538-39, 608-09, 909.

The Princess testified that in July, 1992, she gave ASAC Salvemini an ultimatum that, unless she began receiving a $10,000 monthly salary, she would no longer work as a confidential informant, given the risks she was taking and the hardship to her family. Tr. at 98-99.

| 7/12/96 | $350,000 | the voucher states that this payment is a partial reward; the informant pay record states that this payment is for information. This payment is part of the $966,000 payment approved by Administrator Constantine after the Princess' kidnapping.  Pl. Ex. 93 at G-35. | Pisces | Salvemini |

Pl.'s Exs. 22, 25, 32, 39, 41, 83, 197.

## Plaintiff's "Award" Payments

The informant payment record and vouchers in the record indicate that Plaintiff received three "award" payments from DEA.  The first of the three awards -- $100,000 paid on August 23, 1994 -- was paid from the Asset Forfeiture Fund ("AFF").  Pl.'s Exs. 22, 54.  The source of the funds for the second award --$249,000 paid on May 1, 1995 – is unclear.  Pl.'s Exs. 22, 67.  The third and final award to Plaintiff totaled $966,000 and was made in installments from either the Asset Forfeiture Fund or the Operation Pisces fund.  Pl.'s Ex. 22; Pl.'s Ex. 93 at G-35.

## Total Payments Made to Plaintiff

According to the record, as of February 1995, the Princess received payments totaling $649,951.58 – which consisted of a salary of $270,000.00,[25] payment for operation expenses totaling $196,951.58, and $183,000.00 in rewards.  Pl.'s Ex. 10 at G-37.  By the time of her kidnapping in August 1995, the rewards paid to her had increased to $432,900, and the Princess received award payments after her kidnapping.  Pl. Ex. 93 at G-31; Pl.'s Ex. 22; Tr. at 197-198; Pl.'s Ex. 22.  In total, the Princess received approximately $1.85 million in salary, awards/rewards, and reimbursement for expenses as a result of her service as a confidential informant.  Pl.'s Ex. 22.[26]

---

[25] The record is unclear when the Princess' salary was increased to $10,000 per month or what it had been previously.

[26] The record is unclear as to the precise amounts the Princess was paid.  Defendant submits that the Princess was paid $1,848,839.56 citing the informant payment record, but this document is simply a summary list of payments purportedly entered when made and does not appear to be fully supported by underlying documents.  No copies of cancelled checks are in the record, and it is unclear whether the payment documentation in the form of teletypes, vouchers or memoranda in the record are complete or accurate.  Nonetheless, the Princess admitted that she received compensation but did not quantify the amount and did not dispute Defendant's evidence relating to her payments.  As such, the Court is persuaded that the Princess was paid approximately $1.85 million based upon

**Discussion**

I.      **The Government Did Not Breach its Implied-In-Fact Contract With The Princess For Payment of Commissions**

The Princess claims that the Government breached an implied-in-fact contract by failing to pay her $32 million in "commissions" owed  as a result of her work as a DEA informant -- 25 percent of currency she seized, with a $250,000 maximum per seizure, along with another 5-8 percent of the money laundered through the operation.

An implied-in-fact contract is founded upon a meeting of the minds and "is inferred, as a fact, from the conduct of the parties showing, in light of the surrounding circumstances, their tacit understanding." Night Vision Corp. v. United States, 469 F.3d 1369, 1375 (Fed. Cir. 2006) (quoting Hanlin v. United States, 316 F.3d 1325, 1328 (Fed. Cir. 2003) (citation omitted)).  In order to prove an implied-in-fact contract with the Government, Plaintiff must demonstrate: (1) mutuality of intent; (2) consideration; (3) lack of ambiguity in the offer and acceptance; and (4) actual authority to bind the Government in contract on the part of the Government representative whose conduct is relied upon.  Flexfab, L.L.C. v. United States, 424 F.3d 1254, 1265 (Fed. Cir. 2005) (citing Schism v. United States, 316 F.3d 1259, 1278 (Fed. Cir. 2002) (en banc)); see also Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947).

On summary judgment, the parties focused on the fourth element of the standard on whether an implied-in-fact contract had been formed i.e., whether ASAC Salvemini possessed the requisite authority to promise Plaintiff the commissions or whether such a promise had been ratified by persons with such authority.  SGS-92-X003 v. United States, 74 Fed. Cl. 637, 650-53 (Fed. Cl. 2006).  However, the evidence at trial demonstrated that the promise which DEA made was different than the promise Plaintiff claimed of a set 25 percent commission on all seizures.  Rather, ASAC Salvemini in his capacity as head of both the Ft. Lauderdale District Office and the Regional Task Force, was delegated the authority to pay the Princess any expenditure of up to $25,000 per quarter including rewards or awards consistent with the DEA Manual.  Tr. at 950, 1033-35.[27]  However, ASAC Salvemini could only recommend payment of awards above $25,000 per quarter, of "up to" 25 percent of the seizures.[28]  If ASAC Salvemini made such a recommendation, high level officials at DEA and DOJ would in their discretion authorize additional payments to the Princess based upon the success of the operation.  As ASAC Salvemini testified:

_____

this record.

[27]  The DEA Manual also prohibited promising "any award in any amount to an individual" and stated that "the payment of such awards is purely discretionary."  Pl.'s Ex. 20 at G-72.

[28]  There was an additional caveat that a reward for an individual seizure could not exceed $250,000.

THE COURT:   We had testimony . . . earlier about the limitation on you that required you to get approval if you were going to pay an informant anything above $25,000.00 per quarter.  And I think the testimony was a little bit confusing on that.

On the one hand I think I heard you say that that $25,000.00 per quarter limitation did not apply to rewards.  On the other hand I thought you said that it applied to everything.  So would you please clarify that for me?

THE WITNESS:   It applied to everything.  In other words, no matter what the informant was due, if it exceeded that $25,000.00 I would have to get permission to actually do it.
. . . .

THE COURT: . . . Did the $25,000.00 per quarter limitation on you, the requirement that you had to get approval for any payment above . . . $25,000.00 per quarter apply to rewards?

THE WITNESS:   It would have applied to the reward, of course.

Tr. at 482-83.

ASAC Salvemini admitted that he could only pay the Princess a commission of up to 25 percent if given approval:

THE COURT:   So as I'm understanding this, and correct me if I'm wrong, you had the authority to make the promise, but somebody else was going to make the payment?

THE WITNESS:   Yes.  I didn't have the money in my Shepherd account.  I mean I had PE/PI, but I wouldn't spend it in that fashion.

. . . .

THE COURT:   And who had the authority to make the payment?

THE WITNESS:   I had the authority to make the payment if Headquarters gave me the money to make the payment.

THE COURT:   If Headquarters gave you the approval.  So when you say Headquarters, who had to give you the approval?

THE WITNESS:  Well, if it came out of asset forfeiture fund, I think the Department

37

took it out of their pool.  If it came out of Headquarters, it came out of the
Headquarters PE/PI, a big operation, come from them.  Somebody had to give me the
money to do it.

Tr. at 483-85.

Further, Task Force Agent Hughes testified that when he and Agent Morris met with the
Princess, they told her that on a  "case specific" basis, she could receive "up to 25 percent of the
seizure with a cap on each case."  Tr. at 649.  (emphasis added).  So too, Agent Morris understood
that ASAC Salvemini had the authority to make promises to the Princess "through the Justice
Department" meaning that "he's got the authority to get the authority, basically.  We put our request
in through him and he would go through the appropriate channels in the chain of command to get
the authority for the payments. . . ."  Tr. at 727-28.  Similarly, SAC Cash testified that SACs and
ASACs could "promise to do their best to assist and aid [confidential informants] in every way
possible," but that they could not "make a promise to pay a specific amount of money . . . because
they don't have the decision[al] authority."  Tr. at 864-65.  Likewise, DEA's Deputy Chief of
Operations Wankel testified that agents could not promise or guarantee informants specific amounts
"because the agent did not have the authority to do that and did not know if the funding would be
available."  Tr. at 1033.

Importantly, the Princess herself understood that although ASAC Salvemini had "promised"
her a 25 percent commission, he had to obtain authority "from Washington D.C." to pay her any
amount above $25,000 per quarter.[29]  The Princess testified:

Q  Do you recall that you had to wait for clearance from Washington to get your
payments?

A  To get the payments when they reach a ceratin amount of money, yes.

Q  . . . Whenever you would go over $25,000.00 per quarter, you would have to wait
for clearance from Washington?

A  Exactly.

Q  Okay.  And therefore, you recognized that to get more than $25,000.00 per
quarter, Mr. Salvemini needed to get authority from Washington, D.C.?

---

[29]   The Princess testified that she believed she had been promised a set 25 percent
commission.  Specifically, the Princess testified: "They told me that they would pay me 25 percent
of all the seizures with a cap of $250,000.00."  Tr. at 100.  However, the weight of the evidence,
including the parties' course of performance established that she was promised a commission of "up
to" 25 percent subject to the approval of Washington, D.C.  Id.

A   That was my understanding, yes.

Tr. at 203-04; <u>see also</u> Tr. at 206, 220.[30]

The parameters of this oral agreement which emerged at trial are consistent with limitations in the Asset Forfeiture Act.  The Act provides, in relevant part:

> Any award paid from the Fund . . . shall be paid <u>at the discretion</u> of the Attorney General or his delegate, under existing departmental delegation policies for the payment of awards, except that the authority to pay an award of $250,000 or more shall not be delegated to any person other than the Deputy Attorney General, the Associate Attorney General, the Director of the Federal Bureau of Investigation, or the Administrator of the Drug Enforcement Administration.

28 U.S.C. § 524(c)(2) (2000) (emphasis added).  Thus, the asset forfeiture statute explicitly grants the discretion to pay awards to the Attorney General or his delegee.  As the Federal Circuit has recognized, "[t]o the extent rewarding informants was an 'integral part' of the duties of the officials, they were limited by the Comprehensive Forfeiture Act of 1984, Pub.L. No. 98-473, codified at 28 U.S.C § 524(c), which does not authorize payment promises providing for a percentage of all seizures, as alleged."  <u>Salles v. United States</u>, 156 F.3d 1383, 1384 (Fed. Cir. 1998).

Contrary to ASAC Salvemini and the Princess' characterization, the "promise" was not and could not legally have been for a set commission of 25 percent of all seizures.  Although ASAC Salvemini may have spoken too loosely at times in telling the Princess that she would receive a 25 percent commission on seizures, both he and the Princess acknowledged that this was not the extent

---

[30]  At one point, after threatening to cease her cooperation with DEA, the Princess agreed to continue working only after she received notification that ASAC Salvemini's superiors approved an apparent increase in her salary:

> . . . I told [ASAC Salvemini] , 'If you want me to keep working, I need $10,000.00.' And he told me, 'I don't think this is going to fly.'

> And I said, 'Well, if it doesn't fly I'm not flying anymore because I'm risking my life, I had to pull out of my country my family, and they're having trouble because they don't even have their green card that you promised.' . . .

> And he called me two days later and he said, 'Guess what, they approve it.'  I said,

> 'Thank God.'

Tr. at 98.

of their deal.  Both knew and accepted that "Washington" had to approve her commissions of "up to" 25 percent of a given seizure once ASAC Salvemini's $25,000 per quarter cap had been met.

Not only did the testimony establish the limited extent of the parties' oral agreement, but the parties' course of performance, which spanned almost four years, reflected their understanding that the Princess would receive an award or reward at a level commensurate with the value of her services after a proposal was reviewed and approved by "Washington" in the discretion of high level DEA and DOJ officials.[31]  See generally Restatement (Second) Contracts § 4 (stating that the intention to make a promise may be manifested by implication from other circumstances including a course of dealing, usage of trade or course of performance).

Here, the parties' course of performance reflected that all payments to the Princess above $25,000 per quarter including commissions of up to 25 percent of seizures, awards or rewards, had to be and were approved by DEA or DOJ higher ups in their discretion.  This course of performance between the Princess and ASAC Salvemini was a reflection of their common understanding.

The Princess continued to work as a confidential informant with the knowledge that she would only be paid commissions above the $25,000 quarterly limitation after high level officials approved the payment.  She testified:

Q . . . [Y]ou recognized that to get more than $25,000.00 per quarter, Mr. Salvemini needed to get authority from Washington, D.C.?

A  That was my understanding, yes.

Q  And in fact, there were times you had to wait for a while to get that clearance, for Mr. Salvemini to get that clearance, before you could be paid; is that right?

A  I think so, yes.

        . . . .

Q  But even though as you understood it, Agent Salvemini, . . . had to get that clearance from Washington, you still continued to work for him, correct?

A  Of course.

Q  And that was because you wanted to continue to do the work?

---

[31]  Plaintiff attempts to distinguish between an "award" and "reward," and while there may technically be such a distinction, it was not honored by the parties here.  Rather, they used the terms interchangeably to refer to the Princess' commissions for seizures.

A  Yes, I really like my work.

Tr. at 204-05.

Importantly, the course of performance over the years the Princess served as a Confidential Informant bears out this basic agreement -- that although ASAC Salvemini may have purported to "promise" Plaintiff a 25 percent commission on the value of her seizures, ASAC Salvemini was not himself authorized to pay the Princess a 25 percent commission above $25,000 per quarter, but instead had to obtain approval from Washington, D.C. to do so.  The paper trail of teletypes, payment vouchers, Plaintiff's "Informant Payment Record," as well as ASAC Salvemini's correspondence indicate not only that the Princess was never paid close to a 25 percent commission for her seizures, but also that ASAC Salvemini had not even requested the full 25 percent.  See Pl.'s Ex. 10 at G-38. (where ASAC Salvemini wrote: "Although technically the law provides for an entitlement to twenty-five per cent of this amount in reward, the [Fort Lauderdale District Office] has . . . requested awards for the [Princess] amounting to . . . $500,000, a nominal amount considering the benefits reaped by the Government from the [Princess'] activities to date.").

Given that it is clear that both Plaintiff and ASAC Salvemini understood that his promise to pay the Princess a commission on seizures was conditioned on subsequent approval by higher-ups at DOJ, Plaintiff  has not demonstrated that she entered into a binding agreement with DEA whereby Government agreed to pay her 25 percent of all seizures with a cap of $250,000 per seizure.  Rather, the contract was a very different "trust us" type agreement, whereby ASAC Salvemini promised in essence to use his best efforts to obtain commissions of "up to" 25 percent, that would only be paid upon approval of high-level officials.  The Princess understood she was working for DEA and that her rewards would be recommended by ASAC Salvemini, but paid by the Government if approved and that there was no guarantee that ASAC Salvemini's requests would be approved.  This was the extent of the parties' contract.  As such, the Princess has neither demonstrated the existence of a contract entitling her to a set 25 percent commission on all her seizures, nor a breach of such contract.[32]  The Government paid the Princess approximately $1.85

---

[32]  Nor has Plaintiff established an implied-in-fact contract for 5-8 percent of the money laundered.  Although the Princess understood that she was to receive 5-8 percent of the total funds laundered, ASAC Salvemini testified that she was only promised 5-8 percent of the 5 percent transaction fee that the Princess charged for her money laundering service.  Thus, Plaintiff was to receive a "percent of a percent" of total funds laundered, which ASAC Salvemini testified was "relatively nominal."  Tr. at 474.  Plaintiff has failed to prove the elements of this aspect of her alleged contract.  There was no meeting of the minds as there was no demonstrated offer, acceptance or mutuality of intent on this aspect of her claimed contract, and the purported offer and acceptance were ambiguous.  The complaint adds to this confusion, alleging Plaintiff was entitled to 4 percent of funds laundered directly and 3 percent of funds laundered indirectly as a result of Plaintiff's assistance.  See Compl. ¶¶ 15, 16.  Unlike the Princess' salary, expenses and some award and reward payments, there is insufficient evidence to prove a course of performance with respect to a separate 5-8 percent commission on the money-laundering commission.  As such, the Court finds Plaintiff failed to prove she had a contract for this type of commission.

million for her services as a confidential informant; she has no contractual right to additional compensation for commissions.[33]

This does not however end the matter. Plaintiff has alleged another breach -- that Defendant committed a tortious breach of this same implied-in-fact contract because the Government failed to protect her.

## II.   Defendant Breached The Duty Of Good Faith And Fair Dealing Implied In Its Contract With The Princess

### Jurisdiction Over Tortious Breach of Contract Actions

The Princess claims that the Government breached its contract with her by failing to maintain her confidentiality, protect her from harm and ensure her safety. See Compl. ¶¶ 17-19, ¶ 10.[34] Defendant reiterates arguments it made on motion that these claims should be dismissed for lack of subject-matter jurisdiction because they assert negligence by the Government and therefore sound in tort. Def.'s Post Trial Br. at 43. However, the Court denied this motion to dismiss in an earlier decision, finding that an action which arises primarily from a contractual undertaking may be maintained in this Court regardless of the fact that the loss resulted from the negligent manner in which the Defendant performed its contract. SGS-92-X003 v. United States, 74 Fed. Cl. 637, 655 (2007). Defendant has articulated no rationale for this Court to depart from its previous holding that jurisdiction over this action lies in this Court pursuant to the Tucker Act. The Tucker Act provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any act of Congress . . . or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (emphasis added).

---

[33] Finding liability for any additional amounts would amount to rewriting the Princess' and ASAC Salvemini's agreement. The Court may not assess the Government's contractual liability here in terms of quantum meruit or the benefit it deems the Government received by virtue of Plaintiff's services. Such relief would be appropriate for breach of a contract implied in law, but this Court would lack jurisdiction over such a claim. See Trauma Serv. Group v. United States, 104 F.3d 1321, 1324-25 (Fed. Cir. 1997) ( Tucker Act "[j]urisdiction based on contract 'extends only to contracts either express or implied in fact, and not to claims on contracts implied in law.'" (quoting Hercules, Inc. v. United States, 516 U.S. 417, 423, 116 S.Ct. 981, 985, 134 L.Ed.2d 47 (1996)).

[34] As a result of the trial record Plaintiff has amplified these allegations to argue that Defendant tortiously failed to notify DEA and Colombian officials of her travel to Colombia as a confidential informant during Operation Princess which resulted in her kidnapping and injury. Plaintiff's Proposed Findings of Fact and Conclusions of Law at 102.

"It is well established that where a tort claim stems from a breach of contract, the cause of action is ultimately one arising in contract, and this is properly within the exclusive jurisdiction of the Court of Federal Claims to the extent that damages exceed $10,000." Awad v. United States, 301 F.3d 1367, 1372 (Fed.Cir. 2002); Wood v. United States, 961 F.2d 195, 198 (Fed. Cir. 1992) ("If an action arises 'primarily from a contractual undertaking,' jurisdiction lies in the Claims Court 'regardless of the fact that the loss resulted from the negligent manner in which defendant performed its contract.'") (quoting San Carlos Irrigation and Drainage Dist. v. United States, 877 F.2d 957, 960 (Fed. Cir.1989)); Bird & Sons, Inc. v. United States, 420 F.2d 1051, 1054 (Ct. Cl. 1970); Chain Belt Co. v. United States, 115 F. Supp. 701, 711-12 (Ct. Cl. 1953); Rivera Agredano v. United States, 70 Fed. Cl. 564, 570 (2006).

As the Awad Court recognized,

> many breaches of contract can also be treated as torts. But . . . where the 'tort' complained of is based entirely upon breach by the government of a promise made by it in a contract so that the claim is in substance a breach of contract claim, . . . [the right to sue in tort does not] bring the case within the Federal Tort Claims Act.

301 F.3d at 1372. Here, Plaintiff claims that ASAC Salvemini, her direct supervisor in the undercover operation, dispatched her to Colombia as part and parcel of the parties' performance of their implied-in-fact contract. Plaintiff was working in an undercover capacity and met with the Major of the local police in Colombia to determine the identities of money launderers for a known drug trafficker. Plaintiff had an ongoing relationship with the Major in the operation and was with him just before she was kidnapped.[35] Plaintiff claims that ASAC Salvemini negligently performed his contractual responsibilities when he dispatched her to Colombia without following DEA's minimal procedures of notifying the requisite authorities of her trip. Pl.'s Proposed Findings of Fact and Conclusions of Law at 104.

Defendant relies on Kania v. United States, 650 F.2d 264 (Ct. Cl. 1981) and its progeny, to argue that this Court lacks jurisdiction over Plaintiff's claim by characterizing Plaintiff's alleged contract as a witness protection agreement which it claims is beyond the reach of this Court's Tucker Act jurisdiction. Def.'s Post-trial Brief at 44. The Kania Court found no Tucker Act jurisdiction over an Assistant United States Attorney's (AUSA's) oral agreement to grant immunity for testimony where the agreement did not reflect that the AUSA had specific authority to obligate the Government to pay money. The plaintiff in Kania alleged that the AUSA agreed not to prosecute him if he testified truthfully before a grand jury, but reneged on this agreement by indicting him, causing him to incur defense costs. Kania, 650 F.2d at 267.

In dismissing that breach of contract suit, the Court of Claims carved out an exception to the Court's general Tucker Act jurisdiction stating:

> The contract liability which is enforceable under the Tucker Act consent to suit does not extend to every agreement, understanding, or

---

[35] The Princess had "paid for the Major to be elected as a Major." Tr. at 214.

> compact which can semantically be stated in terms of offer and acceptance or meeting of minds. The Congress undoubtedly had in mind as the principal class of contract case in which it consented to be sued, the instances where the sovereign steps off the throne and engages in purchase and sale of goods, lands, and services, transactions such as private parties, individuals or corporations also engage in among themselves.

650 F.2d at 268.

The Kania Court further noted that it was "particularly unreasonable to suppose that Congress in enacting the Tucker Act intended for this court to intervene in the delicate and sensitive business of conducting criminal trials, and stated:

> [W]e would deem it possible to make a binding contract subject to Tucker Act jurisdiction, creating a liability for breach of a plea bargaining agreement or one to grant immunity for giving testimony, or to protect a witness. But, in such case, the court would look for specific authority in the AUSA to make an agreement obligating the United States to pay money, and spelling out how in such a case the liability of the United States is to be determined. . . .

> The need for specificity is the greater because the role of the judiciary in the high function of enforcing and policing the criminal law is assigned to the courts of general jurisdiction and not to this court. It would be reasonable to expect that the court which is to police and, in appropriate cases enforce, agreements for plea bargains, or witness protection, or for immunity, will be the courts in which are or will be pending the criminal prosecutions to which the agreements relate.

Id. at 268-69.

The Federal Circuit applied Kania's rationale in Sanders v. United States, 252 F.3d 1329 (Fed.Cir. 2001), and held that the Government's alleged breach of an agreement with a criminal defendant concerning his release on bail did not give rise to a claim for money damages. 252 F.3d at 1331. In Sanders, the Federal Circuit expressly recognized that while there is a presumption in a civil context that a damages remedy will be available for breach of an agreement, and that such presumption may apply to agreements that are part civil and part criminal, a different rule obtains where "the agreement is entirely concerned with the conduct of the parties in a criminal case." Sanders, 252 F.3d at 1334.

The Sanders Court followed other courts that likewise concluded that "breaches of plea agreements and other agreements arising out of the criminal justice system do not ordinarily give rise to claims for money damages. Id. at 1335 (citing 1-95-CV-553-P1 v. 1-95-CV-553-D1, 75 F.3d

135 (2d Cir. 1996) and <u>Sadeghi v. United States</u>, 46 Fed. Cl. 660, 662 (2000)).[36]  Like <u>Kania</u>, <u>Sanders</u> reiterated that breaches of agreements unique to the criminal justice system should be left to courts that oversee criminal matters – not the United States Court of Federal Claims.  <u>See id.</u> at 1335-36.[37]

     <u>Kania</u> and <u>Sanders</u> are distinguishable from the instant case in several respects.  First, this is a case where the Government engaged the Princess to perform services not in exchange for immunity or as part of a plea agreement but in exchange for money, and then in performance of this

services contract allegedly failed to follow its own minimal procedures for dispatching her on international travel.  The contracts at issue in <u>Kania</u> and <u>Sanders</u> arose out of the criminal justice system and not in the civil context where "there is a presumption . . . that a damages remedy will be available. . . ."  <u>Sanders</u>, 252 F.3d at 1334.  Indeed, this Court has frequently assumed Tucker Act jurisdiction over the type of agreement the Princess entered into to provide services as a confidential informant.  <u>See, e.g.</u>, <u>Salles v. United States</u>, 156 F.3d 1383, 1383-84 (Fed. Cir. 1998) (affirming summary judgment by Court of Federal Claims denying claims for breach of alleged oral contract on grounds that promisor officials lacked authority to promise informant commission); <u>Tracy v. United States</u>, 55 Fed. Cl. 679, 683 (2003); <u>Doe v. United States</u>, 48 Fed. Cl. 495, 501 (2000); <u>Khairallah v. United States</u>, 43 Fed. Cl. 57, 63 (1999).[38]

     The Princess' services agreement does not arise out of the criminal justice system in the sense that her agreement implicates "the delicate and sensitive business of conducting criminal trials" or is properly enforced by the court administering a criminal case related to her agreement. <u>Kania</u>, 650 F.2d at 269.  Indeed, there is no criminal case related to the Princess' agreement or its breach.  Unlike <u>Kania</u> or <u>Sanders</u>, the Government's prosecutorial discretion did not play any role -- let alone a paramount role -- with respect to Plaintiff's alleged agreement.  This is not a contract like a plea or immunity agreement subject to enforcement in a court of general jurisdiction in connection with its criminal jurisdiction.  Although Defendant characterizes the Princess' contract as an agreement to protect a witness, it is not such an agreement.  The Princess was not in the witness

---

    [36]  <u>Sanders</u> focused on the remedy for an alleged breach of a plea or immunity agreement, noting that no damages remedy is available for breaches of those type of agreements, instead pointing out that the remedy would be enforcement or specific performance of the agreement or affording the defendant the opportunity to withdraw the plea.

    [37]  In <u>Awad</u>, 301 F.3d at 1375 (Fed. Cir. 2002), the Federal Circuit cited <u>Kania</u> with approval and left it to the Court of Federal Claims to determine whether <u>Awad</u>'s suit was "the type of contract action over which it may exercise jurisdiction."

    [38]  Defendant accepts that this Court has Tucker Act jurisdiction over the Princess' claim for commissions under the theory of breach of an alleged agreement for confidential informant services. Yet, the same agreement is alleged to have been breached by the Government's failure to protect the Princess while she performed her undercover services.  Thus, under Defendant's theory, Tucker Act jurisdiction would lie for one claim of breach of a contract but not for another claim for breach of that same contract.

protection program when she was working undercover and abducted, and her confidential informant contract was not incident or adjunct to any particular criminal proceeding.[39]

In assuming jurisdiction in this case, this Court is not treading on the District Court's criminal jurisdiction, it is merely entertaining a claim for breach of contract. If not actionable in this Court, the alleged breach of this contract is actionable nowhere.

## Defendant Breached Its Contract With The Princess By Failing to Follow Its Established Procedures

With respect to every government contract, both the Government and its contracting partner are bound by the covenant of good faith and fair dealing. Centex Corp. v. United States, 395 F.3d 1283, 1304 (Fed. Cir. 2005); Essex Electro Eng'rs, Inc. v. Danzig, 224 F.3d 1283, 1291 (Fed. Cir. 2000); see also United States v. Winstar Corp., 518 U.S. 839, 895-96 (1996). The covenant imposes obligations on contracting parties that "include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." Centex, 395 F.3d at 1304. A governmental entity's actions under a contract are "limited by the implied duties to cooperate and not to hinder found in every contract, which are subspecies of the implied duty of good faith and fair dealing." Trinity River Lumber Co. v. United States, 66 Fed. Cl. 98, 108 (2005) (citing Precision Pine v. United States, 50 Fed. Cl. 35, 59 (2001)); see also Maxima Corp. v. United States, 847 F.2d 1549, 1556 (Fed. Cir. 1988) ("The need for mutual fair dealing is no less required in contracts to which the government is a party, than in any other commercial arrangement."). If a plaintiff has successfully stated a claim for breach of the implied covenant of good faith and fair dealing by the Government, he has also stated a legitimate claim for damages that ensued as a result of the breach. See Centex, 395 F.3d at 1314; Commerce Int'l Co. v. United States, 338 F.2d 81, 86 (Ct. Cl. 1964).

The nature and scope of the Government's duty to cooperate " is to be gathered from the particular contract, its context, and its surrounding circumstances." Commerce Int'l Co., 338 F.2d at 86. Here, under the parties' implied-in-fact contract whereby the Princess served as a confidential informant, the Government owed the Princess a duty to refrain from taking any action that would either disrupt her ability to effectively perform as a confidential informant or that might render the value of its own performance worthless. See Centex, 395 F.3d at 1304. In practical terms, this meant DEA was obligated to follow its own established protocol for sending the Princess overseas -- minimal notification to ensure her continued viability as a confidential informant. The government's own investigation established that ASAC Salvemini failed to follow fundamental DEA and Colombian protocols when he authorized the Princess' travel to Colombia without notification of or approval from the proper authorities. While DEA's obligations to a confidential informant may not extend to ensuring an informant's safety, at the very least, the agency was obligated to follow its own policies when sending an informant to a volatile "hot spot" overseas. See, e.g., Agredano v. United States, 82 Fed. Cl. 416, 444-45 (2008) (stating that the plaintiff could

---

[39] While it was the hope of DEA and the Princess that her efforts would lead to criminal prosecutions of drug traffickers, this does not convert the Princess' contract into one arising out of the criminal justice system.

prove that Government violated covenant of good faith and fair dealing if, among other things, the Government "acted in direct contravention of its stated policy").

Administrator Constantine, Chief Marshall, Chief Chretien, and DAAG Warren all confirmed DEA's failure, specifically ASAC Salvemini's failure, to properly coordinate the Princess' activities with both the United States agencies and the Colombian embassy and government in the days and weeks leading up to her kidnapping in August, 1995. Specifically, Chief Marshall and Chief Chretien concluded that:

> . . . ASAC Salvemini was well aware of the <u>accepted principle of coordinating interoffice investigations with all concerned offices</u>, and he did not ensure that such coordination took place.

> . . . ASAC Salvemini either fabricated a non-existent agreement regarding the [Princess'] travel arrangements or grossly misinterpreted conversations with various people in arriving at the alleged "travel at will" arrangement.

Pl.'s Ex. 92 at G-22 (emphasis added).

Chiefs Marshall and Chretien advised Administrator Constantine that "it is a <u>long established, recognized and accepted principle</u> that any interoffice investigative activities require coordination with and approval by the division or country office in which the activities are conducted." Pl. Ex. 92 at G-21 (emphasis added). Administrator Constantine also testified that the Princess had been sent overseas without proper authorization:

> . . . My main concern . . . at that point in time was the safety of the individual involved in this, and <u>my concern was that the individual had been placed in harm's way without proper authorization from DEA supervisors at the appropriate levels</u>. And I kind of tasked the staff to do everything we possibly could legally to get that person back safely. That was my primary issue on this.

Tr. at 1335 (emphasis added).

Section 205, comment d of the Restatement (Second) of Contract states:

> Good faith performance. Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified. But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

Restatement (Second) Contracts § 205 cmt. d. At the very least, DEA here interfered with and

47

failed to cooperate in the Princess' performance of the Colombian operation. Although the evidence suggests that ASAC Salvemini was a "rogue agent," he was employed by DEA and acting within the scope of his employment when he sent the Princess into "harm's way" without following procedures or notifying domestic and international authorities or obtaining DEA's authorization. According to the Government's own documents, ASAC Salvemini was aware of the agency's "accepted principles," but violated them and either "fabricated a non-existent agreement" or "grossly misinterpreted" conversations in dispatching the Princess to Colombia. Pl.'s Ex. 92 at G-22. This is precisely the type of subterfuge and evasion which in the words of Section 205 of the Restatement "violate the obligation of good faith in performance even though the actor believes his conduct to be justified." Restatement (Second) of Contracts, Section 205, cmt. d. The Court need not attempt to define the full nature or extent of the Government's duty to protect confidential informants in the context of this case. Suffice it to say that the Government here breached its own minimal standards -- mere compliance with established, recognized and accepted operating procedures and protocol -- by ASAC Salvemini's admitted failure to notify DEA and the Colombian Government of this informant's overseas travel.

While the Court has found that the Government breached its duty of fair dealing inherent in the Princess' implied-in-fact contract by failing to follow its own protocol in sending her to Colombia, this finding of liability does not address whether or to what extent this breach caused Plaintiff compensable damages. Because the parties requested bifurcated proceedings, this issue will be addressed in a subsequent trial. Plaintiff has the burden of proving that her kidnapping and ensuing damages resulted from the Government's breach of contract. San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1562-63 (Fed. Cir. 1997); Prudential Ins. Co. of Am. v. United States, 801 F.2d 1295, 1300-01 (Fed. Cir. 1986); see also Bohac v. Dep't of Agriculture, 239 F.3d 1334, 1339-41 (Fed. Cir. 2001). A party that establishes a breach of contract may recover expectancy damages "sufficient to place the injured party in as good a position as he or she would have been had the breaching party fully performed." San Carlos, 111 F.3d at 1562-63 (citing Estate of Berg v. United States, 687 F.2d 1345, 1358 (1969)); see also Restatement (Second) of Contracts § 344.

The Federal Circuit recently articulated a test for the recovery of expectancy damages stating:

> As a general proposition, a party is entitled to expectancy damages if the party satisfies three requirements. First, the party must show that the claimed damages were within the realm of reasonable foreseeability at the time the contract was entered into (the foreseeability requirement). Second, the party must establish that the damages would not have occurred but for the breach (the causation requirement). Third, "the measure of damages must be reasonably certain, although if 'a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery' " (the proof of damages to a reasonable certainty requirement).

Fifth Third Bank v. United States, 518 F.3d 1368, 1374 (Fed. Cir. 2008) (citations omitted). Losses are foreseeable as a probable result of a breach if they follow from the breach in the "ordinary

course of events." Restatement (Second) of Contracts § 351. "Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made." Id. "Remote and consequential damages are not recoverable in a common-law suit for breach of contract . . . especially . . . in suits against the United States for the recovery of common law damages . . . ." San Carlos, 111 F.3d at 1563.

Thus, in order to recover damages, the Princess must demonstrate that the losses she suffered followed from DEA's failure to notify the requisite entities in dispatching her to Colombia. See Adregano, 82 Fed. Cl. at 448. Secondly, Plaintiff must demonstrate a causal relationship between the Government's breach and her losses.[40] In analyzing causation, the Federal Circuit has set forth two standards: the "substantial factor" theory and the "but for" theory. Citizens Fed. Bank v. United States, 474 F.3d 1314, 1318 (Fed. Cir. 2007). Under the "substantial factor" theory of causation a plaintiff may recover damages where a defendant's breach of a contract "was a substantial factor in causing the damages." Id. The "but for" theory . . . provides that "a 'plaintiff can only recover those items of damage which are the proximate result of the acts of the Government.'" Id. (quoting Myerle v. United States, 33 Ct. Cl. 1, 27 (1897)). Ultimately, it is within the discretion of the trial court to determine which standard to apply: "the selection of the appropriate causation standard depends upon the facts of the particular case and lies largely within the trial court's discretion." Id.

With regard to the third requirement, that damages be proved with reasonable certainty, Plaintiff may not recover speculative damages or damages for which there is not tangible proof. Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 667 (Fed. Cir. 1992) (citing Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562-63 (1931); Assurance Co. v. United States, 813 F.2d 1202, 1205 (Fed. Cir. 1987); Joseph Pickard's Sons Co. v. United States, 532 F.2d 739, 744 (Ct. Cl. 1976)). While the amount of damages need not be proven with "absolute exactness or mathematical precision," Indiana Michigan Power Company v. United States, 422 F.3d 1369, 1373 (Fed. Cir. 2005), the evidence adduced must enable the court to make a "fair and reasonable approximation of the damages." Slattery v. United States, 69 Fed. Cl. 573, 576 (2006) (quoting Locke v. United States, 283 F.2d 521, 524 (1960)).

## Conclusion

1.      Plaintiff has not established that the Government breached a contract to pay her commissions for her service as a confidential informant. As such, the Court directs the Clerk to enter judgment dismissing her claim for commissions.

2.      This Court has Tucker Act jurisdiction over Plaintiff's claim that the Government breached her contract for services as a confidential informant. This action is not within the exception to Tucker Act jurisdiction set forth in Kania and its progeny.

---

[40] Because of the bifurcation of proceedings, Plaintiff has not yet articulated with specificity what losses she claims stemming from Defendant's breach. Prior to commencing further proceedings, this Court will require Plaintiff to do so.

3.     The Government breached its implied duty of good faith and fair dealing inherent in Plaintiff's contract by violating its own procedures in sending the Princess to Colombia.  Because this is a bifurcated proceeding, a separate trial will be held to determine whether the Government's breach caused the Plaintiff damages, and if so, in what amount.

4.     The Court will conduct a status conference with counsel via telephone on **February 23, 2009, at 11:30 a.m.**  In preparation for this conference Plaintiff shall file a statement setting forth separately the elements of her damages and the amount of each element.  This Statement of Damages shall be filed by **February 20, 2009.**

5.     This decision is issued under seal.  The parties shall file any proposed redactions by **February 6, 2009**.


s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**