# In the United States Court of Federal Claims

### No. 97-579C
### (Filed August 30, 2014)
### (Republished September 26, 2014)[1]

```
* * * * * * * * * * * * * * * * * * * * * * * * * * * *
                                              *
SGS-92-X003,                                  *
                                              *
              Plaintiff,                      *
                                              *
       v.                                     *
                                              *
THE UNITED STATES,                            *
                                              *
              Defendant.                      *
                                              *
* * * * * * * * * * * * * * * * * * * * * * * * * * *
```

Breach of Implied-in-Fact Contract;
Breach of Duty of Good Faith and
Fair Dealing; Duty to Protect;
Confidential Informant; Violation of
Procedures; Multiple Sclerosis;
Expectation Damages; Causation;
Foreseeability; Reasonable Certainty.

Michael L. Avery, Sr., 1331 H Street, N.W., Washington, D.C., for Plaintiff.

Stuart F. Delery, Jeanne E. Davidson, Bryant G. Snee, and Jonathan Reid Prouty, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Ben Franklin Station, Washington, D.C. 20044, for Defendant.

---

## OPINION AND ORDER

---

WILLIAMS, Judge.

This breach-of-contract action comes before the Court after a trial on damages. In its decision addressing liability, the Court determined that the Drug Enforcement Administration ("DEA") breached an implied-in-fact contract and its duty of good faith and fair dealing by failing to protect Plaintiff, an undercover informant. During an undercover operation in Colombia, Plaintiff, known as "the Princess," was kidnapped and held captive for more than three months. Plaintiff claims that her kidnapping and prolonged captivity caused the onset of her multiple sclerosis[2] and seeks compensatory damages in the amount of $10,000,000 for

---

[1] The Court issued this opinion under seal on August 30, 2014, and directed the parties to file proposed redactions by September 19, 2014. The Court publishes this opinion with the proposed redactions and errata corrected. Redactions are indicated by brackets "[ * * * ]."

[2] "A chronic, typically progressive disease involving damage to the sheaths of nerve cells in the brain and spinal cord, whose symptoms may include numbness, impairment of speech and

financial losses, inconvenience, future medical expenses, physical pain and suffering, and mental anguish arising from Defendant's breach.

Because Plaintiff demonstrated that Defendant's breach of contract was a substantial factor in causing the Princess' kidnapping and captivity, and triggering her multiple sclerosis, the Court awards the Princess the value of her life care plan, $1,145,161.47.[3]  Plaintiff failed to prove any other damages.

## **Findings of Fact**[4]

Plaintiff served as a confidential informant for DEA from December 1991 to 1995.  DX 6;[5] PX 119.  The Princess and DEA representatives signed a "Statement of Understanding" that acknowledged that the Princess was "a cooperating individual involved in obtaining confidential information for [DEA] and has voluntarily undertaken the role for compensation."  DX 6; PX 1.  DEA ran an undercover operation revolving around the Princess out of its Fort Lauderdale District Office ("FLDO").  As head of that office, Assistant Special Agent in Charge ("ASAC") Joseph P. Salvemini created the "Southeast Florida State and Local Task Force" to focus on top-tier narcotics cases.[6]  SGS-92-X003 v. United States, 85 Fed. Cl. 678, 82 (2009).

---

muscular coordination, blurred vision and severe fatigue."  Concise Oxford English Dictionary 1289 (12th ed. 2011).

[3] The life care plan, prepared by Plaintiff's expert in rehabilitation and life care planning, sets forth estimated costs for the Princess' medical treatment for multiple sclerosis and other related services for the remainder of her life expectancy.

[4] These findings of fact are based on the record developed at the liability and damages trials and supplemented thereafter to incorporate documents that were not produced by the Government until very late in the litigation—some after the damages trial.  The issue of sanctions stemming from the Government's conduct was settled by the parties.

At the time the Court issued its liability opinion it did not have all the relevant facts due to the Government's failure to timely produce documents.  Accordingly, the Court makes additional findings of fact that relate to liability.

Citations to "2007 Tr." are to the transcript from the two-week trial on liability.  Citations to "2010 Tr." are to the transcript from the first phase of the damages trial held on April 6-7, 2010.  Citations to "2011 Tr." are to the transcript from the second phase of the damages trial held on September 21-23, 2011.

[5] For ease of reference, throughout this Opinion the Court refers to Plaintiff's exhibits and Defendant's exhibits as PX and DX, respectively.

[6] As head of the Fort Lauderdale District Office and the task force, ASAC Salvemini was the Princess' supervising DEA official from the beginning of her cooperation with the agency.

The Princess was the key informant in a long-term money-laundering operation aiming to develop cases against high echelon drug traffickers and money launderers. See PX. 611.[7]  As a "cover" for her work as an informant, Plaintiff posed as a money launderer. Id.; 2011 Tr. 518 (Princess).[8]  The Princess' work for DEA "resulted in the penetration of a number of targeted kingpin organizations" that recognized her as a "safe avenue for laundering their illicit drug proceeds" and, she was "increasingly being contacted by representatives of these [organizations]" to launder money.  PX. 611.  According to a letter ASAC Salvemini sent to DEA Headquarters, the Princess' cooperation resulted in seizure of approximately $23 million, over 20 "spin-off" investigations, multiple arrests, prosecutable cases against approximately 80 traffickers, "cell-heads" and couriers, and unquantifiable intelligence.  SGS-92-X003 v. United States, 74 Fed. Cl. 637, 648 (2006).

### DEA Recognized Its Duty to Protect the Princess

From the beginning of her tenure as an undercover informant, DEA actively undertook steps to protect the Princess.  During the Princess' first meeting with ASAC Salvemini, he discussed her security and promised her that he "would do everything within [his] power to make sure that she was never injured or placed in harm's way." 2007 Tr. 290 (Salvemini).  As the Princess' supervising DEA official from DEA's Fort Lauderdale, Florida District Office, ASAC Salvemini testified, he "had concerns on a daily basis with her safety."  2007 Tr. 321 (Salvemini).  In an internal DEA memorandum dated March 17, 1993, DEA intelligence analyst Sandra Neal, who frequently worked with the Princess, acknowledged the risk to Plaintiff and her family if the Princess' identity were revealed.  The memo stated:  "[b]y virtue of the fact of that [the Princess] has been accepted as 'trustworthy' by [drug trafficking organizations] it can be assumed that [the Princess] is now known to all, and were [the Princess'] identity to be revealed, all activities in the above-cited cases would undoubtedly terminate, and [the Princess] and [the Princess'] family would be placed in a position of grave danger."  PX 611.  The Princess too was concerned about her safety and asked that DEA implant a tracker in her arm.  2007 Tr. 134 (Princess); 2011 Tr. 533 ("I did request there be a . . . [tracker]—like a Norplant so they will know where I was . . . .  But they always told me that they had everything under control.").  For safety reasons, the Princess requested that DEA remove her family from Colombia, and ASAC Salvemini arranged for the Princess' brother, his wife, and their two children to come to the United States where they moved in with the Princess.  2007 Tr. 144-45 (Princess); see also 2007 Tr. 291 (Salvemini).

---

[7]   The Government produced Plaintiff's Exhibit 611 after the trial on damages and Plaintiff added it to the record on May 31, 2013.  It is a memorandum, dated March 17, 1993, from Sandra Neal, FLDO Intelligence Analyst, to ASAC Dale W. Schuitema of the Miami Divisional Office and ASAC Salvemini of FLDO, describing "on-going initiatives that would be jeopardized should the identity of [the Princess] be revealed."  PX 611.

[8]   As related in the procedural history below, the Court held multi-day trials in three different years with certain witnesses testifying over several days and in multiple years.  As such, for the sake of clarity the Court cites the transcripts by year, transcript, page number, and witness.

Another example of DEA's efforts to protect the Princess involved an incident in November 1993, when a member of the Italian mafia arranged to "test" Princess by having her launder money after a "pick-up" in Geneva, but DEA unexpectedly seized the money and called the Princess to warn her to "get out of there."   2007 Tr. 135-36 (Princess); 2011 Tr. 532-33 (Princess); PX 140.

### The Princess' International Work for DEA

As part of the money laundering operation, the Princess regularly traveled outside the United States, including trips to Colombia, Venezuela, Costa Rica, Italy, Geneva, and France. 2011 Tr. 519 (Princess); see also SGS-92-X003 v. United States, 85 Fed. Cl. 678, 699 (2009) (citing 2007 Tr. at 128-29, 138-39) ("[S]he and DEA executed numerous operations in Colombia and several other international locations including Switzerland, Costa Rica, Ecuador, Spain, Italy, and Canada."); PX 92 at G-17.

### Indications that the Princess' Cover Was Compromised

In 1994, the Princess received a letter written by one drug trafficker to another that stated, in essence, "be careful" of the Princess because she works for DEA and "gave up" the author, and is "trying to do the same to other people." 2011 Tr. 525-26 (Princess).[9] Upon her return to the United States, the Princess immediately handed the letter over to the DEA agents. Id. Similarly, according to an application for monetary award for the Princess authored by ASAC Salvemini, the Princess received a death threat on a "recent" trip to Cali, Colombia because she had been identified as working for DEA and would be killed upon her arrival. PX 10.[10]

As of early October 1994, DEA knew that numerous individuals in Colombia suspected the Princess was cooperating with authorities.   In October 1994, the Princess traveled to Colombia at the direction of DEA for the primary purpose of getting a "face-to-face" meeting with Juan Carlos Ramirez, "Chupeta."  PX 452.  Major Beltran[11] picked up the Princess at the airport, and she stayed at his home.  The Princess often used Major Beltran as security and for his connections to drug traffickers, the police, money, and information.  2011 Tr. 529 (Princess). Major Beltran informed the Princess that she would have problems setting up meetings with traffickers because of her "problem"—an individual who blamed her for DEA seizures of his money.  PX 452.  This prediction was borne out during that October 1994 trip as one person, Yolanda, who worked for Don Ramon, did not respond to any requests to meet, despite prior such indications; the Princess was told by Carlos Emel Gomez that Yolanda believed that the Princess had something to do with the imprisonment of Francisco Cruz in Canada.  Because of

---

[9] Plaintiff's counsel pointed out that this letter was never produced during discovery. 2011 Tr. 526.

[10] Plaintiff's Exhibit 10 is a memorandum written by ASAC Salvemini to DEA headquarters dated February 22, 1995, regarding payment of awards to the Princess.  PX 10.

[11] Hernan Beltran, known as "el Major," was a former sub-commander for the Colombian National Police in Cali, Colombia.  PX 479.

Yolanda's boss' connections with Caicedo, he would be reluctant to meet with the Princess until the Caicedo "problem" was resolved. Before leaving Colombia in early October, the Princess made plans to return that same month to meet someone in Ramirez's organization.

In early 1995, DEA thwarted a plot to assassinate the Princess. A known criminal with connections with a major drug cartel plotted to assassinate the Princess. PX 140; 2011 Tr. 529 (Princess). In an internal DEA memorandum, ASAC Salvemini explained that there was extensive "fall-out" from the Princess and DEA's November 1993 money seizure, including that the drug cartel held the broker responsible for the missing money and seized his and his family's property as payment. PX 140; 2011 Tr. 532-33 (Princess). The broker blamed the Princess for the situation which included his arrest and extradition to the United States. Id. Later, "[i]n January 1995 [the broker], while incarcerated, approached a subject who was incarcerated with him . . . [and asked him] to kidnap and execute [the Princess]." PX 140. Upon learning of this, DEA arranged for an undercover agent to accept the "contract" for the kidnapping and murder of the Princess. 2011 Tr. 529 (Princess). Because the broker provided the undercover agent with the Princess' home address and other pertinent details, DEA moved the Princess for her safety. Id. at 528-29.

On March 29, 1995, an Assistant United States Attorney ("AUSA") in Chicago disclosed the Princess' status as a confidential informant to a criminal defendant whom the Princess had lured to the United States to be arrested. PX 91 at G-3; PX 421. When reporting this incident the very same day in a memorandum, Special Agent Charles Dvorak also related that "throughout the debriefings," before the AUSA blew the Princess' cover, the criminal defendant had stated that he and members of his family believed that the Princess was cooperating with the United States Government. PX 421. Neither Special Agent Dvorak nor "any part[y] related to this investigation" was the first to mention the Princess. When the AUSA revealed the Princess' cooperation, the criminal defendant had "no adverse reaction" and admitted that it confirmed his suspicions. Id. In a letter dated April 14, 1995, an unidentified person at DEA sent memoranda to ASAC Salvemini regarding "the unnecessary compromise of" the Princess by the Chicago AUSA and noted that "I bring this to your personal attention because this type of careless disregard for the safety and security of our informant should not be tolerated."[12] PX 422. Later, in a memorandum written to DEA's Chief of Operations, Harold Wankel, dated October 3, 1995, entitled "ABDUCTION OF SGS-92-X003" that reviews the history of Princess' work as an undercover informant, ASAC Salvemini stated:

> The information provided by [the Princess] against the HERRERA organization may be the reason for [her] disappearance as on March 19, 1995, . . . an Assistant United States Attorney for the Northern District of Illinois advised Mr. HERRARA of the identity of SGS-92-X003. It should be noted that this information was disclosed by AUSA [] intentionally and in direct contravention with agreements made with high ranking DEA official[s] and DOJ personnel.

---

[12] ASAC Salvemini had previously refused to permit the United States Attorney's Office in Chicago to use evidence gained by the Princess for fear her identity would be revealed. PX 94 at 3.

PX 91 at G-3.

In July 1995, DEA in Rome, Italy intercepted a conversation between drug traffickers that suggested the Princess' cover had been compromised.  PX 5.[13]  According to a memorandum by ASAC Salvemini dated July 19, 1995, however, the Rome DEA office subsequently reported that "the [Princess'] cooperation may not be compromised as originally reported."  Id.  In his memo, ASAC Salvemini concluded:  "The FLDO assessment of this situation is that [the Princess] remains in good standing with these targets . . . ."  Id.  DEA also booked hotels for the Princess using the "government rate" when she traveled to meet drug dealers and sent her a fax with DEA letterhead when she was undercover.  2007 Tr. 142-43 (Princess).

### The Princess' Two Trips to Colombia in August 1995

Despite the notification that Princess' cover might be compromised, in August 1995, ASAC Salvemini dispatched the Princess to Colombia to make contacts in the money-laundering business and bolster her cover as a money launderer.  PX 92 at G-19.[14]  The Princess traveled to Colombia on August 7, 1995, to gain "additional current information on principals to be targeted in the new operation" aimed at the Ramirez organization.  PX 434 at G-15.  The Fort Lauderdale District Office was then seeking approval for this "new operation."  Id.  During her August 7th trip, Sandy Neal, a Fort Lauderdale District Office Analyst, contacted the Princess to ask her to remain in Colombia longer.  Id.  The Princess returned to the United States on August 16, 1995, but returned to Colombia, at DEA's behest, on August 23, 1995, to "assess the damage done to the Cali Cartel following recent [Government of Colombia] enforcement actions."  Id.; PX 92 at G-19.

As with other international travel, ASAC Salvemini understood that he had to obtain "country clearance" by notifying the country's Ambassador and DEA that he wished to send an informant.  2007 Tr. 243 (Salvemini).  He testified:

---

[13] Plaintiff's Exhibit 5 is a July 19, 1995 memorandum to DEA headquarters regarding the Sensitive Activities Review Committee ("SARC") proposal for Operation Princess II describing concerns from the Rome, Italy DEA office that the investigation's targets were aware that the Princess was cooperating with DEA.  PX 5.

The Department of Justice and DEA held SARC meetings to discuss "operations out in the field that had a sensitive nature . . . operations that had Attorney General exemptions that had to be reviewed relative to ongoing activities in those investigations."  2007 Tr. 566; see also SGS-92-X003 v. United States, 74 Fed. Cl. 637, 641 (2006) (citing the declaration of former Deputy Assistant Attorney General Mary Lee Warren).

[14] Plaintiff's Exhibit 92 is a June 18, 1996 memorandum for former DEA Administrator Thomas Constantine by Chief of Domestic Operations Donnie R. Marshall and Chief of International Operations Craig N. Chretien describing their investigation of ASAC Salvemini's actions in dispatching the Princess to Colombia in August, 1995.

> [I]f I was sending someone down to Colombia, I would have to get country clearance from the Colombia – from the Ambassador of Colombia.  I would also have to get clearance from Foreign Operations . . .[i]n addition to getting my clearances through, you know, my own [DEA] . . . [a]nd sometimes the U.S. Attorney. . . .

Id. at 243; see also, id. at 353-54 (Salvemini) ("[e]very time she went down there we got country clearance.");  PX 92 at G-17.   Earlier that August, ASAC Salvemini received a memorandum from DEA's Office of Chief Counsel concerning the Fort Lauderdale Office's proposal for another international money-laundering operation, titled "Operation Princess II."[15]  PX 612.   In this memorandum, DEA's Office of Chief Counsel emphasized that "Any operational activity which occurs in foreign countries . . . must be approved by the appropriate DEA C/As, the U.S. Embassy, and foreign counterparts."  Id.[16]

At the time of the Princess' August 1995 trip to Columbia, DEA's Bogota, Colombia, Country Attaché, Anthony Senneca, was responsible for granting confidential informants permission to enter the country.  See 2011 Tr. 596 (Senneca).[17]   In deciding whether to grant

---

[15] The Princess' money-laundering investigation operated mainly under the umbrella of Operation Pisces, which was a much larger money-laundering investigation run by South Florida DEA.  See 2011 Tr. 344-45 (Levine); 2007 Tr. 297-99 (Salvemini); PX 123.

[16] Plaintiff's Exhibit 612 is dated August 2, 1995.  Defendant produced PX 612 after the trial on damages.  The Court ordered Plaintiff to file the documents counsel referred to during argument that had not yet been provided.  Order, May 2, 2013.  Plaintiff's Exhibit 612 was one of the documents designated pursuant to the Court's May 2, 2013 Order.

[17] Anthony Senneca served as the Government's only witness at the damages trial.  Defendant sought to have Mr. Senneca admitted as an expert on drug trafficking in Colombia.  The Court sustained Plaintiff's objection on the ground that the Government's pre-trial memorandum did not identify Mr. Senneca as an expert witness and Defendant had not submitted an expert designation or report as required by Rule 26(a)(2) of the Rules of the Court of Federal Claims.  2011 Tr. 557.  Mr. Senneca testified as a lay witness.

Attaché Senneca has held multiple positions within DEA since 1966, including Deputy Director of the Cocaine Section, where he was involved in Colombian cocaine investigations in New York City, Philadelphia, and Connecticut.  In 1994, Mr. Senneca became DEA's Country Attaché in Bogota, Colombia.  In that capacity, Mr. Senneca worked on counter-narcotics programs and developed evidence to be used in United States prosecutions.  Id. at 555.  In August 1995, DEA maintained a staff of about 50 people in its Bogota, Colombia office, including approximately 30 agents.  The Bogota office sought to develop evidence for U.S. prosecutions and worked with Colombian forces to identify and destroy cocaine laboratories.  Id. at 554.  DEA also conducted and directed covert operations in Colombia and exchanged intelligence with Colombian national authorities.  Id.

country clearance, Attaché Senneca would have considered whether the informant's cover had been disclosed to the individuals with whom she was meeting. Id. 577-78. Attaché Senneca testified that a confidential informant's supervising ASAC briefed the Country Attaché on the following topics:

> what the planned activity of this informant would be; where they were going, very specifically where they were going; who they were meeting; and what they're engaged in. And that could be a wide range of activities that they could be proposed to be engaged in.

Id. at 561. Attaché Senneca stated that safety "is absolutely our biggest concern is the life—the safety and the lives of the people we work with. Whether they're agents or informants, we take them equally seriously, we don't treat one different than the other." Id. at 583. He acknowledged that "there are times when we do take significant risks. It's part of the business." Id. On occasion, country clearance was denied. 2007 Tr. 314-15 (Salvemini).

DEA had established procedures for such international travel by confidential informants. Former DEA Administrator Thomas Constantine explained:

> [F]or an individual working with or being involved in any DEA investigation to go to a foreign country, especially a place as volatile as Columbia was during that period of time, there are certain key people at headquarters that have to be notified and approve that.
>
> * * *
>
> In addition to that, the head of the DEA contingent in the country involved would have to be notified. I think that's an established protocol, and I think we can all understand it. So that if you're in Columbia, and you're responsible for 40 or 50 DEA agents, you want to know what's occurring as another DEA investigation in your area of responsibility and maybe can provide some type of safety or cover or contact.

2007 Tr. 1338-39 (Constantine).

As Attaché Senneca testified, the situation in Colombia in the early to mid 90s was volatile, with Colombian drug traffickers killing individuals whom they suspected were working with DEA. 2011 Tr. 570-71 (Senneca); 2010 Tr. 215 (Princess). Kidnappings were common in Colombia. 2007 Tr. 270 (Princess); 2007 Tr. 1523 (Warren) ("[W]e got the report [the Princess] had been abducted. That was not an unusual report in Colombia then or now unfortunately."). Drug-traffickers held people "responsible" for seized money through such kidnappings—they

---

After he served as an attaché, Mr. Senneca became an ASAC, but the Court refers to Mr. Senneca as Attaché Senneca throughout the opinion because that was his position during the relevant timeframe.

would retaliate against anyone who lost their money.  2011 Tr. 576, 591, 593-94 (Senneca); 2011 Tr. 157-58 (Levine).

ASAC Salvemini failed to notify DEA's Bogota Attaché or DEA headquarters of the Princess' travel to Colombia in August 1995.  PX 94 at 7;[18] see also 2007 Tr. 1059-60 (Marshall) (stating that ASAC Salvemini did not coordinate the Princess' travel with DEA's Bogota Country Office.); 2011 Tr. 568 (Senneca) (stating that no one had sought country clearance for the Princess for the August 1995 trip); 2007 Tr. 1339-40 (Constantine) ("Virtually all of the DEA supervisors in Washington and in Bogota said they didn't recall or didn't have any notice or any knowledge of this individual [the Princess] being in country.").  ASAC Salvemini concedes that, for this particular trip, he did not obtain permission because he believed that prior notifications remained in effect.  2007 Tr. 353-54.

### The Princess' Abduction

On her DEA-sanctioned travel to Colombia in August 1995, the Princess met with Hernan Beltran ("Major Beltran") on several occasions.  PX 541.[19]  At that time, Major Beltran served as head of security for the largest drug trafficker in Colombia with whom the Princess did "business" as a money launderer.  Id.; PX 479.  Hernan Beltran, known as "el Major," was a former sub-commander for the Colombian National Police in Cali, Colombia.  PX 479.  After his dismissal from the National Police for misconduct, the Major turned to private security and intelligence work for Cali drug traffickers.  PX 247, 486.[20]  Major Beltran was described by known DEA sources as "a ruthless individual who 'kills for the fun of it'" and often carried out kidnappings and torture.  PX 247.  To win his good grace, the Princess had paid for the Major to be elected as a Major.  2007 Tr. 269 (Princess).[21]  The Princess also regularly hired the Major

---

[18] Plaintiff's Exhibit 94 is entitled "Memorandum for the Administrator" and was written by ASAC Michael F. Kane after the Princess' tenure as a confidential informant.  PX 94.

[19] Plaintiff's Exhibit 541 is a debriefing of the Princess conducted on January 17, 1996, after her release from captivity.  The debriefing was not produced by the Government until after the first phase of the damages trial held April 6-7, 2010.  At a pre-trial conference held on March 29, 2010, Defendant's counsel acknowledged that the Government had been unable to find—and never produced—the Princess' debriefing referenced during the liability trial.  The Court ordered the Government to produce every document pertaining to the Princess in the possession of the Government worldwide in the form of an administrative record.  Pre-Trial Conf. Tr. 66-67, Mar. 29, 2010.  The Government produced this debriefing after that order.  See PX 541; Oral Arg. on Mot. for Sanctions Tr. 43-44, July 10, 2012.

[20] Exhibits 243 to 253 are designated as Plaintiff's Exhibits, but the documents are joint exhibits filed after the trial on liability.  Joint Notice of Filing, Dec. 10, 2007.

[21] The Princess testified as follows:

Q. . . . When you were in Colombia is it true that you spent money to appear to be a person who had the money launderer's lifestyle?

"for security" while in Colombia since he was ex-police and had connections with the drug traffickers. 2011 Tr. 529-31 (Princess).

On August 29, two days before her kidnapping, the Princess met the Major to introduce him to an associate. PX 541. Major Beltran mentioned that he had recently "done a job" for someone who needed to move money, and the Princess expressed interest in a potential client. Id. On August 31, 1995, Major Beltran notified the Princess that he had arranged a 6 p.m. meeting for her with a known drug trafficker and "controller [of] financial operations for the Ramirez organization." PX 541; PX 479.[22] After the meeting, the Princess took a taxi with the Major. 2007 Tr. 212 (Princess). Major Beltran exited the taxi near a shopping center, leaving the Princess in the car. Id. at 202. Shortly thereafter, two armed men stopped the taxi and got in. Id. Later, the Princess' abductors moved her from the taxi to the trunk of another car. Id. at 203-04 (Princess); PX 541.

The kidnappers took the Princess to an unknown location. The Princess believed her captors were going to kill her. Id. at 204; SGS-92-X003 v. United States, 85 Fed. Cl. 678, 694 (2009). At their destination, the Princess' captors brought her into a small room with a dirt floor furnished with a bed made out of straw, a couch, and a table. She remained confined there for the duration of her captivity. 2010 Tr. 205, 209, 219 (Princess). Men in ski masks armed with machine guns guarded the Princess. Id. at 206. Her captors identified themselves to her as members of a Colombian guerilla group. 2010 Tr. 206 (Princess). The Princess' captors did not physically abuse her. 2007 Tr. 223 (Princess). For the first five days of her captivity, her captors put a noose around her neck with loops attached to her hands, so that she was forced to keep her hands close to her body or the noose would tighten, but they subsequently removed this rope. PX 541; 2010 Tr. 221 (Princess).

On the third day of her captivity, the kidnappers returned the Princess' small black book that they had confiscated, and asked her to identify a contact to negotiate her ransom. 2007 Tr. 217-18 (Princess). The Princess ate the pages of the book over the course of three days so that her notes and contacts would not fall into the hands of her captors. 2010 Tr. 211 (Princess). The kidnappers' leader came to the room to ask her whom he should contact. Id. at 214. The Princess testified:

> [W]hen the commandante came back in about three days, and he got a little bit I
> will say violent. He start pushing me and how come you don't know who to call
> and this and that. Then, I said, I mean, this is it. That's when I decided to give

---

A. Of course. I paid for the Major to be elected as a Major. I brought a $3,000.00 dog for one of the drug dealers. I bought him a pair of glasses. I mean you had to buy them and you buy them as gifts.

2007 Tr. 269 (Princess).

[22] Plaintiff's Exhibit 479 is a memorandum dated September 7, 1995 from ASAC Salvemini to ASAC Frank Tarallo of the Miami Field Division providing a brief history of the Princess' work as an undercover informant and a synopsis of the investigation of her abduction.

> Beltran's name because I got very scared.   What went through my mind, I
> couldn't see how I was going to come out of this one.

Id. at 213-14.   Over the course of her kidnapping, the Princess gave her captors names and numbers of several people to contact to negotiate her release.  PX 541.

In one note to her brother, dated November 14, 1995, the Princess wrote:  "I am very bored and a little sick.  (My legs are bad)."  PX 609.[23]   In late November 1995, the Princess asked her kidnappers to request Major Beltran to contact her brother because her "legs were hurting."  PX 541.

During her captivity, the Princess began to suffer from exhausting headaches and felt very weak.  2010 Tr. 216, 218, 224 (Princess).  She described her headaches as follows:

> I still get them once in a while.  It's like inside the brain that you cannot look.  It's
> not a migraine because I thought it was migraine, but it's something like inside
> the head, and then it leaves me like exhausted like inside the brain, like yes.  Like
> a hat, but inside the brain.

2010 Tr. 218 (Princess).   At one point, the Princess' captors told her that they had killed her mother and her daughter. Id. at 217.  The Princess related:

> [I]t was like I lost it completely because that's the only thing you don't want to
> hear that they had done anything to a member of your family, plus I remember
> working, and they always told me don't worry, don't worry.   The family's
> covered.   They're going to be okay, so for it was like what's happening here.
> After that moment, it was like I lost interest of everything.  I didn't care.
>
> That's when my body started feeling like weird.  Like, the first thing I felt was
> like I had an octopus inside of my stomach, and the octopus was doing like this.  I
> mean, that is very strange, but that's what I felt.  It wasn't pain, but it was that
> extremely discomfort.  Then, the first time they took me to take a shower, I
> fell down, and I say why am I falling down.  Then, I wanted to do exercise.  I had no
> room because I wanted to stretch my legs, but I had very much pain from my
> waist down, my legs.  I mean, it was very difficult.

Id.   Once, the Princess attempted to escape the room through a hole in the ceiling, but failed because of her difficulties with her leg. Id. at 220.

---

[23] Plaintiff's Exhibit 609, a handwritten note from the Princess in Spanish and a typed translation, was not produced by the Government until after the trial on damages.  Plaintiff filed these materials as trial exhibits on May 31, 2013.  Pl.'s Ex. List, May 31, 2013.

## The Efforts to Secure the Princess' Release

After the Princess gave her captors Major Beltran's name, Major Beltran contacted the Princess' brother in Florida and offered to negotiate for her release. PX 479, 511. The kidnappers provided several "proofs of life," including an audio recording of the Princess' voice, handwritten notes, answers to questions that only she would know, and photographs of the Princess holding a December 11, 1995 issue of a Colombian newspaper. PX 485, 489.[24]

While still in negotiations for the Princess' release, a multi-agency team from the Department of Justice ("DOJ"), Department of State, DEA, and the FBI attempted to determine the identity of her captors. PX 486. Their efforts were unsuccessful.[25] Administrator Constantine explained: "My main concern . . . at that point in time was the safety of the individual involved in this, and my concern was that the individual had been placed in harm's way without proper authorization from DEA supervisors at the appropriate levels." 2007 Tr. 1335 (Constantine).

A confidential source for the Bogota Country Office independently pursued efforts to effect the release of the Princess by requesting "several significant members of the Cali mafia intercede on behalf of" the Princess. PX 259.[26] This source was a "criminal associate of many high level Cali mafia members" and believed that the Princess' "current plight resulted from the loss of trafficker moneys by the [Princess]." Id.

On December 15, 1995, with the help of the Bogota Office's source, who made a $ 350,000 ransom payment from his own funds, the Princess' captives freed her three-and-a-half months after her abduction. 2010 Tr. 225 (Princess); PX 94 at 8.

---

[24] Plaintiff's Exhibit 485 is a memorandum from Legal Attaché Dwight S. Dennett to File containing a timeline of significant events in the Princess' life. Plaintiff's Exhibit 489 is a memorandum prepared by DEA agent Rafael Aguirre to ASAC Salvemini based on his first-hand observations of the negotiations that led to the Princess' release on December 15, 1995. Mr. Aguirre escorted the Princess from Bogota to Miami, FL after her release from captivity. PX 489.

[25] DEA also investigated Major Beltran, who coordinated the Princess' travel and exited the taxi shortly before the abduction. See PX 509 (listing key personalities in the Princess case as of November 19, 1995 and identifying Mr. Beltran as the "[m]ain suspect in the kidnapping.").

[26] Plaintiff's Exhibit 259 is a memorandum from Country Attaché Senneca to Deputy Chief Craig Chretien of International Operations. PX 259.

### The Princess' Debriefing and DEA's Review

After her kidnapping, the FBI debriefed the Princess once, and DEA debriefed her twice. 2010 Tr. 241 (Princess); see also, PX 94.[27]  DEA's Miami Field Division recommended "five moiety payments" to the Princess which could help "any future litigation problem between DEA and [the Princess].  PX 94 at 8.  Upon further review, DEA reduced the award recommendation, and Administrator Constantine finally approved a payment of $996,000 to be disbursed over a two-year period with payment of $350,000 to be disbursed immediately.  PX 94 at 10.

Following the Princess' release, DEA's Chief of Domestic Operations, Donnie R. Marshall, and DEA's Chief of International Operations, Craig Chretien,[28] conducted a review of ASAC Salvemini's actions and released a memorandum on June 18, 2013.  PX 92 at G-17. According to the Chiefs' memorandum:  "Senneca said he felt very strongly that [the Bogota Country Office] should know about all [confidential source] travel to Colombia, and was very vocal about this issue.  .  .  .  Senneca said he thought it was clear between [him] and ASAC Salvemini that he would be notified of all activity."  Id. at G-19.  According to an internal memorandum entitled "Travel and Kidnapping of SGS-92-X003 in Colombia," Attaché Senneca told Chief Marshall that he believed there was widespread disregard for any need to coordinate confidential source travel with the Bogota Country Office.  Id. at G-19.  The Chiefs' review found that Salvemini "either fabricated a non-existent agreement regarding [the Princess]'s travel arrangements or grossly misinterpreted conversations with various people" in believing that he was not required to seek approval each time the Princess traveled overseas.  Id. at G-22.  Chiefs Marshall and Chretien recommended that Miami Field Division Management strongly counsel ASAC Salvemini regarding his failure to properly coordinate the Princess' activities and document this counseling.  Id.  In addition to reprimanding ASAC Salvemini, DEA Chiefs recommended revising the DEA Agent's Manual to reflect "requirements for coordination of interoffice investigations, including interoffice travel and activities, by [confidential sources]." Id.

### The Princess' Health and Medical Treatment

#### The Princess' Health Prior to the Abduction

Prior to her kidnapping, the Princess maintained an active lifestyle and jogged every morning.  2010 Tr. 249 (Princess); 2010 Tr. 138 (Cadavid).  The Princess also experienced

---

[27] During her January 17, 1996 debriefing by DEA, the Princess recounted the events leading to her abduction on August 31, 1995, and described the conditions of her captivity. PX 541.  The Government failed to produce Plaintiff's Exhibit 541 until after the first phase of the damages trial held April 6-7, 2010, after locating it during a Court-ordered world-wide search for documents concerning the Princess.  Pre-Trial Conf. Tr. 44, 66-67, Mar. 29, 2010.

[28] A 1995 memorandum relates Chretien's title as Deputy Chief of International Operations while the June 1996 memorandum refers to him as Chief of International Operations. See, PX 259, PX 95.

intermittent "tightness" in her feet.   After her kidnapping, the tightness in her feet became constant.  PX 413.

In May 1993, the Princess experienced discomfort in her chest and back and stiffness in her right leg.  Id.  The Princess' doctor discovered that she had a lesion on her spinal cord.  PX 415.[29]  A doctor placed her on steroid therapy and scheduled the Princess for surgery to remove the lesion.  Id.  On the date scheduled for the surgical procedure, an MRI revealed that the lesion had disappeared.  2010 Tr. 257-58 (Princess).  Following the disappearance of the lesion, the Princess returned to work and resumed jogging.  Id. at 259-60.

A DEA memorandum, authored by Task Force Agent Tiderington while the Princess was in captivity, related that before the Princess left on her second trip to Colombia in August 1995, she told DEA agents that it would be better to contact her in the afternoon because she scheduled "daily morning appointments" with a chiropractor for "her sciatic nerve problem."  PX 434.[30]  The Princess denied seeking treatment from a chiropractor and testified she "never had sciatic problems in Colombia."  2010 Tr. 269 (Princess).  She recalled telling Agent Tiderington that she was having massages in Colombia.  Id.

## The Princess' Health During Captivity

While being detained, the Princess began to suffer headaches "like a hat, but inside the brain" that she still experiences to date.  2010 Tr. 218 (Princess).  Additionally, the Princess began noticing extreme stomach discomfort and pain from her waist down, once causing her to fall in the shower.  Id. at 217.  Pain in her legs foiled an attempt to escape through a hole in the ceiling.  She explained:

> I grabbed the wood by the hands, and I tried to [lift] my right leg, and there was no way.  I mean, no way.  I mean, my leg went up to a little bit, and I remember I used to be a horse rider.  I used to jump, so I said how come my leg doesn't work.  I became aware then that I had a little bit of problems with my legs, but I thought it was for the fact that I was inside of this little room, and I had no room to walk or exercise.

---

[29] Plaintiff's Exhibit 415 is a set of medical records from Dr. Sheremata documenting the Princess' visits that took place between May 1, 1996 and September 12, 2003, as well as a visit on May 20, 2009.  Plaintiff's Exhibit 415 also contains medical records for visits with Dr. Silvia Delgado, M.D., Assistant Professor of Neurology, Department of Neurology, University of Miami.  PX 415.

[30] PX 434, entitled "SGS-92-X003 TRAVEL TO COLOMBIA" and dated November 16, 1995, describes the reasons for the Princess' travel in August 1995, the dates of her travel, and other details about her arrangements such as with whom the Princess would stay while in Colombia.

Id. at 220.  The Princess mentioned this pain when she wrote to her brother. [31]

### The Princess' Health and Medical Treatment After Returning from her Abduction

The Princess testified that immediately after her release from captivity:

I was walking funny.  I mean, I was on the floor more than I was standing up.
Then, I was feeling very strange.  It wasn't me, very strange.  I was having
difficulty going from one place to the other.  I mean, like my legs were like inside
cement blocks.  I had difficulty going, and it's not me.  It was me, so I had to go
to see a doctor.

Id. at 244.  The Princess experienced constant "tightness" in her feet and intermittent "vibration"
sensations.  PX 413.  The headache-like pain first experienced in captivity persisted.  Id. at 218-
19.  At trial, the Princess testified:  "The worst part of everything for me was the depression and
the weakness, not being able to walk properly because I used to [jog] every morning . . . ."  Id. at.
249.

The Princess also had difficulty sleeping:

I couldn't sleep.  I mean, thinking about what I have gone through, and I was
more and less on the same space of mind that I was when I was kidnapped when I
wanted to wake up and think that it wasn't true.  I was trying to stay awake
because I just couldn't.  I mean, I just didn't want to.  I couldn't sleep. I couldn't
sleep.

Id. at 245.

Additionally, the Princess experienced "palpitations, general anxiety nearing panic at
times with peaks of diaphoresis.[32]  PX 412.[33]  She had a significant decrease in appetite and in
general was having quite a bit of difficulty dealing with re-adjustment."  Id.  The Princess' sister,
Luisa Cadavid, testified that the Princess was "very, very depressed" and observed that "[S]he
cried a lot.  She didn't want to shower, that my sister is always a person that is always very, very
neat, so it's not like her for her not to shower.  She didn't care about anything, *anything*."  2010
Tr. 144 (Cadavid).  The Princess' son, Joseph Cinnante, testified: "She gets very hyper, very
hyperactive, very on the move.  She wants to start spending money that she doesn't need to be
spending.  There are certain signs.  You can tell something bad is about to happen."  2010 Tr.
157 (Cinnante).

---

[31]  As discussed, *supra,* while in captivity, the Princess wrote a letter to her brother dated
November 14, 1995, stating: "I am very bored and a little sick.  (My legs are bad)."  PX 609.

[32] Diaphoresis is perspiration. STEDMAN'S MEDICAL DICTIONARY, 475 (26th ed. 1995).

[33] Plaintiff's Exhibit 412 is a narrative dated May 17, 1996 of the Princess' treatment
provided by Dr. Mata, a psychiatrist, to Task Force Agent Greg Lees.

On December 22, 1995, shortly after her release, the Princess consulted Dr. Fernando Mata, a psychiatrist. 2010 Tr. 242 (Princess). Dr. Mata assessed the Princess as having an "[a]djustment disorder [with depressed] mood v. [post-traumatic] stress disorder" and noted that "[s]he [is] having quite a bit of difficulty dealing with issues adapting back into everyday life and concurrent medical problems." Id. Dr. Mata prescribed Pamelor and Ambien for sleep, and Desyrel. Id. According to Ms. Cadavid, the Princess' sister, the Princess' depression improved after she began seeing a doctor and taking medication. 2010 Tr. 144 (Cadavid). Though her depression symptoms improved, in late December 1995, the Princess still reported to Dr. Mata that she was experiencing flashbacks and difficulty sleeping. PX 412. Soon thereafter, after discovering that multiple sclerosis was the cause of her leg pains, the Princess ceased seeing Dr. Mata.[34] 2010 Tr. 243 (Princess).

### The Initial Diagnoses of Multiple Sclerosis:  December 26, 1995

On December 26, 1995, less than two weeks after her return from the kidnapping, the Princess consulted Dr. Albin Morariu, a neurologist. During this initial visit, the Princess "complain[ed] of constant 'tightness' in both feet, 'boot-like' distribution and intermittent vibration. She also has anxiety . . . ." PX 413. Dr. Morariu's notes state that "Prior to this [kidnapping the Princess] felt intermittently 'tightness' in her feet. After her release, the symptoms became constant." Id.; see also 2010 Tr. 267 (Princess). Dr. Morariu's "motor exam" revealed spastic paraparesis affecting the right lower extremity more than the left lower extremity." PX 413. His examination records also note "problems with the tandem gait" and "diminution of the vibratory imposition sense at the distal level of both lower extremities (right more than left)." Id. Dr. Morariu's "impression" during the initial visit was "1. Multiple sclerosis (spastic paraparesis) 2. Reactive depression." Id. Plaintiff's expert, Dr. Sheremata,[35] defined multiple sclerosis as follows:

> Multiple sclerosis is a uniquely human neurological disorder. It is characterized by the onset and devastate of neurological symptoms to relapse and subsequently remit at least in part. It is also characterized by a tendency to accumulate neurological disability so that a large proportion of people lose their ability to walk, but there are many other impairments, and it's only in recent years that the focus on cognitive ability has received much attention.

2010 Tr. 33-34 (Sheremata).

---

[34] Between December 27, 1995 and March 7, 1996, the Princess saw Dr. Mata for four follow-up visits.

[35] The Court admitted Dr. Sheremata as an expert in neurology with a sub-specialty in multiple sclerosis. 2010 Tr. 21 (Sheremata). Dr. Sheremata, M.D., is a Professor of Neurology at the University of Miami, Florida. At the damages trial, Dr. Sheremata testified that he had treated approximately 1,500 patients with multiple sclerosis in the past year. Id. at 20-21. Dr. Sheremata has published numerous books, articles, and monographs on multiple sclerosis, and has been a fellow of the American Academy of Neurology for 33 years. Id.

On December 29, 1995, three days after her initial visit, the Princess again visited Dr. Morariu and was again diagnosed with multiple sclerosis and depression.  PX 413.  During this follow-up visit, the Princess reported that she suffered from "numbness and 'vibration sensations' as well as weakness at the level of her legs below the knee right more than left. [And] ha[d] persisting difficulties with coordination in the lower extremities."  Id.[36]  Dr. Morariu's records elaborate on his earlier diagnosis, stating: "It is my opinion that this patient has a spinal cord form of multiple sclerosis and that the stress that she had during her captivity in Columbia from August through December of 1995, produced an exacerbation of her condition due to the stress that she was under."  Id.

Dr. Sheremata testified that in 1996, when Princess returned from her captivity, a diagnosis of multiple sclerosis was based on the occurrence of two neurological events.  2010 Tr. 31, 35 (Sheremata) ("in 1996, it was really dependent upon the second neurological event to make that diagnosis [of MS].")  According to Dr. Sheremata, the effects of multiple sclerosis may include loss of vision, difficulty walking, loss of bladder control, cognitive problems, lack of judgment, and bi-polar disease.  Id. at 34.  In the first 10 to 15 years, 85% of multiple sclerosis patients experience relapsing/remitting multiple sclerosis during which the patient's symptoms come and go and completely or almost completely resolve.  2010 Tr. 109 (Horstmyer); see also 2010 Tr. 49 (Sheremata) (indicating that the majority of patients with multiple sclerosis have relapsing and remitting multiple sclerosis).  After about 15 years, most patients enter the secondary progressive phase where symptoms that manifest do not totally resolve, resulting in increasing disability over time.  2010 Tr. 109-10 (Horstmyer).  Of every 1,000 patients diagnosed with relapsing/remitting multiple sclerosis, fifty percent will need a device to ambulate within about 15 years of the diagnosis.  Id. at 133.  There is no cure for multiple sclerosis.  2010 Tr. 66 (Sheremata); 2010 Tr. 122 (Horstmyer).

Although the cause of multiple sclerosis is unknown, the medical literature and the credible unrebutted testimony of both Plaintiff's experts, Drs. Sheremata and Horstmyer, establish that stress is a "major" factor that triggers or activates multiple sclerosis.  See 2010 Tr. 36-37 (Sheremata).   A study by Dr. Igor Grant, cited by Dr. Sheremata and published in the Journal of Neurology, Neurosurgery, and Psychiatry in 1989, concluded there was a connection between stressful life events and the onset of symptoms in multiple sclerosis.  PX 625; 2010 Tr. 87 (Sheremata).[37]  Dr. Sheremata echoed this view, stating: "there is a good deal of acceptance that stress is a major factor in precipitating attacks of multiple sclerosis . . . ."  2010 Tr. 37 (Sheremata).  Dr. Horstmyer also shared this opinion, stating:  "What we do know is there are certain things that trigger or activate the disease, stress being one of them."  2010 Tr. 108 (Horstmyer).

---

[36] Plaintiff's Exhibit 413 is a set of the Princess' medical records from Dr. Morariu for consultations between December 22, 1995 and April 8, 1997.

[37] Plaintiff's Exhibit 625 is a copy of the study: Igor Grant et al., Severely Threatening Events and Marked Life Difficulties Preceding Onset or Exacerbation of Multiple Sclerosis, 52 J. NEUROLOGY, NEUROSURGERY, & PSYCHIATRY 8-13 (1989).

### Other Potential Stressors:  Plaintiff's March 4, 1996 Car Accident and Its Effects

On March 4, 1996, three months later, during a "return office visit" to Dr. Morariu, the Princess reported that her depression improved, she was sleeping and eating better, she had commenced acupuncture, and "was improving physically and psychologically."  PX 413  Still, the Princess continued to experience "numbness and tingling sensations in the lower extremities and slight unsteadiness."  Id.

On that same date, after this doctor's visit on March 4, 1996, a car rear-ended the Princess' vehicle at a stop light.  The impact's force threw her forward and backward and caused her to hit her head on the headrest.  Id.  Following the car accident, she developed "generalized pains, stiffness, dizziness, headache, as well as cervical, dorsal and lumbar pain with radiation into the right hip."  Id.  The Princess reported that these symptoms worsened over the course of the night.  The next day, March 5, 1996, the Princess returned to Dr. Morariu's office complaining of a throbbing headache, dizziness, nausea, and pains following the accident.  Id.  Dr. Moariu's notes reflect that the Princess could "not perform tandem gait" and that she had "[p]ostconcussion syndrome manifested primarily as posttraumatic headaches and posttraumatic vestibular syndrome"—dizziness—he stated there was "an exacerbation of multiple sclerosis." Id.; see 2010 Tr. 72-73 (Sheremata).

Within a month or so, by April 1996, the Princess' back pain and dizziness had improved. The headaches, however, endured and occurred once or twice a week, lasting several hours with nausea.  PX 413.  The Princess still reported neck pain radiating intermittently, numbness in her right upper extremity, and recurrent tingling sensations in her feet and right upper extremity.  Id. A month later, in May 1996, the Princess experienced the same symptoms with a slightly increased weakness in her right lower extremity.  Id.

### Dr. Morariu's Referral to Dr. Sheremata and the Princess' Hospital Stay

On May 1, 1996, at Dr. Morariu's referral, the Princess consulted Dr. William Sheremata, who is also a neurologist.  2010 Tr. 22-23 (Sheremata).  During her initial consultation, the Princess complained of "severe fatigue since the release [from her kidnapping]" and weakness and numbness in her right lower extremity.  PX 415.  Based on his examination, Dr. Sheremata diagnosed her with multiple sclerosis and assigned the Princess an EDSS rating of 4.5, "indicative of a substantial amount of disability, [and] impairment of gait" among other difficulties.  Id.; 2010 Tr. 27-29 (Sheremata). The EDSS scale measures the degree of disability caused by multiple sclerosis in a patient from zero to 10, with zero signifying that the patient exhibits no symptoms, and 10 signifying that the patient is dead.  2010 Tr. 27-29 (Sheremata).

Immediately after this first consultation, Dr. Sheremata wrote to Dr. Morariu, stating: "[The Princess] certainly has multiple sclerosis as you have diagnosed, but she seems to have accumulated new neurological deficits at a significant rate during the last several months since her kidnapping in Colombia."  PX 415.  In this letter, Dr. Sheremata provided a brief medical history of the Princess including that "[the Princess] indicates that in May of 1993, she began to

experience some stiffness in the right lower extremity after using it.  It was a recurrent problem."
Id.; see also 2010 Tr. 265 (Princess).

In his letter dated May 1, 1996, Dr. Sheremata conveyed his recommended treatment, stating:  "It appears that [the Princess] has had a succession of relapses since her incarceration in Colombia . . . .  I have encouraged her to undergo a course of ACTH with physical therapy . . . . She is planning on doing this [later] after meeting some needed obligations . . . ."  PX 415; see also 2010 Tr. 247 (Princess).  The record does not define ACTH, but Dr. Sheremata testified that "we treated her with intravenous ACTH, which I affectionately refer to as Jewish holy water, first developed by Dr. Leo Alexander, who testified at the Nuremberg trials.  He was the first to use ACTH in the management of patients with multiple sclerosis."  2010 Tr. 39 (Sheremata). According to a medical dictionary, ACTH is "Adrenocorticotropic Hormone:" a hormone that is produced by the anterior lobe of the pituitary gland and that stimulates the secretion of corticosteroids, cortisone, aldosterone, and other hormones by the adrenal cortex.  STEDMAN'S MEDICAL DICTIONARY, 20, 807, 838 (26th ed. 1995).  Within the month, the Princess was admitted to the hospital where she received a 10-day course of intravenous ACTH and physical therapy.  PX 415; 2010 Tr. 39-40 (Sheremata); 2010 Tr. 247-48 (Princess).

### Plaintiff's Treatment and Condition After Hospital Discharge:  May 1996 - May 1998

The hospital discharged the Princess on May 24, 1996, and she continued to see both Dr. Morariu and Dr. Sheremata at regular intervals.  PX 413, 415.  At each visit, Dr. Sheremata conducted a neurological exam of the Princess and typically assigned her an EDSS score.

At the end of May 1996, soon after the Princess' discharge from the hospital, Dr. Sheremata prescribed her Avonex, a beta interferon that suppresses the increased production of the harmful interferon, gamma, in patients with multiple sclerosis.  2010 Tr. 39-40, 54-55 (Sheremata).  The Princess responded well to Avonex and began to feel better.  Id.; 2010 Tr. 249-50 (Princess).

On June 19, 1996, the Princess visited Dr. Morariu for a return office visit.  PX 413.  In his records, Dr. Morariu noted the kidnapping, the car accident, and the recent hospital visit.  Id. He further stated that the Princess was on "Avitan 1 mg" for dizziness and 20 mg of Prozac. Despite the recent hospital stay, the Princess still complained of headaches, dizziness, neck pain "with radiation into the right shoulder," mid-back pain, and low-back pain. Id.

On July 17, 1996, the Princess had a follow-up visit with Dr. Sheremata, and he noted that she had been on Avonex for five weeks.  In the record of the appointment, Dr. Sheremata noted that the Princess "did have some systemic complaints, including loss of well-being and increasing headaches . . . some chills, but no real problems. . . . after the first week or so [of Avonex] she felt well."  PX 415.  His examination revealed some slowness in rapid alternating movement and increases in tone and reflexes in the lower extremities.  In the narrative section of his notes, Dr. Sheremata recorded that the Princess had remarried her former husband and appeared happy, but often "pushe[d] herself to stay up" late when she was ready for bed by 9 p.m. in order to spend time with her husband.  Id.  The doctor advised her to rest in the

afternoon, avoid staying out in the heat, to manage her stress, and not take on her children's problems. Id. He assigned her an EDSS score of 3.0. Id.

On July 29, 1996, Dr. Morariu determined the Princess had reached "maximum medical (neurological) improvement in respect to the deficits caused by the accident of March 4, 1996." PX 413. Dr. Morariu noted that the Princess' headaches had subsided, but she continued to experience dizziness, numbness in the lower extremities, and extreme fatigability. In his records of this visit, Dr. Morariu stated that he was concerned about the increase in the Princess' depression "while on Avonex" and recommended that she consult her psychiatrist to adjust her dosage of Prozac. Id. He also recommended physical therapy. Id.

On September 5, 1996, the Princess visited Dr. Sheremata who recorded that the Princess had a period of depression that "has given way to a marked elevation of mood." PX 415. Dr. Sheremata noted that she was elated, speaking rapidly, and exhibited jerky, zigzagging eye movements. Id.; 2010 Tr. 43 (Sheremata). Visible zigzagging eye movements indicate abnormality and signal that nerve fibers to nerve cells in the lower part of the brain are affected. Id. at 43.

On December 12, 1996, the Princess had a follow-up with Dr. Sheremata, and his record of this visit begins: "[The Princess] appears today indicating that she feels quite depressed because her husband is divorcing her. She had been in a manic state and had been travelling extensively about three months ago." PX 415. Despite the decline in her mood, Dr. Sheremata's examination discovered that the Princess' jerky eye movements had improved, her muscle tone and strength were normal in her upper extremities, she had a slight increase in tone in her lower extremities, and "brisk" reflexes. Id. At trial, Dr. Sheremata explained that muscle tone increases with neurological injury in the spinal cord or in the brain. As a result, the reflexes are also increased. 2010 Tr. 49-50 (Sheremata). The Princess reported feeling tightness in her lower abdomen and the same tingling sensation in her legs that she reported since her first visit. PX 415. For this follow-up, Dr. Sheremata assigned her an EDSS score of 2.0 and later stated that "the Princess was generally better than she had been before." Id.

During the first half of 1997, the Princess experienced no new physical symptoms. In fact, during a visit on March 25, 1997, Dr. Sheremata recorded that "[the Princess] presents at this time in obvious control of her situation . . . she is divorced tomorrow and when this is done, she is throwing her husband out of her business which she financed." Id. Though his notes do not reflect an EDSS score for this visit, Dr. Sheremata wrote "[the Princess] is a good example of stabilization of her illness in response to Avonex administration." Id.

In June, 1997, however, the Princess was "sliding into a deep depression again," and Dr. Sheremata noted that "this has been a teeter-totter situation since she was first seen." Id. The Princess decided to turn her business over to her ex-husband. Id. As always, the Princess reported fatigue. Id.

At the end of August 1997, the Princess stopped taking Avonex out of concern that she would not be able to afford it when her health insurance terminated and because she felt that she did not improve on it. Id.; see also 2010 Tr. 279, 250-51 (Princess). At her appointment with

Dr. Sheremata on December 11, 1997, the Princess confessed that she had ceased taking Avonex, and Dr. Sheremata explained that Avonex prevents exacerbations of multiple sclerosis and was not meant to improve her condition.  PX 415.  This voluntary cessation of Avonex caused an exacerbation of the Princess' multiple sclerosis.  PX 415; 2010 Tr. 78 (Sheremata).   In the records for her December 11, 1997 appointment, Dr. Sheremata notes that the Princess was unable to walk well, had an abnormal tandem gait, and weakness in her right hand finger abductors, her dorsiflexors, and her hip flexors—particularly the right-side.  PX 415; 2010 Tr. 48 (Sheremata).  The Princess continued to feel depressed and tired, and the notes relate that "Dr. Mario [had] placed her on Paxil 30 mg daily . . . ."  PX 415.  Dr. Sheremata assigned the Princess an EDSS score of 3.5 for this visit.  Id.

By her February 19, 1998 visit to Dr. Sheremata, the Princess had resumed taking Avonex and experienced a corresponding improvement in her physical condition.  Id. ("she is feeling much better").  The record of the visit notes that the Princess' company had failed to pay her health insurance and she was worried about obtaining Avonex in the future.  Id.  Dr. Sheremata stated that the Princess' EDSS score was "3.0, although if mental status is eliminated, this would be 2.0."  Id.

On May 5, 1998, the Princess returned to Dr. Sheremata who noted that "the Princess has improved, but she has been left with impairment of the vibration sense which probably accounts for the problems with tandem gait . . . ."  Id.  Dr. Sheremata explained:

> Vibration sense is a measure of function of the posterior columns of the spinal cord.  The back half of the spinal cord is largely involved in position sense and functions having to do with position sense. Vibration sense and position sense don't always parallel each other in multiple sclerosis. . . .examining position or vibration sense is taking a tuning fork and applying it to the toe, the ankle, the knee and fingers, elbow, shoulders and determining whether it's normally perceived or not. . . . . Position sense itself, that is determining position in space or the patient's ability to know where a digit is in space[,] is a relatively crude examination.  Very often we do pick up losses of vibration sense where we don't clearly pick up losses of position sense.  Although they [both] contribute to disability . . . .

2010 Tr. 48-52 (Sheremata).

### Remission:  2000-2001

Over the next four years, the Princess experienced little physical difficulty.  In 1999, the Princess was doing well, except for some back problems, and did not visit Dr. Sheremata.  PX 415.

In 2000, the Princess resumed her visits with Dr. Sheremata.  At an appointment on January 18, 2000, Dr. Sheremata recorded that the Princess was doing well and continuing to take lithium, amatandine, and Avonex.  Id.  Dr. Sheremata's examination revealed a normal tandem gait, normal strength in the upper extremity, slight slowness of rapid alternating

movements in the upper extremities, and moderate weakness in her right hip flexor.  Id.  The record of this visit does not contain an EDSS score.

On November 17, 2000, the Princess returned to Dr. Sheremata and reported that she had a fight with her ex-husband about "business issues" and was experiencing increased pain in her right sacroiliac joint that she felt impaired her walking.  Id.  Dr. Sheremata noted that her gait was "somewhat more spastic than" normal and that she was clearly upset, but her business seemed to be doing well.  In his record of the visit, Dr. Sheremata assigned the Princess an EDSS Score of 3.0 and states: "[n]ote, the patient has been taking Avonex for the last 4 ½ years and has only had one relapse during an interval where she had stopped taking Avonex."  PX 415.

Between November 2000 and her August 24, 2001 visit to Dr. Sheremata, the Princess experienced no exacerbations of her symptoms.  Notes from this August visit assigned her an EDSS score of 1.5 and stated that, despite problems with her business doing poorly, the Princess had removed herself from the stress of the situation.

### Exacerbation of Multiple Sclerosis:  Relapse and Diagnosis of Multiple Sclerosis Secondary Progressive

On March 26, 2002, the Princess returned to Dr. Sheremata reporting that she had been under a "great deal of stress" related to her business and discovery that her partner may have been involved in money laundering.  Id.; 2010 Tr. 56-57 (Sheremata).  The Princess reported tingling sensations and loss of feeling in her legs and incontinence lasting three days.  PX 415; 2010 Tr. 56-57.  The examination revealed that since August 2001, the Princess lost about 10 pounds, her eye movements were jerky, she demonstrated weakness in her right shoulder abductors and right hip flexor, had moderately severe right knee flexor weakness and mild position sense loss in the right upper and lower extremities.  PX 415.  In his record of the visit, Dr. Sheremata stated that "[the Princess] appears today very distressed. She has not had any real difficulty with exacerbation of multiple sclerosis over the past four years . . . [the Princess] has obviously suffered a substantial exacerbation of illness . . . she will be admitted to the hospital." Id.[38]  The record does not reflect an EDSS score for this visit.

On July 26, 2002, the Princess returned to Dr. Sheremata who noted that she "bounced back remarkably from her recent exacerbation and appears to be doing well."  Id.  The records note that she continued to be on Avonex and was also taking Paxil.  Dr. Sheremata assigned an EDSS score of 1.5 to the Princess on this date.  Id.

In a January 3, 2003 visit, the Princess complained of "substantial fatigue" and could not complete a walk of 500 meters at Dr. Sheremata's office.  Id.  After walking 300 meters, she felt too tired to go farther as she lacked muscle coordination.  Id.  The Princess had not worked for the past 10 months and had signed over her interest in her business.  Id.  Dr. Sheremata's records state that the Princess appeared to have "markedly elevated mood and [was] remarkably

---

[38] Though Dr. Sheremata's records indicate that he contemplated admitting the Princess to a hospital, there is no indication in the record that this happened immediately following the May 2002 visit.

distractible." Id.  The examination revealed she experienced weakness in her upper extremities and right knee and hip flexors.  Id.  Due to the Princess' financial circumstances, she had been unable to follow up with her psychiatrist, but she remained on lithium and Paxil.  Id.  In his record of the visit, Dr. Sheremata stated "[the Princess] is obviously severely impaired" and he recommended referral to a psychology clinic and a pschyiatrist.  Id.  Dr. Sheremata also noted two "Provisional Diagnos[e]s: 1.  Multiple Sclerosis, secondary progressive.  2. Bi-polar disorder (severe)" and assigned her an EDSS score of 5.0 and 5.5.  Id.  Dr. Sheremata concluded his report of the visit by stating that "By reason of the Association of Bipolar Disease with secondary progressive multiple sclerosis, [the Princess] clearly is disabled and must be considered permanently disabled."  Id.

At trial, Dr. Sheremata explained the significance of an EDSS rating of 5.0 or 5.5: "That's a high level of disability.  6 would be cane dependent. 5.5, most people are using a cane or walking along walls also."  2010 Tr. 59-60 (Sheremata).  Dr. Sheremata also explained his provisional diagnosis of secondary progressive multiple sclerosis: "when people begin to worsen between attacks without an ability to say they had some worsening with subsequent improvement, if they're worsening between attacks for at least six months, this is evidence of secondary progressive multiple sclerosis."  Id. at 60.

At trial, Dr. Sheremata described bi-polar disorder as having:

a great range of changes in affect or mood. It can be so-called cyclothymic personality where people feel sad, and then the mood swings up, and they seem to function pretty well, but under periods of enormous stress, they may not, but the classical manic-depressant disorder where people can stay awake for days or even two or three weeks at a time then to be followed by severe depression, they may become catatonic, unable to move, unable to speak is the other end of the scale, but most patients are somewhere in between.

Id. at 61 (Sheremata).  Dr. Sheremata noted that:

bi-polar disorders are commonly associated with multiple sclerosis, and cognitive disability can uncover or make the bi-polar disorder more evident and accentuate the mood swings that the patients are experiencing. Bi-polar disorders are clearly related to genetic factors, but there's also the response to environmental stress. Patients can compensate and modulate their mood swings, but when they're cognitively impaired, they're less able to do so.

Id. at 60-61.

### The Princess' Fall and Ensuing Hospital Stay:  2003

At some point in January 2003, the Princess discontinued taking Avonex due to insurance problems.  PX 415.

On February, 27, 2003, the Princess was admitted to the hospital after suffering a fall caused by weakness in her lower extremities.  Id.  Subsequently, she fell a second time, fracturing her right patella, and needed to use a brace or walker.  Id.

On March 4, 2003, the Princess paid an emergency visit to Dr. Silvia Delgado, a neurologist and assistant professor in the Department of Neurology at the University of Miami where Dr. Sheremata also practices.  Id.  It was at this visit that the Princess admitted that she had discontinued taking Avonex three months before.  Id.  In the "assessment and recommendation" section of the appointment notes, Dr. Delgado wrote: "[the Princess] has secondary progressive multiple sclerosis. . . . her symptoms are worsening.  Id.  This could be secondary to being out of the [Avonex] for the last three months along with the increased amount of stress due to family issues."  Id.

### Additional Neurological Difficulties

On April 8, 2003, the Princess followed up with Dr. Delgado who noted that the Princess was recovering from her right patellar fracture and planned to be evaluated for physical therapy by an orthopedist one month later.  Id.  The Princess limped mildly due to impairment of her right leg.  The Princess reported that she had restarted Avonex three weeks prior and also complained of depression and fatigue.  Id.  Dr. Delgado assigned the Princess an EDSS score of 4.0 "without ambulation" and noted that she was "neurologically stable."  Id.

On September 12, 2003, the Princess had a follow-up visit with Dr. Sheremata who noted that she was "quite hyperactive" despite her continued use of lithium and valium, though she had ceased taking her Paxil.  Id.  The examination revealed reduced vision in both eyes, a decrease in her position sense relating to her lower extremities and toes, some tremor in her upper extremities, full strength in all extremities except her hip flexors, and a spastic gait.  Id.  Dr. Sheremata concluded that the Princess experienced "additional neurological difficulties" and assigned her an EDSS score of 4.5. Id.

One year later, on September 14, 2004, the Princess visited Dr. Delgado who noted that the Princess had no new neurological symptoms, but her bi-polar disorder was "not well controlled" as her son and brother were worried about her "shopping sprees."  Id.  The notes relate the Princess reported having been admitted to the hospital two months before due to increased depression, headaches, and mood irritability.  Id.; see also PX 416 ("she was hospitalized at Jackson Memorial in July of 2004 with manic exacerbation.").

### The Princess' New Doctors: Dr. Horstmyer and Dr. Paredes

On November 1, 2004, the Princess sought treatment from another neurologist, Dr. Jeffrey Horstmyer, through Dr. Sheremata's referral.  PX 416.[39]  Dr. Horstmyer's notes from the Princess' first visit state that the Princess had a small progression of weakness in her lower extremity, particularly on her right side, and continued to suffer from chronic constipation.  Id.

---

[39] Plaintiff's Exhibit 416 is a set of medical records from Dr. Horstmyer for consultations with the Princess between November 1, 2004, and February 24, 2009.  PX 416.

Dr. Horstmyer's examination revealed decreased vibratory sensation and a mildly impaired gait. Id. The "impressions" section of Dr. Horstmyer's record states that the Princess has multiple sclerosis and "appears to have entered a secondarily progressive phase" and manic depressive disorder. Id. The Princess saw Dr. Horstmyer every three months after the first visit, and he was her treating neurologist at the time of the damages trial. 2010 Tr. 105, 111 (Horstmyer). At trial, Dr. Horstmyer explained that he independently diagnosed the Princess' multiple sclerosis, and simply accepted the reported diagnosis of manic depressive disorder. Id. at 105-111.

In 2005, the Princess experienced no major changes in her neurological condition, but she did experience small changes in her mood. At the recommendation of Dr. Horstmyer, the Princess began psychiatric treatment with Dr. Juan Paredes. PX 417.

Dr. Paredes wrote in his account of the Princess' first visit: 53-year-old Hispanic Female Patient who purported to be diagnosed with bi-polar disease for approximately 20 years. PX 417; 2010 Tr. 82 (Sheremata). In April 2005, the Princess felt better due to medicines prescribed by Dr. Paredes, but one month later, began feeling slightly depressed. PX 416. Around this time, the Princess' daughter, who was living in Puerto Rico, developed a drug addiction. 2010 Tr. 289 (Princess). Her daughter's addiction was stressful for the Princess, and she traveled to Puerto Rico several times to help her daughter. Id. at 274.

### The Princess' Condition Between 2006-2009

In a January 23, 2006 visit, Dr. Horstmyer noted that the Princess developed mild sciatica, but was otherwise doing well. PX 416. She continued to experience fatigue and some tingling in her feet, with no changes in balance. Id.

On April 25, 2006, Dr. Horstmyer diagnosed the Princess with pathological fatigue, a common symptom in patients with multiple sclerosis and noted that the Princess' fatigue rendered her "clearly unable to work." Id.; 2010 Tr. 113 (Horstmyer). Later that year, in August, 2006, the Princess felt her balance had improved, though Dr. Horstmyer noted she had "pathological fatigue." PX 416.

On January 30, 2007, the Princess visited Dr. Horstmyer who observed that she was doing well and that her last exacerbation "was several years ago." She was no longer experiencing significant lower extremity weakness and had no issues with fatigue and no bowel or bladder problems. Id. In May 2007, however, the Princess was hospitalized for bronchitis, but recovered. She reported feeling stressed, tingling, and increased fatigue, but no other neurological symptoms. Despite these symptoms, Dr. Horstmyer wrote "improved" when describing her multiple sclerosis. Id. In an August 7, 2007 appointment with Dr. Horstmyer, the Princess reported that she was spinning seven days a week, swimming 1500 meters a day, lifting weights three times a week, and was feeling great. Id.

On November 6, 2007, in a visit to Dr. Horstmyer, the Princess reported that she continued to exercise regularly, and Dr. Horstmyer observed that despite her fitness, she had developed memory loss and "[m]ild cognitive impairment, at least partially related to multiple

sclerosis."[40]   <u>Id.</u>   The Princess was concerned that her forgetfulness was interfering with activities of daily living, including driving.  <u>Id.</u>  For help with the memory loss, she sought treatment from Dr. Paredes, but continued to experience memory loss into the first half of 2008. <u>Id.</u>; PX 417.  Dr. Paredes referred the Princess for neuropsychological testing.  PX 417.

In February 5, 2008, Dr. Horstmyer found that the Princess' pathological fatigue had improved.  He testified: "When she comes under increased stress, it tends to activate her disease, and at that time, if I recall, it may have been issues with the daughter."  2010 Tr. 117 (Horstmyer).  In the fall of 2008, the Princess discontinued taking Avonex, but the record does not reveal why.  PX 416.

On February 24, 2009, Dr. Horstmyer observed that there were no significant changes in the Princess' physical condition.  <u>Id.</u>  She continued to exercise almost daily and although she felt tired, her fatigue seemed to be better.  There was no improvement, however, with respect to her forgetfulness and the Princess exhibited difficulty with wordfinding.  <u>Id.</u>; <u>see also</u> 2010 Tr. 135 (Horstmyer).

On May 20, 2009, Dr. Sheremata examined the Princess after a referral from Dr. Horstmeyer.  PX 415.  She had developed symptoms of numbness in her hands, particularly her right hand.  The Princess had difficulty climbing stairs, and her eyes moved in a zigzag fashion. 2010 Tr. 66 (Sheremata).  In addition, she exhibited moderately severe hip flexor weakness and moderate to severe weakness of her neck muscles on both sides.  PX 415; 2010 Tr. 66 (Sheremata).  The Princess also had increased muscle tone in both legs.  <u>Id.</u>  In a letter to Dr. Horstmyer, Dr. Sheremata wrote: "this lady must be put back on her Avonex without any delay. . . . She may very well have a major relapse within the next few days."  PX 415.  Dr. Sheremata's "provisional diagnosis" for this visit was "multiple sclerosis with relapse."  <u>Id.</u>

### The Princess' Health in 2010

There are no medical records for 2010, but the Princess' son testified to her health at the damages trial. He stated:  "Physically, she's strong . . . . Every now and then there's just a little weak spell, but she seems well."  2010 Tr. 159 (Cinnante).  Her emotional state, though, he explained, still exhibited those "ups and downs . . . .  There's sometimes the depressions. There's sometimes the speeding up that usually leads to the real negative situations, but I think she's maybe learned [how] to manage it a little bit better."  <u>Id.</u>  During the damages trial in 2010, the Princess testified that she continued to have difficulties with her short term memory.  2011 Tr. 513 (Princess).

---

[40] Although Dr. Horstmyer subsequently revised his conclusion, determining that the Princess' mild cognitive impairment was "unlikely to be related to multiple sclerosis given the findings from detailed neuropsychological evaluation," he testified at the damages trial that new information supported his initial conclusion that the Princess' cognitive impairments were linked to her multiple sclerosis.  2010 Tr. 116-17 (Horstmyer).

## The Princess' Future Health and Medical Treatment:  the Life Care Plan

Plaintiff's expert, Sharon Reavis, R.N., prepared a life care plan estimating the cost of medical treatment for the remainder of the Princess' life expectancy.  PX 418.[41]  In 2010 when she testified, Ms. Reavis gauged the Princess' life expectancy to be 25.6 years from mortality tables prepared by the U.S. Department of Health and Human Services.  2010 Tr. 192-93 (Reavis).  The life care plan includes estimated costs from 2010 to 2036 in five categories: drugs and supplies, home services, medical routine, medical services, therapies.  PX 418.  These costs total $1,145,161.47.  In preparing the life plan, Ms. Reavis relied on the cost of medical services from her experience and speaking with the doctors, the Princess' medical records, and an interview of the Princess.  2010 Tr. 172-73 (Reavis).  Ms. Reavis testified she determines medical costs by "refer[ring] to the costs of care all over the country and look[ing] at the provision of the service."  Id. at 176.  In estimating the cost of Avonex, Ms. Reavis compared the costs of about 15 providers of Avonex and consulted a database of medications.  Id. at 176-77.  Ms. Reavis also consulted the Princess' treating physician, Dr. Horstmyer, and corresponded with the Princess' psychiatrist, Dr. Paredes.  Id. at 185.[42]  Ms. Reavis excluded from the life care plan any cost that could not be accurately estimated even if those services would be necessary.  2010 Tr. 198 (Reavis).  For example, though the Princess will need to see a neurologist, specifically Dr. Horstmyer to be treated and prescribed Avonex, Ms. Reavis excluded this cost from the life care plan because Dr. Horstmyer could not estimate the frequency or costs of future visits, even though historical data show visits once every three months.  Id.

### Life Care Plan:  Drugs and Supplies

The drugs and supplies category includes the costs of five medications taken by the Princess: Avonex, Clonazepam, Lithium, Lamotrigine, and Ambien.  Ms. Reavis testified that Avonex is used extensively to stabilize the symptoms of multiple sclerosis; Clonazepam is an anti-convulsant used to treat the Princess' anxiety; Lithium is used to treat manic-depressive or bi-polar disorders; Lamotrigine is an anti-convulsant that stabilizes mood and prevents extreme

---

[41] The Court accepted Ms. Reavis as an expert in the fields of rehabilitation counseling and life care planning.  Ms. Reavis is a registered nurse, licensed in the state of Virginia, and a fellow in the American Academy of Life Care Planners.  Since 1978, she has been a medical case manager, coordinating care and services for individuals with disabilities and chronic illnesses.  2010 Tr. 166-67 (Reavis).  Ms. Reavis has testified in over 50 cases over the past four years.  She has taught a medical course for rehabilitation counselors at the Medical College of Virginia, Virginia Commonwealth University.  2010 Tr. 168-69 (Reavis).  Ms. Reavis received a Master's degree in rehabilitation counseling from Virginia Commonwealth University and received her nursing degree from Riverside Hospital School of Professional Nursing.

[42] On cross-examination, Ms. Reavis testified that she had asked Dr. Paredes in a letter whether "the Princess's current medication protocol was required because of the trauma of her captivity or exacerbated by the incident, e.g. does she require more medication accordingly?" 2010 Tr. 188 (Reavis).  Dr. Paredes responded in writing: "The captivity happened many years ago.  For me it is difficult to determine if her captivity years ago is affecting her current medication protocol."  DX 23.

27

fluctuations in behavior; and Ambien is prescribed to aid sleep.  Id. at 176-78.  Ms. Reavis calculated the unit cost of each drug based on a review of the drug costs of 15 different providers.  Id. at 189.  She further explained that the cost of Avonex in the life-care plan was the Princess' out-of-pocket cost as her Medicare plan does not cover Avonex.  Id. at 189-90.  The cost of drugs, including Avonex, and associated supplies, was $998,414.08 for the Princess' remaining 25.6 years.

### *Life Care Plan:  Home Services*

The home services category includes the cost of housekeeping services once a week.  Ms. Reavis testified that the Princess is unable to independently handle heavier housekeeping duties, such as scrubbing floors and cleaning bathrooms.  Id. at 179.  Noting that "[d]eterioration would require additional household services," such as a homemaker, Ms. Reavis testified that she did not include the cost of a homemaker in the life care plan "because there's no way to predict exactly when [the Princess'] condition will worsen . . . ."  Id.; PX 418.  The total cost for this category was $93,184.00.  Id.

### *Life Care Plan:  Medical Routine*

The medical routine category includes the costs of the Princess' medical visits to an ophthalmologist and a psychiatrist.  PX 418.  Ms. Reavis included the costs of visits to an ophthalmologist because individuals with MS can experience vision loss, blurring, and double vision.  2010 Tr. 180 (Reavis).  The life care plan also includes costs for the Princess's psychiatrist, Dr. Paredes, for medication management and therapy.  PX 418.  The total cost for the medical routine category was $23,150.59.  Id.

### *Life Care Plan:  Medical Services*

The medical services category includes the cost of an MRI of the brain required once a year to monitor the progression of multiple sclerosis. The total cost for this category was $15,360.00.  Id.

### *Life Care Plan:  Therapies*

The therapies category includes the cost of a fitness center and monthly membership fee at a yearly cost of $588 for 25.6 years.  Ms. Reavis testified that exercise is important because it helps the Princess' balance, combats fatigue, and builds strength.  2010 Tr. 182 (Reavis).  The total cost for this category was $15,052.80.  PX 418.

## **Procedural History**

Plaintiff filed the instant action claiming that DEA breached its contract by failing to pay her commissions on money laundered and property seized as a result of her efforts, and that DEA breached its duty to protect her from injury or harm, to maintain the secrecy of Plaintiff's identity, and to aid Plaintiff when in danger.  Plaintiff sought a judgment of $ 33,850,000, plus interest and costs.

In November 1997, at Defendant's request, the Court stayed proceedings until DEA completed an investigation. <u>See</u> Mot. to Stay, Nov. 7, 1997.[43]   Between 2000 and 2003, the parties engaged in discovery, and both parties substituted counsel.

In early 2005, the Government filed a motion to dismiss and, simultaneously, a motion for summary judgment, arguing that this action sounds in tort and the Court lacked subject-matter jurisdiction.  Plaintiff filed a cross-motion for summary judgment.  The Court denied Defendant's motion to dismiss and the cross-motions for summary judgment in late 2006. <u>SGS-92-X003 v. United States</u>, 74 Fed. Cl. 637, 655 (2006).

The Court held a trial on liability in West Palm Beach, Florida from June 11-14, 2007, and in Washington, DC, from June 18-20, 2007.  At the trial, examination and testimony revealed that the Government was relying on documents it had never produced to Plaintiff.  2007 Tr. 1530-45; <u>see SGS-92-X003 v. United States</u>, 85 Fed. Cl. 678, 690 n.16 (2009).[44]   The Court stated that it was "rather surprised that on the sixth day of trial the Government [was] producing documents for the first time" and directed the Government to renew its search for missing documents, including the SARC minutes that Plaintiff requested, but the Government had not located during discovery.  2007 Tr. 1536; Order, July 2, 2007; Order, July 9, 2007.  Within three months of the Court's orders, the Government located and filed two sets of SARC Committee minutes, after the secretary for former DEA Administrator Thomas Constantine discovered them in a "dormant 'classified documents' file drawer" when she was cleaning.  Def.'s Status Rep., Sept. 14, 2007.  Soon after this discovery, the Court directed counsel for the Government to file a declaration that "the Department's files have been searched thoroughly for the SARC minutes and the Princess files, all of the documents that had been asked for 10 years ago."  2007 Tr. 12-13; Order, Sept. 26, 200.  The Court permitted the parties to file additional documents that they wished to include in the trial record.  Order, Nov. 14, 2007.  The parties supplemented the record in late 2007, and filed post-trial briefs and replies over the course of 2008.

On January 27, 2009, the Court issued an opinion on liability under seal and published the redacted opinion on February 9, 2009.  The Court held that "the evidence at trial established that Plaintiff had an implied-in-fact contract with the DEA but not for a set commission." <u>SGS-92-X003 v. United States</u>, 85 Fed. Cl. 678, 681 (2009).  The Court stated: "[u]nder this contract, which was demonstrated by the parties' course of performance," Plaintiff's supervising officer could pay her $25,000 quarterly, but could "only <u>recommend</u> rewards or commissions above that amount."  <u>Id.</u> (emphasis in original).  Therefore, the Court denied liability on Plaintiff's claim for commissions.  The Court continued:

> The landscape is different however with respect to Plaintiff's claims that the DEA
> failed to protect her in the line of duty.  The evidence at trial—primarily the

---

[43] From 1997 to 2003, the Honorable Judge John P. Weise presided over this case.  On August 15, 2003, this case was reassigned to the undersigned.

[44] However, on October 21, 1997, prior counsel for Plaintiff had made a request "to the Defendant to produce/preserve the entire original Princess file."  Pl.'s Amended Mot. for Sanctions at 2, Apr. 24, 2012.

Government's own evidence including detailed documentation and the testimony of two former DEA Administrators and the Deputy Attorney General— established that the DEA sent the Princess on a mission to Colombia without following its own procedures.

Id. The Court found that the Government breached the implied-in-fact contract, explaining:

While DEA's obligations to a confidential informant may not extend to ensuring an informant's safety, *at the very least*, the agency was obligated to follow its own policies when sending an informant to a volatile "hot spot" overseas. See, e.g., Agredano v. United States, 82 Fed. Cl. 416, 444-45 (2008) (stating that the plaintiff could prove that Government violated covenant of good faith and fair dealing if, among other things, the Government "acted in direct contravention of its stated policy").

SGS-92X003 v. United States, 85 Fed. Cl. 678, 709 (2009) (emphasis added). The parties completed discovery relating to the damages phase of the trial and filed their expert reports over the course of 2009.[45]

On March 15, 2010, the Government filed its pre-trial brief for the damages trial. The Government objected to this Court's determination of liability and argued that the "objection is strengthened by two recent decisions by the United States Court of Appeals for the Federal Circuit that cast doubt upon the foundations of the Court's liability decision," Def.'s Pre-Trial Memo at 5, March 15, 2010, citing Agredano and Precision Pine, both of which reversed decisions of the United States Court of Federal Claims. See Agredano v. United States, 595 F.3d 1278, 1280 (Fed. Cir. 2010), rev'g 82 Fed. Cl. 416 (2008); Precision Pine & Timber, Inc. v. United States, 596 F.3d 817 (Fed. Cir. 2010), aff'g in part and rev'g in part 50 Fed. Cl. 35 (2001). Though the Government did not formally seek reconsideration of this Court's liability decision, in its pre-trial memorandum, Defendant requested "that the Court find that the United States is not responsible for any breach of contract with plaintiff or for any damages allegedly stemming from such breach." Def.'s Pre-Trial Brief at 10, March 15, 2010.

On Monday, March 29, 2010, at the pre-trial conference, counsel for the Government reported that the previous Friday, while searching for documents regarding Major Beltran, counsel discovered documents relating to the Princess that had not been produced. Pre-Trial Conf. Tr., Mar. 29, 2010. Counsel explained that he had discovered the Princess files in another DEA case file and had not yet finished sorting through the file to see if there were other responsive documents. Id. at 22.[46]

---

[45] By request of the parties, the Court bifurcated proceedings on liability and damages. SGS-92-X003 v. United States, 85 Fed. Cl. 678, 682 n.3 (2009).

[46] The Court ordered the Government to produce every document pertaining "to the Princess in the possession of the Government worldwide" in the form of a certified administrative record. Id. at 66-67. DEA's Chief Counsel issued a memorandum to each of DEA's 21 field divisions, its six regional directors, and all headquarters components seeking responsive documents and requiring a written response. Def.'s Status Rep., June 1, 2010.

The Government conceded that Plaintiff's expert in law enforcement, Michael Levine, was entitled to more time to review the recently discovered documents. Pre-Trial Conf. Tr. 21-22, March 29, 2010. The parties agreed to proceed with trial and present the medical testimony and other fact witnesses, and continue the remaining parts of the damages phase when the Government finished its search and Plaintiff's expert had reviewed the new evidence. Id. at 25, 44, 93-95.[47]

From April 6 to 7, 2010, the Court held the first phase of the damages trial in West Palm Beach, Florida.

On June 1, 2010, the Government filed a status report to apprise the Court of its progress in resolving outstanding discovery issues that stated it had "collected approximately 15,000 pages of documents" it would produce. Def.'s Status Rep., June 1, 2013. Faced with the need to sort through 15,000 pages, some of which had been previously produced, on September 9, 2010, Plaintiff filed a consent motion to continue the second phase of the damages trial. Pl.'s Mot., Sept. 9, 2010. In her motion to continue, Plaintiff noted that the recently produced documents "more than doubl[ed] the amount of materials previously received" and it would take the expert months to review the documents and draft his report. Id. at 3. The Court granted Plaintiff's motion and rescheduled the trial for the Fall of 2011. Order, Sept. 13, 2010.

On August 16, 2011, Plaintiff filed a motion seeking sanctions, citing the Government's egregiously late production of responsive documents and its destruction of documents and recordings after initiation of this suit. Pl.'s Sanctions Mot. at 4, Aug. 16, 2011. Based on the agreement of the parties, the Court deferred ruling on the motion for sanctions until after the damages trial, but ordered the Government to "file, on or before August 31, 2011, spreadsheets cataloguing any destruction of evidence and any relevant appendices." Order, Aug. 26, 2011. In complying with this Order, the Government revealed that it had destroyed evidence in 1998—more than a year after Plaintiff filed suit—pertaining to the Princess or operations with which she was involved, including instructions sent to the Princess regarding currency pickups for money laundering and audio tapes of the Princess' telephone calls with Colombian drug traffickers that occurred on September 7, 1994, November 4, 1996, November 5, 1996, January 21, 1998, and October 28, 1998. See also Def.'s Notice, Aug. 31, 2011, Def.'s Notice, May 31, 2013.

The Court held the second phase of the damages trial in West Palm Beach, Florida from September 21 to 23, 2011. At trial, counsel for Plaintiff objected because the Government was using less redacted versions of documents it had produced and in one instance a document it may

---

[47] Also at the pre-trial conference on March 29, 2010, the Court denied the Government's motion in limine requesting the Court to preclude Plaintiff's expert from testifying regarding DEA's inadequate supervision of the Princess, among other things, because it did not directly relate to "the effects of DEA's failure to obtain country clearance." Def.'s Mot. at 9, Mar. 17, 2010, ECF No. 172; see also, Pre-trial Conf. Tr. at 85, Mar. 29, 2010. In denying the motion, the Court stated that it "did not intend its liability opinion to be read as narrowly as the Defendant is now construing it." Pre-trial Conf. Tr. at 85, Mar. 29, 2010.

not have produced at all.  See 2011 Tr. 602 (Avery), ("I should've gotten the draft; I should've gotten the final one; I should've got the unredacted one. And this has been the issue all along."). The Court expressed "concern about the documentary evidence in the case" but gave the Government "an opportunity to explain to the Court what happened and why these documents are different." Id. at 601.

At a status conference held on October 3, 2011, Plaintiff's counsel reiterated his concerns about missing discovery in the case, specifically citing DEA's Office of Professional Responsibility's ("OPR") file for its investigation of Sandy Neal, a DEA analyst who worked closely with the Princess. J. Stat. Rep., 1, Feb. 10, 2012. In a Joint Status Report filed on February 10, 2012, the parties informed the Court that counsel for the Government had directed DEA's OPR to retrieve the files from storage and made the file available to Plaintiff's counsel. Id.  The Report explained that "shortly after the review of the OPR documents by Plaintiff's counsel, OPR informed DEA counsel that it had discovered additional documents related to the Neal investigation that had not been earlier provided as a result of an unanticipated feature of its filing system." Id. at 2. The Government provided Plaintiff's counsel with these recently-discovered documents.  Hence, well after the damages trial, DEA produced responsive documents that it had never before provided Plaintiff.

On April 24, 2012, Plaintiff filed an amended memorandum in support of its motion for sanctions, alleging that the Government was grossly negligent in failing to preserve, search, and timely produce evidence in its possession.  Later that day, on April 24, 2012, the Government produced five new documents. Accordingly, on April 25, 2012, Plaintiff filed a supplemental memorandum attaching these five new documents.  The Government filed its opposition to the motion for sanctions on June 4, 2012, and the Court held oral argument on July 10, 2012.  A month after oral argument, the parties informed the Court they had reached a settlement on the motion for sanctions, and on December 6, 2012, Plaintiff withdrew her motion.  See J. Status Report, Aug. 30, 2012.

After settlement of the sanctions issue and post-trial briefing, the Court determined that the record was incomplete and ordered the parties to file documents they had previously represented that they would file.  Order, May 2, 2013.  The parties complied with the Court's Order on May 31, 2013.  Pl.'s Ex. List, May 31, 2013; Def.'s Notice, May 31, 2013.  The Court offered the parties an opportunity to reopen the record in light of the late-filed documents, but they opted not to do this.  See e.g., Oral Arg. Tr. 32-33, July 10, 2012.

## Discussion

Plaintiff claims that DEA's breach of the implied-in-fact contract resulted in her kidnapping and captivity, thereby causing her multiple sclerosis, severe financial losses and hardship, physical pain and suffering, emotional distress, and inconvenience.  Pl.'s Pre-Trial Brief at 37, March 1, 2010.  Plaintiff asks the Court to award the value of her life care plan, $1,145,161.47, and "a sum of money to fully and fair[ly] make her whole" which Plaintiff contends is $10 million dollars.  Id.; Pl's Post-Trial Brief at 78-80, Jan. 23, 2013.

Although this is an opinion on damages, two circumstances compel the Court to revisit its decision on liability—the agency's production of documents for the first time after the opinion

on liability,[48] and the Federal Circuit's recent jurisprudence on breach of good faith and fair dealing, which the Government claims undermines this Court's determination of liability.[49]

### The Government's Duty to Protect the Princess

Plaintiff claimed her agreement with DEA "bound the United States" to pay her commissions, maintain the secrecy of her identity, aid her when she was in danger, and protect her from harm and injury. Compl. 3; see also SGS-92-X003 v. United States, 85 Fed. Cl. 678 (2009). In its opinion on liability, the Court found that Plaintiff established an implied-in-fact contract with DEA, that the contract required the Government to protect the Princess in the line of duty, and that DEA breached this aspect of the contract. SGS-92-X003, 85 Fed. Cl. at 681-83. Specifically, with respect to Plaintiff's claim that DEA failed to protect her in the line of duty, this Court found:

> The evidence at trial — primarily the Government's own evidence including detailed documentation and the testimony of two former DEA Administrators and the Deputy Attorney General — established that DEA sent the Princess on a mission to Colombia without following its own procedures. The evidence is uncontroverted that the head of DEA's Fort Lauderdale Office, who supervised the Princess, sent her on this undercover operation without advising DEA Headquarters or the Colombian attache — in violation of established DEA procedures. In short, in the words of a former DEA administrator, DEA sent the Princess into "harm's way," in the course of performing its implied-in-fact contract. As such, *the Court enters judgment for Plaintiff on liability for this aspect of her claim.*

Id. (emphasis added).

The documents produced after the Court's liability decision do not undermine the finding of liability. Internal DEA memoranda that the Government produced after the damages trial echo the conclusion that DEA owed a duty to protect informants as the memoranda require extensive information from an applicant seeking approval for an operation, including how he or she would ensure the safety of agents and confidential informants during an operation. PX 612. So too, the testimony of Plaintiff's expert in law enforcement, Mr. Levine, although directed at the causation element of damages, also established DEA's duty to protect its confidential

---

[48] The Government's failure to produce documents was egregious. Throughout this protracted litigation, the agency delayed producing documents until the 11th hour and destroyed potentially relevant evidence. Oral Arg. Tr. at 16, July 30, 2012 ("It was grossly wasteful not only of your and your client's time but of this Court's time, and it happened again and again.").

[49] See Agredano v. United States, 595 F.3d 1278 (Fed. Cir. 2010), rev'g 82 Fed. Cl. 416 (2008); Precision Pine & Timber, Inc. v. United States, 596 F.3d 817 (Fed. Cir. 2010), rev'g in part 50 Fed. Cl. 35 (2001). Since this Court's liability opinion, the Federal Circuit has provided additional guidance on the breach of the implied duty of good faith and fair dealing. See Metcalf Constr. Co., Inc. v. United States, 742 F.3d 984 (Fed. Cir. 2014).

33

informants.  2011 Tr. 349 (Levine).  Furthermore, DEA's conduct in providing the Princess bodyguards on certain missions, in re-locating her family from Colombia, paying $350,000 when the mafia held the Princess responsible for lost funds in Geneva, re-locating the Princess upon learning of the foiled kidnapping plot earlier in 1995, undertaking an extensive search and internal investigation upon her kidnapping, and coordinating her release from captivity, demonstrate that DEA willingly assumed and regularly acknowledged its duty to protect the Princess.

## The Government's Breach of Contract and Implied Duty of Good Faith and Fair Dealing

Although the Government downplays the requirement of obtaining country clearance, characterizing it as a mere formality, the Government's witness confirmed that observance of DEA's country notification procedures was critical to ensure the Princess' safety.  Former Administrator Constantine characterized agency procedures to be followed when an informant is sent to a foreign country as an "established protocol":

> [F]or an individual working with or being involved in any DEA investigation to go to a foreign country, especially a place as volatile as Colombia was during that period of time, there are certain key people at headquarters that have to be notified and approve that.

> In addition to that, the head of the DEA contingent in the country involved would have be notified.  I think that's an established protocol, and I think we can all understand it.  So that if you're in Colombia, and you're responsible for 40 or 50 DEA agents, you want to know what's occurring as another DEA investigation in your area of responsibility and maybe can provide some type of safety or cover or contact.

2007 Tr. 1338-39 (Constantine).  Administrator Constantine continued:  "I said how in God's name did this happen that somebody is placed in jeopardy, and it's a problem, and I get hot about things like that because I don't like to see people get hurt."  Id. at 1339.

So too, according to Attaché Senneca, was safety an important consideration in clearing an informant for entry to Colombia.  2011 Tr. 583 (Senneca).  Attaché Senneca acknowledged that DEA had a duty to protect informants:

> [W]hen you say protect them, yes, there is an absolute duty to protect them in very specific circumstances, but those are generally well-defined circumstances that involve an operation, something that involves perhaps a lot of money passing back and forth, like a buy of an undercover purchase or something like that. That's when there's a really well-defined responsibility.

> There's a broader general responsibility that requires, you know, other kinds of things.  You know, just a constant sort of vigilance, but not, you know, some kind of specific activity.

34

Id. at 576.

The Government contends that ASAC Salvemini's failure to secure country clearance cannot be the cause of any damages the Princess claims, citing the testimony of Anthony Senneca, the Country Attaché to the Bogota Office in August 1995, when the Princess was kidnapped, that he would have granted country clearance if ASAC Salvemini had asked.  Attaché Senneca testified:  "The only thing I could say is that it was probable that I would have [granted country clearance] because it would have been based upon the kinds of things that ASAC Salvemini would've said to me." Id. at 568.

The Government's attempt to brand country clearance as a mere formality is undercut by its own evidence.  In determining whether to grant clearance, Attaché Senneca typically received a detailed briefing from the supervising ASAC on the informant's planned activities, contacts, and whereabouts.  Id. at 561-62.  Attaché Senneca followed up with questions about the informant's travel, especially the "downside risks" for the person, DEA, and the United States Government, "because you're operating in a foreign country." Id. at 561.  Attaché Senneca considered a myriad of factors before granting clearance. Id. at 577, 581, 592.  Of these factors, safety of the agent or informant was of paramount importance.  Id. at 581-583.  On occasion country clearance was denied. PX 92 at G-20 (relating on "several occasions" either DEA headquarters or the Bogota Country Office had denied country clearance for the Princess.).

The Government's speculation about what might have transpired if DEA had complied with its country clearance protocol is hypothetical and cannot form the basis for a finding, as the Government suggests, that the Princess would have been kidnapped and endured a three-month captivity anyway.  More importantly, Attaché Senneca's testimony contradicts the suggestion that the Attaché would have rubber-stamped an ASAC's request for country clearance for the Princess.  Recognizing that DEA's Bogota office did not "have the power to put eight or ten guys on the street with heavy weapons in cars and communications," Attaché Senneca acknowledged that he would have denied clearance to the Princess if her identity was compromised among the people she planned to meet.  2011 Tr. 564-66, 586 (Senneca).  Attaché Senneca conceded  that he would have denied the Princess permission to enter Colombia if he had known that there was a plot to assassinate her or that an Assistant United States Attorney had revealed the Princess' cover to an individual whom Princess had helped the Government arrest.  Id. at 592.

But DEA's misstep in failing to obtain the requisite clearance or follow notification procedures in dispatching Plaintiff to Colombia was only part of the breach here.  As Plaintiff's expert in law enforcement, Michael Levine, credibly testified, DEA never should have sent the Princess on this mission to Colombia in the first place.[50]  Several circumstances formed the basis

---

[50] This Court accepted Mr. Levine as an expert in the area of law enforcement, particularly undercover tactics and procedures, confidential informant handling, money laundering, and intelligence gathering.  At the time of the damages trial, Mr. Levine was a police instructor, trial consultant, and witness, and worked for the United States Department of State teaching "undercover tactics and informant handling in Brazil."  2011 Tr. 8 (Levine). After joining DEA in 1973, he served in multiple positions, including as an International Group Supervisor, Country Attaché to Uruguay, Argentina, and Brazil, and as an inspector in the Office

of this opinion by Mr. Levine—the Princess was being held accountable for missing trafficker funds, her cover had been compromised, and she had been the victim of a foiled kidnapping and assassination plot. As context for his opinions, Mr. Levine noted that in his view, DEA's mismanagement throughout the entire operation placed the Princess in danger. 2011 Tr. 52, 448-49 (Levine). Specifically, Mr. Levine testified that ASAC Salvemini and members of his Task Force did not have the requisite expertise in money laundering operations to direct the Princess when she adopted the cover of a money launderer. Id. at 45; see also SGS-92-X003, 85 Fed. Cl. at 697 (noting that ASAC Salvemini "begged" DEA headquarters for direction about how to utilize a confidential informant of the Princess' caliber).

### Missing Trafficker Funds

Mr. Levine opined that the Princess was kidnapped because she was held accountable for the loss of drug trafficker funds. 2011 Tr. 118 (Levine). Mr. Levine related an incident in July 1993, when DEA seized funds that the Princess was purportedly laundering for Colombian drug traffickers; the Princess diverted blame for the seizure from DEA's undercover agents in order to continue the operation. Id. at 64-65. Despite the Princess' deflecting blame, Mr. Levine explained: "[w]hen that amount of money disappears there is just simply no way — she is under the gun. She is under the gun of suspicion. Whether that comes out as a murder in a month or two year, a year later, I don't know. But I know that's a ticking time bomb." Id. at 65-66.

Mr. Levine opined that the actions of undercover DEA Group Supervisor Rene De La Cova, who posed as the Princess' employee to meet with drug traffickers and engage in currency pick-ups, also jeopardized the Princess. Id. at 105-08. Mr. Levine explained how money "pick-ups" should have occurred and that, under the Princess' operation, there were "no controls over the money or the counting" which increased the likelihood of missing funds. Id. at 52. This came to fruition when Agent De La Cova stole money because he was able to simply make "pick-ups" by himself, put the money in the trunk of his car, and drive off, without impediment. Id. at 437. During a money pickup in Houston on July 17, 1993, Mr. De La Cova stole approximately $700,000 of drug trafficker money to be laundered by the Princess. Id. at 110-11; PX 239. Mr. De La Cova pleaded guilty to theft of government funds, resigned from DEA as part of his plea agreement, agreed to make full restitution of the stolen money, and served a prison term. PX 239; 2011 Tr. 115 (Levine).

Mr. Levine concluded that there were missing trafficker funds comparing Reports of Investigation completed by DEA undercover agents after picking up trafficker funds to a summary report of currency pickups for Operation Princess. PX 462; 2011 Tr. 274-76 (Levine).[51] The conclusion that there were missing trafficker funds is supported by other DEA

---

of Professional Responsibility. Mr. Levine was one of the most decorated undercover agents DEA had. Id. at 26. Following his retirement from DEA in 1989, Mr. Levine was an author, expert witness, and police instructor. He has published professional articles and several works of non-fiction. Mr. Levine has testified "close to 300 times" since 1966, including during his career with the Government. He holds a Bachelor's degree from Hofstra University in accounting.

[51] The summary spreadsheet in the record, entitled "Operation Princess," documents currency pickups by transaction number, amount, city, transfer amount, commission, and amount

documents including a statement by another DEA confidential informant, known as "[ * * * * *]," who assisted DEA in its attempts to locate the Princess after her abduction and negotiated with the Princess' captors for her release.  PX 259  According to a memorandum from Attaché Senneca to Deputy Chief Craig Chretien of International Operations, "[[* * * * *]] believes the [Princess'] current plight resulted from the loss of trafficker moneys by the [Princess]."  PX 259.

## The Compromise of the Princess' Cover, the Death Threat, and Foiled Kidnapping and Assassination Plot

Mr. Levine testified that the Princess' identity was disclosed by an Assistant United States Attorney for the Northern District of Illinois to a criminal defendant, a Colombian drug dealer, who was arrested after being lured to the U.S. by the Princess.  PX 91; 2011 Tr. 72 (Levine).  In addition, in July 1995, DEA permitted the Princess to listen to an audio recording of an intercepted conversation between two traffickers regarding the Princess' possible involvement with DEA.  2011 Tr. 137-38 (Levine).  Finally, based on cables sent by the Rome, Italy DEA in July 1995, indicating that targets of an investigation knew the Princess was cooperating with law enforcement, Mr. Levine opined that the Princess' cover was compromised.  Id. at 57.

An incident of lost funds led to traffickers seizing a broker's property in Colombia for payment, and the broker, then in prison, hiring someone to kidnap and kill the Princess.  In early 1995, DEA intercepted and foiled this kidnapping plot.  According to Mr. Levine, the Princess' cover as a money launderer was at risk, as evidenced by this foiled attempt to kidnap the Princess in Fort Lauderdale in January 1995, and a death threat received by the Princess in July 1994.  Id. at 68; PX 10.[52]  Mr. Levine testified:  "It's just inconceivable to me that anyone would allow her to go back to Colombia" in light of the death threat.  2011 Tr. 92-93 (Levine).

Defendant submits that Mr. Levine harbors a bias against DEA and argues that his testimony was exaggerated and drew unmerited conclusions.  Def.'s Post-Trial Br. 9.  The Court, finding that Mr. Levine was a knowledgeable, forthright witness based on his demeanor, disagrees.  Mr. Levine's testimony here was largely based on DEA's own documentation and his first-hand knowledge of how DEA operated based on 44 years of experience.  The Court found that Mr. Levine had the requisite expertise to render his opinions, that his view of DEA's conduct was supported by the record and that his testimony was reliable.

DEA breached its duty to protect the Princess by recognizing her cover was weakened, knowing she was at risk for missing trafficker funds, knowing that she had been the victim of a

---

seized.  PX 462.  This document was from DEA's files, but Mr. Levine did not know who created the summary table or how it was created.  2011 Tr. 432-33 (Levine).

[52] According to a request for award addressed to Robert Michelotti from ASAC Salvemini dated February 22, 1995, "[T]he [Princess'] activities on behalf of DEA have placed both the [Princess] and his/her family in a position of considerable personal jeopardy.  This has already been demonstrated by one foiled attempt to kidnap [the Princess] in Ft. Lauderdale in recent months, and a death threat received by [the Princess] while in Colombia during a recent trip there."  PX 10.

foiled kidnapping and assassination plot and a death threat, but nonetheless sending her to Colombia on an undercover operation.  If DEA had not sent the Princess to Colombia in August 1995, based on the "15 or 20 items of real intelligence that she is suspected of being an informant" or had denied her clearance to travel consistent with its protocol, then the Princess would not have been kidnapped in Colombia.  <u>See</u> 2011 Tr. 157 (Levine).  As such, Defendant's breach of its duty to protect Plaintiff embodied in the parties' contract and Defendant's implied duty of good faith and fair dealing led to Plaintiff's kidnapping.

**<u>The Evolution of Jurisprudence on Breach of the Implied Duty of Good Faith and Fair Dealing</u>**

In characterizing Defendant's conduct as a breach of the implied duty of good faith and fair dealing inherent in the Princess' contract with DEA, the Court relied on case law that has since been overturned—the Court of Federal Claims' decisions in <u>Agredano</u>, 82 Fed. Cl. 416, <u>rev'd</u>, 595 F.3d 1278 (Fed. Cir. 2010) and <u>Precision Pine & Timber Inc. v. United States</u>, 81 Fed. Cl. 733, <u>rev'd in part</u> 596 F.3d 817 (Fed. Cir. 2010).  This Court reasoned:

> Here, under the parties' implied-in-fact contract whereby the Princess served as a confidential informant, the Government owed the Princess a duty to refrain from taking any action that would either disrupt her ability to effectively perform as a confidential informant or that might render the value of its own performance worthless.  <u>See Centex</u>, 395 F.3d at 1304.  In practical terms, this meant DEA was obligated to follow its own established protocol for sending the Princess overseas—minimal notification to ensure her continued viability as a confidential informant.  The government's own investigation established that ASAC Salvemini failed to follow fundamental DEA and Colombian protocols when he authorized the Princess' travel to Colombia without notification of or approval from the proper authorities.  While DEA's obligations to a confidential informant may not extend to ensuring an informant's safety, at the very least, the agency was obligated to follow its own policies when sending an informant to a volatile "hot spot" overseas.  <u>See, e.g.</u>, <u>Agredano v. United States</u>, 82 Fed. Cl. 416, 444-45 (2008) (stating that the plaintiff could prove that Government violated covenant of good faith and fair dealing if, among other things, the Government "acted in direct contravention of its stated policy").

<u>SGS-92-X003</u>, 85 Fed. Cl. at 709.  Relying on the reversal of <u>Agredano</u>, Defendant contends that the violation of an agency's regulations and procedures, without more, cannot constitute a violation of a contractual obligation.

In <u>Agredano</u>, the plaintiff purchased a car from a United States Customs Service ("Customs") auction of forfeited vehicles.  <u>Agredano</u>. 595 F.3d at 1279.  The plaintiff signed a form agreeing to comply with the terms of sale which stated "all merchandise is sold on an 'AS IS WHERE IS' basis without any warranty or guarantee . . . implied or otherwise."  <u>Id.</u>  Several months later, Mexican soldiers stopped the plaintiff and found marijuana hidden between the upholstered walls and body of the vehicle; the plaintiff was arrested and spent nearly a year in prison before being exonerated by a Mexican court <u>Id.</u> at 1280; <u>Agredano</u>, 70 Fed. Cl. at 567.

The plaintiff in <u>Agredano</u> later sued the United States Government for breach of contract. <u>Agredano</u>. 595 F.3d at 1280.

Based on Customs' regulatory duty to remove contraband, the Court of Federal Claims found that "the contract contained an implied-in-fact warranty that the vehicle did not contain contraband, and Customs breached this warranty." <u>Id.</u> at 1280-81 (citing <u>Agredano</u>, 82 Fed. Cl. at 437, 440, 452). The Federal Circuit reversed, noting that Customs' express disclaimers as to the condition of the vehicle clearly negated any intent to make any warranty with regard to the vehicle. <u>Id.</u>

This Court's liability determination is unaffected by the Federal Circuit's decision in <u>Agredano</u>. While Customs may have been required under its regulations to remove contraband from the car, the parties' contract said the plaintiff was buying the car "as is" without any warranty, implied or otherwise. Because the contract in <u>Agredano</u> expressly disclaimed the warranty plaintiff was seeking to enforce, there was no meeting of the minds. The meeting of the minds, however, that was lacking in <u>Agredano</u> is apparent in this case. Beginning with Salvemini's first promise to protect the Princess and continuing through the Government's efforts to secure her release from captivity, this duty to protect was a bargained-for benefit of the contract that the Government willingly recognized and undertook throughout the life of the contract—without any disclaimers. Hence, the source of DEA's duty to protect Plaintiff in this case is not, as in <u>Agredano</u>, an independent regulatory obligation of the agency—it is the promise DEA made in its implied-in-fact contract with the Princess, a contract that spanned years and exemplified the parties' course of dealing. In contrast to the absence of any expectation about the condition or contents of the vehicle in <u>Agredano</u>, both Plaintiff and DEA had the expectation that DEA would protect Plaintiff while she was in the line of duty working undercover for DEA.

Relying on another precedent issued after this Court's liability decision, <u>Precision Pine & Timber, Inc. v. United States</u>, 596 F.3d 817 (Fed. Cir. 2010), Defendant argues that Plaintiff cannot state a viable claim for breach of the implied covenant of good faith and fair dealing.

In <u>Precision Pine</u>, the Government suspended 14 timber-harvesting contracts pursuant to a court order that directed the Forest Service to consult with the Fish and Wildlife Service about how these timber sale contracts would affect the Mexican spotted owl. <u>Id.</u> at 821. The Court of Federal Claims held that the Government's suspension breached express contractual warranties and the implied duty of good faith and fair dealing. <u>Id.</u> at 820, 824. On appeal, the Federal Circuit reversed, observing that 13 of the 14 contracts contained a clause permitting the Forest Service to suspend operations. The Circuit acknowledged that the duty of good faith and fair dealing inheres in every contract, but "what that duty entails depends in part on what that contract promises (or disclaims)." <u>Id.</u> at 830.

The Federal Circuit held that for the plaintiff in <u>Precision Pine</u> to prevail on its claim for breach of the implied covenant of good faith and fair dealing, it had to demonstrate that the Government's actions were "specifically designed to re-appropriate the benefits the other party expected to obtain from the transaction." <u>Id.</u> at 829. More precisely, the <u>Precision Pine</u> plaintiff had to show that the "government action was for the specific purpose of eliminating an express,

bargained-for benefit in the contracts and 'sole[ly] impact[ed]' these contracts."  Id. at 829-30 (citing Hercules, Inc. v. United States, 516 U.S. 417 (1996)).

In Metcalf Construction Company v. United States, the Federal Circuit clarified that this "specifically targeted" standard in Precision Pine is not a requirement for finding a breach of the implied duty of good faith and fair dealing in all situations.  742 F.3d 984, 990-94 (Fed. Cir. 2014).[53]  In Metcalf, the Federal Circuit articulated the parameters of the parties' implied duty:

> The implied duty of good faith and fair dealing is limited by the original bargain: it prevents a party's acts or omissions that, though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value.  See First Nationwide Bank v. United States, 431 F.3d 1342, 1350 (Fed. Cir. 2005) (duty was breached by legislation that "changed the balance of contract consideration").

Id. at 991.  The Federal Circuit in Metcalf noted that in Precision Pine there was no breach of the duty of good faith and fair dealing because "the challenged conduct was not contrary to the contract bargain."  Id. at 990-92, 996.

Unlike in Precision Pine, the challenged conduct that breached the implied duty of good faith and fair dealing here was contrary to Plaintiff's implied-in-fact contract with DEA and inconsistent with the contract's purpose.  A fundamental bargain of the Princess' contract was that while she worked undercover, DEA would protect her.    The Princess and DEA had a protracted contractual relationship, and the duty to protect the Princess was a promise both contemplated when the contract was created—as acknowledged by the testimony of ASAC Salvemini, Administrator Constantine, and the Princess—and carried out during much of performance.  The Government's breach of its duty to protect the Princess was not only a breach of the duty of good faith and fair dealing, it was a breach of the implied-in-fact contract itself. Throughout the course of the contract, DEA willingly assumed the duty to protect the Princess, and the evidence shows that DEA considered her safety on a regular basis.  Hence, unlike clause CT6.5 in Precision Pine, which expressly permitted the alleged breaching action there— suspension—the bargain between DEA and the Princess did not permit DEA to ignore considerations of the Princess' safety and dispatch her to Colombia knowing of her questionable cover, the risk of being accountable for missing trafficker funds, the recent death threat, and plot to kidnap and kill her.  In the words of the Metcalf Court:

> In short, while the implied duty exists because it is rarely possible to anticipate in contract language every possible action or omission by a party that undermines the bargain, the nature of that bargain is central to keeping the duty focused on

---

[53]  As Professor Nash recognized:  "The court held that the lower court had read Precision Pine too narrowly and that "specific targeting" was only one example of the type of conduct that could constitute a breach of the implied duty of good faith and fair dealing."  Ralph C. Nash, The Government's Duty of Good Faith and Fair Dealing, Public Contracting Inst. (Mar. 11, 2014), http://www.publiccontractinginstitute.com/the-governments-duty-of-good-faith-and-fair-dealing/.

"honoring the reasonable expectations created by the autonomous expressions of
the contracting parties."

Metcalf Constr. Co., 742 F.3d at 991 (quoting Tymshare, Inc. v. Covell, 727 F.2d 1145, 1152,
(D.C. Cir. 1984) (per Scalia, J.)).   The Government's actions and omissions in failing to follow
notification procedures, failing to enforce the requirement that ASAC Salvemini coordinate the
Princess' activity with headquarters, and sending the Princess to Colombia with a potentially
compromised cover after she had received credible threats, were, of course, not spelled out in
this implied-in-fact contract, but they certainly undermined the parties' bargain.  As such, DEA's
conduct constituted a breach of the implied duty of good faith and fair dealing.  This Court's
liability decision does not run afoul of the Circuit's pronouncements in Agredano, Precision
Pine, or Metcalf.

## Damages

### The Legal Standard for Breach of Contract Damages

Once an injured party establishes a breach of an enforceable contract, that party has a
right to damages unless the breach caused no loss or the party cannot prove a loss. RESTATEMENT
(SECOND) OF CONTRACTS § 346 (1981).  Specifically, the injured party has a right to expectation
damages "measured by (a) the loss in the value to him of the other party's performance caused
by its failure or deficiency, plus (b) any other loss, including incidental or consequential loss,
caused by the breach, less (c) any cost or other loss that he has avoided by not having to
perform."  Id. at § 347.  "A party that establishes a breach of contract may recover expectancy
damages 'sufficient to place the injured party in as good a position as he or she would have been
had the breaching party fully performed.'"  San Carlos Irrigation & Drainage Dist. v. United
States, 111 F.3d 1557, 1562-63 (Fed. Cir. 1997).

To recover expectancy damages for the Government's breach of her implied-in-fact
contract, Plaintiff must establish that (1) the damages were caused by the breach; (2) the
damages were reasonably foreseeable at the time the contract was entered into; and (3) the
measure of damages are reasonably certain.  See, e.g., Kan. Gas & Elec. Co. v. United States,
685 F.3d 1361, 1369 (Fed. Cir. 2012) (citing Ind. Mich. Power Co. v. United States, 422 F.3d
1369, 1373 (Fed. Cir. 2005)).  Causation, foreseeability, and proof of damages are issues of fact.
See Anchor Sav. Bank, FSB v. United States, 597 F.3d 1356, 1361 (Fed. Cir. 2010); Bluebonnet
Sav. Bank, F.S.B. v. United States, 266 F.3d 1348, 1355–57 (Fed. Cir. 2001); Fifth Third Bank
v. United States, 518 F.3d 1368, 1374 (Fed. Cir. 2008)).  Plaintiff has the burden of proof on the
three elements.  Yankee Atomic Electric Co. v. United States ("Yankee II"), 536 F.3d 1268,
1273 (Fed. Cir. 2008); Bluebonnet Sav. Bank, 266 F.3d at 1355.

## Causation

Plaintiff has the burden of proving that her kidnapping and ensuing damages, including
her multiple sclerosis, resulted from the Government's breach of the Princess' implied-in-fact
contract.  A critical threshold determination this Court must make is what legal standard to apply
in assessing causation.  The Court has a choice—the "but for" or "substantial factor" standard.
As the Federal Circuit explained in Citizens Federal Bank v. United States:

Our cases dealing with the proper standard of causation may appear superficially somewhat inconsistent in applying the 'substantial factor' and 'but for' theories. We discern a common thread among them, however: the selection of an appropriate causation standard depends upon the facts of the particular case and lies largely within the trial court's discretion. The standard is comparable to that governing selection of an appropriate methodology for determining damages, which lies within the trial court's discretion. See Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1461 (Fed. Cir. 1998) (en banc) ("The amount of damages determined by a district court is a question of fact that is reviewed for clear error on appeal, while the method used by a district court in reaching that determination is reviewed for an abuse of discretion.") (citation omitted).

474 F.3d 1314, 1318 (Fed. Cir. 2007).  Under the "but for" test, the plaintiff must show that the claimed losses "would not have occurred but for the breach"—though the breach need not be the sole cause—to recover damages.  Cal. Fed. Bank. v. United States, 395 F.3d 1263, 1268 (Fed. Cir. 2005); Anchor Sav. Bank, FSB v. United States, 81 Fed. Cl. 1, 59 (2008).  Further, the plaintiff must show that damages flow "inevitably and naturally" from the breach.  Citizens Fed. Bank, 474 F.3d at 1318 (quoting Myerle v. United States, 33 Ct. Cl. 1, 27 (1897)).  Under the "substantial factor" standard, damages are recoverable where "the breach is a substantial causal factor in the damages."  See, e.g., Kan. Gas & Elec. Co. v. United States, 685 F.3d 1361, 1369 (Fed. Cir. 2012); Citizens Fed. Bank v. United States, 474 F.3d 1314, 1319 (Fed. Cir. 2007); Ind. Mich. Power Co., 422 F.3d at 1373; Bluebonnet Sav. Bank, 266 F.3d 1348.

## The Substantial Factor Test is Appropriate Here

Where multiple factors potentially combine to produce an injury, the "substantial factor" test is appropriate.  See, e.g., Am. Sav. Bank, F.A. v. United States, 98 Fed. Cl. 291, 301 (2011) ("The substantial factor standard is properly invoked when the parties assert multiple possible causes for the claimed damages."); Energy Capital v. United States, 47 Fed. Cl. 382, 395 (2000) ("Because often many factors combine to produce the result complained of, the causation prong requires the injured party to demonstrate that 'the defendant's breach was a 'substantial factor' in causing the injury." (quoting Cal. Fed. Bank v. United States, 43 Fed. Cl. 445, 451 (Fed. Cl. 1999) vacated in part sub nom. California Fed. Bank, FSB v. United States, 245 F.3d 1342 (Fed. Cir. 2001), on remand 54 Fed. Cl. 704 (2002), aff'd, 395 F.3d 1263 (Fed. Cir. 2005) (internal citation and quotation marks omitted)), aff'd in part and rev'd in part on other grounds, 474 F.3d 1314, 1391 (Fed. Cir. 2007); Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400, 414 (2004) (applying the "substantial factor" test because "independent factors combine[d] to harm Plaintiff"); Westfed Holdings, Inc. v. United States, 52 Fed. Cl. 135, 160 (2002) (finding the "substantial factor" test appropriate where breach was one of multiple possible factors that caused Plaintiff damages); see also Northeast Savings, F.A. v. United States, 91 Fed. Cl. 264, 327 (2010).

Courts have also applied the substantial factor test to spent nuclear fuel cases for mitigation damages and to claims for lost profits.  Ind. Mich. Power, 422 F.3d at 1373; Englewood Terrace Ltd. P'ship v. United States, 94 Fed. Cl. 116, 124 (2010) (applying test to claim of lost profits from alleged breach of Housing Assistance Payment contract with HUD);

Wis. Elec. Power Co. v. United States, 90 Fed. Cl. 714, 726 (2009); Franconia Assocs. v. United States, 61 Fed. Cl. 718, 747 (2004) (applying test to lost profits claim where the Farmers' Home Administration allegedly breached low interest loan agreements by restricting Plaintiffs' right of prepayment).

The Government contends that the Court should apply the "more traditional" "but for" test citing "Yankee II." 536 F.3d at 1272-73.; Def.'s Post-Trial Brief 5, Feb. 28, 2013. In Yankee II, the Federal Circuit upheld the Court of Federal Claim's use of the "substantial factor" test but stated, "[a]lthough the substantial test is not preferred, this court has refrained from reversing trial courts that have applied the substantial factor test in Winstar and SNF cases." 536 F.3d at 1272-73. In so ruling, the Federal Circuit acknowledged that the trial court "enjoy[s] discretion to use the substantial factor test." Id. at 1273. While the evidence is clear that Plaintiff suffers from multiple sclerosis and that she was diagnosed just after her return from captivity, Defendant contends that other stressors triggered the onset of Plaintiff's multiple sclerosis. Thus, this case fits within the Energy Capital line of cases applying the substantial factor test where a defendant's breach is claimed to be one of multiple causes for a plaintiff's damages. There is another reason to apply the substantial factor test here—the pragmatic consideration that the "substantial factor" method of ascertaining causation provides a better fit for this factual scenario involving complex medical causation. Unrebutted testimony established that there cannot be one "but for" cause of MS because it requires two neurological events to trigger the onset of MS. Additionally, the doctors' testimony established that the diagnosis of multiple sclerosis is nuanced and that MS is unpredictable. 2010 Tr. 31-39, 89 (Sheremata); 2010 Tr. 108 (Horstmyer). As such, the "but for" test could not be meaningfully applied here.[54]

## Whether DEA's Breach Proximately Caused the Princess' Kidnapping

As explained above, the Court concludes that DEA breached its duty to protect the Princess both by 1) sending the Princess to Colombia "into harm's way" in August of 1995, despite a recent death threat, and recent kidnapping and assassination plot against her, her association with missing trafficker funds, and her potentially compromised cover, and 2) by failing to follow its protocol for sending undercover agents to foreign countries. The Court is persuaded that this breach proximately caused the Princess' kidnapping. In so holding, the Court credits Mr. Levine's testimony that DEA never should have sent her to Colombia, and that in doing so, DEA placed her in danger. 2011 Tr. 115, 144, 197-98 (Levine). Mr. Levine's testimony established that DEA not only failed to protect Plaintiff but acted with reckless disregard for her safety in light of its intelligence indicating how at risk she was. After discussing DEA's numerous missteps, Mr. Levine opined: "the totality of this, and through the totality of evidence that I've reviewed, [she was] literally being delivered into the lion's mouth." Id. at 56. Pointing to the DEA report relating the specific people who suspected that the Princess was cooperating with authorities and discussing Caicedo's "problem" with the Princess, i.e. that he blamed her for his lost money, Mr. Levine stated:

---

[54] The Court recognizes that the "but for" test could be applied in determining whether DEA's breach of its duty to protect Plaintiff caused her kidnapping. As noted above, the Court concluded that but for this breach, Plaintiff would not been have sent to Colombia and thus would not have been kidnapped.

> Well, my opinion is that if she has a life insurance company they're closing up
> and running.  The likelihood of her coming out of this situation alive is so slim
> it's miraculous that this woman is still alive . . . we know that Beltran works for
> the cartels.  We know at this point that there are 15 or 20 items of real intelligence
> indicating that she is suspected as being an informant from Italy throughout South
> America.  We know that an Assistant U.S. Attorney has already blown her cover
> in a case related with drug traffickers that [the] Princess set up. . . .  [Regarding]
> the seizure of money []—she is responsible.  . . . All you can assume is that she's
> got numerous faceless enemies out there that either want to kidnap or kill her.

Id. at 158-59.  When counsel sought clarification on what Mr. Levine meant by the Princess
"being responsible" for missing money, Mr. Levine replied:  "Mortally responsible." Id. at 158.

Attaché Senneca's testimony supports that, in a non-breach world, where ASAC
Salvemini would have sought country clearance and honestly answered Attaché Senneca's
questions, he would have denied country clearance and the Princess would not have been in
Colombia on August 31, 1995—the date of her kidnapping.  2011 Tr. 586, 592 (Senneca)
(admitting that he would have denied the Princess clearance if Salvemini told him her cover may
be compromised amongst the people she planned to meet or if Salvemini related the foiled
assassination plot).

### Whether Plaintiff Established that Her Kidnapping Was a Substantial Factor in Causing Her Multiple Sclerosis

The parties do not dispute that the Princess suffers from multiple sclerosis or that severe
stress may cause symptoms of multiple sclerosis to manifest during an "exacerbation" or
"attack."  Def.'s Post-Trial Br. 22.  They disagree, however, that the Princess' captivity
precipitated the onset of her multiple sclerosis which was diagnosed in December 1995 and May
1996.  Defendant contends that the Princess exhibited symptoms of multiple sclerosis before her
kidnapping, and that other life stressors could have exacerbated the Princess' condition without
the kidnapping.  Id. at 22-24.

At trial Plaintiff presented two medical experts, Dr. Sheremata and Dr. Horstmyer, both
Plaintiff's treating neurologists.  The Government did not present an expert.

As Dr. Sheremata explained, in 1996, a diagnosis of multiple sclerosis was based on the
occurrence of two neurological events.  2010 Tr. 35 (Sheremata).  Dr. Sheremata opined that the
Princess manifested the first "event" indicating that she was at risk for multiple sclerosis in May
1993, when she developed a spinal cord lesion and planned to have surgery, but the lesion
disappeared and the surgery became unnecessary.  Dr. Sheremata believed that this lesion was
evidence of transverse myelitis, and that this spinal legion—or transverse myelitis—was the
Princess' "initial neurological event" because, when viewed in retrospect, it was a manifestation
of multiple sclerosis.  Id. at 68, 99.  He stated:  "That event became part of the basis upon which
the diagnosis of multiple sclerosis was made, but [the Princess] did not have multiple sclerosis at
that time, but clearly biologically she was set up as a risk factor."  Id. at 93.  Although there is a
higher probability that individuals with a transverse myelitis will develop multiple sclerosis, Dr.
Sheremata explained that some individuals never experience a second neurological attack or

further evidence of multiple sclerosis.  Id. at 100.  This event, the transverse myelitis, Dr. Sheremata explained was also the source of the Princess' "tightness" in her feet before her kidnapping, but was not the cause of the multiple sclerosis.

While transverse myelitis was the "first neurological event" which Dr. Sheremata considered in diagnosing the Princess' multiple sclerosis, Dr. Sheremata explained that a person can have transverse myelitis without it ever progressing to multiple sclerosis.  He explained:

> If a person has a transverse myelitis, even if they never have a second attack of neurological disease, heat, fatigue, other things can bring out symptoms without it being an attack or an exacerbation.  We see this often.  There's a lot of history behind it, which I won't go into, but the recurrence of those kinds of symptoms, they simply reflect the fact that there's been damage in the nervous system.  The disappearance of something by MRI after treatment does not mean that the tissues return to normal.

Id. at 70.

Dr. Horstmyer agreed that when a lesion manifested on the Princess' spinal cord in May 1993, the Princess did not meet the diagnostic criteria for clinically definite multiple sclerosis. 2010 Tr. 125 (Horstmyer).  Although he stated during his deposition that "[i]t's likely she had MS in 1993," at the damages trial Dr. Horstmyer clarified: "Well, not exactly.  There's a criteria for clinically definite MS, so on hindsight can one say that it was the beginning of MS, it's possible."  DX 22 at 26; 2010 Tr. 126 (Horstmyer).

In Dr. Sheremata's view, the Princess' second neurological event was the development of new spinal cord signs evidenced by the Princess' difficulty with her balance and her ambulation after her kidnapping.  2010 Tr. 101 (Sheremata).  Dr. Sheremata opined that these symptoms could not have been caused by the spinal cord lesion the Princess developed in May of 1993. 2010 Tr. 101 (Sheremata).  Both Dr. Morariu and Dr. Sheremata diagnosed the Princess with relapsing and remitting multiple sclerosis in 1996 soon after her return from the kidnapping. Between 1996 and 2003, the Princess' condition was consistent with the diagnosis of relapsing and remitting multiple sclerosis, which is characterized by neurological difficulties that appear and disappear over a period of days to weeks.  Id. at 49.[55]

### The Causal Role of Stress

At trial, both doctors testified that the kidnapping caused the Princess' multiple sclerosis, specifically the second neurological event that led to her diagnosis.  Both doctors also opined that stress is a factor in bringing out multiple sclerosis.

Dr. Sheremata characterized the Princess' kidnapping as "the most severe of severe life threats" and further stated "I can't think of anything more stressful, and if stress has any role in

---

[55] The majority of patients with multiple sclerosis have relapsing and remitting multiple sclerosis.  2010 Tr. 49 (Sheremata).

multiple sclerosis, which I believe it does, nothing could have been more stressful." Id. at 98. Specifically, when asked about the significance of the kidnapping and incarceration in Colombia "with regard to [his] diagnosis and [his] medical opinion with regard to MS[,]" Dr. Sheremata testified: "Well, she was in fact kidnapped and threatened with execution. That must surely be the largest amount of stress that a person could undergo, and this certainly was an important factor in precipitating the onset of what then could be called multiple sclerosis." Id. at 30.[56]

Dr. Sheremata acknowledged that the Princess had other sources of stress in her life, including severe marital discord, divorce, conflict with her ex-husband over the management of her business, and the discovery that her business partner was involved in money-laundering. Id. at 76-81. When asked whether it was possible to assign a portion of a subsequent disability to a particular life stressor, Dr. Sheremata testified: "Multiple sclerosis is unpredictable, and the business of assigning stressors, the only thing I can think of is the severe threatening events which precipitated the onset of her illness were relatively more important." Id. at 89.

Dr. Horstmyer's testimony was consistent with Dr. Sheremata's opinion. Dr. Horstmyer also testified about triggers for multiple sclerosis stating: "[A]s to what actually triggers the disease, nobody knows. . . .What we do know is there are certain things that trigger or activate the disease, stress being one of them." 2010 Tr. 108 (Horstmyer). Even though "no one actually knows the cause of MS, but [Dr. Horstmyer] felt that the activation of [the Princess'] MS was related to the stress from the kidnapping." Id. at 107. The Princess' kidnapping "was certainly the most prominent stressor out of all of the history that [Dr. Horstmyer] obtained" but it is still very hard to know whether the Princess would have developed multiple sclerosis absent her kidnapping. Id. 108, 132. Though he did not testify, Dr. Morariu's records demonstrate that he too believed that the Princess' kidnapping precipitated the onset of multiple sclerosis. PX 413.

### The Government's Breach was the Proximate Cause of the Onset of the Princess' Multiple Sclerosis

The Court is persuaded that the Princess' abduction was a substantial causal factor in the onset of her multiple sclerosis. The evidence adduced at trial established that the Princess was in normal physical condition before her kidnapping. With the exception of the difficulties with her right leg caused by the transverse myelitis in 1993, the Princess was active and athletic. 2010 Tr. 138 (Cadavid); 2010 Tr. 259-60 (Princess). During her three-month captivity, however, the Princess began to experience severe impairments consistent with a second neurological attack. She began falling frequently and experienced difficulties with her right leg that foiled her attempts to escape through a hole in the ceiling. 2010 Tr. 220 (Princess). In captivity, the Princess wrote a note to her brother relating that her legs were hurting. Shortly after her release,

---

[56] Although Dr. Sheremata's description of the Princess' kidnapping was not entirely accurate and was apparently based on his understanding of details provided by the Princess, it did not depict a situation more stressful or anxiety-provoking than what actually transpired. 2010 Tr. 95 (Sheremata). Dr. Sheremata testified that the Princess was kidnapped for ransom, but escaped and returned to her work as an informant. She was then recaptured and threatened with execution and there was no demand for ransom. Id. 94-95 (Sheremata).

in December 1995, Dr. Morariu diagnosed the Princess with multiple sclerosis which Dr. Sheremata confirmed in May, 1996.

The Government suggested that the Princess already had multiple sclerosis before her kidnapping. To support this theory the Government cited the May 1993 spinal lesion the Princess experienced and her complaints of "tightness" in her feet before and during the kidnapping. The record does not support the Government's argument that the May 1993 spinal lesion and complaints of sciatica were misdiagnoses of multiple sclerosis. As both Dr. Sheremata and Dr. Horstmyer testified, the May 1993 transverse myelitis was the first neurological event, but absent a second event, triggered by the "largest amount of stress that a person could undergo" the Princess' neurological condition would not have progressed to multiple sclerosis. The Court finds the testimony of Dr. Sheremata and Dr. Horstmyer credible and notes that the Government did not put forth an expert to support its theory that these earlier complaints were, in fact, multiple sclerosis.

Additionally, the Government argued that while stress is a cause of multiple sclerosis, the Princess had many sources of stress in her life, including a past abusive husband, a daughter battling drug addiction, divorces, and a failing business, hence the kidnapping cannot be isolated as the sole "cause." The Court's determination that the Princess' kidnapping and captivity was a substantial causal factor in triggering her multiple sclerosis does not exclude the influence of other factors. See Ne. Sav., F.A. v. United States, 91 Fed. Cl. 264, 327 (Fed. Cl. 2010), dismissed, 453 F. App'x 961 (Fed. Cir. 2010) ("Courts have recognized that the substantial factor test is appropriate when Defendant asserts multiple causes for the claimed damages."). The Court is persuaded that during the critical period between her initial neurological attack in May, 1993, and Dr. Morariu's diagnosis of multiple sclerosis in December 1995, the Princess' abduction was the most severe stressor in her life. Defendant has identified no plausible alternative stressor of that magnitude—a life threatening kidnapping and three-month captivity— during that time period that could have been the primary trigger for Plaintiff's condition. Cf. 2010 Tr. 108 (Horstmyer) ("[The Princess's kidnapping] was certainly the most prominent stressor out of all of the history that I had obtained.").

### Foreseeability

"The foreseeability requirement reflects the principle that a breaching party should not be liable for damages that 'it did not at the time of contracting have reason to foresee as a probable result of such a breach.'" Citizens Federal, 474 F.3d at 1321 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 351 cmt. a (1981)). Section 351 of the Restatement provides that a "[l]oss may be foreseeable as a probable result of a breach because it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know." RESTATEMENT (SECOND) OF CONTRACTS § 351 (1981); see Bluebonnet Sav. Bank, 266 F.3d at 1355. "Foreseeability 'requires only reason to foresee, not actual foresight.'" First Fed. Sav. & Loan Ass'n. v. United States, 76 Fed. Cl. 106, 122 (2007) (quoting Anchor Sav. Bank, FSB, 59 Fed. Cl. at 146), aff'd 290 Fed. App'x. 349 (Fed. Cir. 2008)); see 11 Corbin on Contracts § 56.7 ("What is required is merely that the injury actually suffered must be one of a kind that the defendant had reason to foresee and of an amount that is not beyond the bounds of reasonable prediction."). Damages must be "reasonably foreseeable by the breaching party at the time of contracting." Vt. Yankee Nuclear Power Corp.

v. Entergy Nuclear Vt. Yankee, LLC, 683 F.3d 1330, 1344 (Fed. Cir. 2012) (citing Williston on Contracts § 64:29).

The inquiry under foreseeability in this case is whether Plaintiff's damages, namely her multiple sclerosis and the ensuing costs of her medical care, were reasonably foreseeable at the time of contract formation. Anchor Sav. Bank, FSB, 597 F.3d at 1361; Pratt v. United States, 50 Fed. Cl. 469, 482 (2001) ("Whether damages are foreseeable is a factual determination made at the time of contract formation.") (citing Bohac v. Dep't of Agriculture, 239 F.3d 1334, 1340 (Fed. Cir. 2001)).   Hence, Plaintiff must show that both the kidnapping, her ensuing health problems, and consequential financial costs of medical care constituted the type of loss that was reasonably foreseeable when the parties formed their implied-in-fact contract.

Plaintiff has established that her kidnapping was reasonably foreseeable at the time the contract was entered into.  From the outset ASAC Salvemini voiced concerns for the Princess' safety, and DEA moved her family because of the dangers of her operation as part of her agreement to work with DEA.   Evidence revealed that kidnappings were not uncommon in Colombia at the time.  2007 Tr. 270 (Princess); 2007 Tr. 1523 (Warren) ("[W]e got the report [the Princess] had been abducted.  That was not an unusual report in Colombia then or now unfortunately.").  Plaintiff established that harm to undercover informants, including injury and death, were reasonably foreseeable consequences of a breach at the time of contract formation.

Knowing, as DEA did, of the dangers inherent in undercover operations aimed at high-echelon Colombian traffickers, especially kidnapping in Colombia—a "hot spot"—the Princess' kidnapping and resultant harm to her health was a reasonably foreseeable type of injury at contract formation. The Court recognizes that DEA likely did not specifically foresee that the injury would be multiple sclerosis, but this is not a requirement for a showing of foreseeability. Anchor Savings Bank, FSB, 597 F.3d at 1362-63 (noting that "the particular details of a loss need not be foreseeable," as long as the mechanism of loss was foreseeable) (quoting Fifth Third Bank v. United States, 518 F.3d 1368, 1376 (Fed. Cir. 2008)).

### **Damages:  Reasonable Certainty**

Plaintiff seeks an award of $10,000,000 in damages plus interest stemming from her multiple sclerosis, severe financial losses and hardship, physical pain and suffering, emotional distress, and inconvenience and "a sum of money to fully and fair make her whole."  Pl.'s Pre-Trial Brief at 37, March 1, 2010; Pl's Post-Trial Brief at 80, Jan. 26, 2013.

To prevail on a claim for damages stemming from Defendant's breach of contract, Plaintiff must prove her damages with reasonable certainty.  Citizens Fed. Bank, 474 F.3d at 1318.   Contract law precludes recovery of speculative damages.   Roseburg Lumber Co. v. Madigan, 978 F.3d 660, 667 (Fed. Cir. 1992).  "Where responsibility for damages is clear, it is not essential the amount thereof be ascertainable with absolute exactness or mathematical precision . . . ."  San Carlos Irrigation & Drainage Dist., 111 F.3d at 1563 (quoting Elec. & Missile Facilities, Inc. v. United States, 416 F.2d 1345, 1358 (Ct. Cl. 1969)).

## Extreme and Severe Financial Losses and Hardship

Plaintiff has not proved damages stemming from what she characterizes as "severe financial losses and hardship." Plaintiff did not present any evidence on the quantum of such alleged damages or seek to recover for specific out-of-pocket expenses. There is no evidentiary basis to award Plaintiff damages for unspecified monetary loss and hardship.

## Future Medical Expenses and Bodily Injuries

Plaintiff is entitled to recover the full amount of the life care plan, totaling $1,145,161.47. PX 418. Plaintiff's expert in rehabilitation counseling and life care planning, Sharon Reavis, R.N., prepared a life care plan estimating the cost of future medical treatment for the remainder of the Princess' life expectancy—25.6 years—based on mortality tables prepared by the United States Department of Health and Human Services. Id.; 2010 Tr. 192-93 (Reavis).

The life care plan includes estimated costs for 25.6 years from 2010, i.e., until 2036, in five categories: drugs and supplies, home services, medical routine, medical services, therapies, totaling $1,145,161.47. PX 418.

The drugs and supplies category includes the costs of five medications taken by the Princess: Avonex, Clonazepam, Lithium, Lamotrigine, and Ambien. The cost of drugs, including Avonex, and associated supplies, was $998,414.08 for the Princess' remaining 25.6 years. Id.

The home services category includes the cost of housekeeping services once a week, as the Princess is unable to independently handle heavier housekeeping duties. 2010 Tr. 179 (Reavis). The total cost for this category was $93,184.00. PX 418.

The medical routine category includes the costs of the Princess' medical visits to an ophthalmologist because individuals with multiple sclerosis can experience vision loss, blurring, and double vision, and costs for the Princess' psychiatrist, Dr. Paredes, for medication management and therapy. PX 418; 2010 Tr. 180 (Reavis). The total cost for the medical routine category was $23,150.59. PX 418.

The medical services category includes the cost of an MRI of the brain required once a year to monitor the progression of multiple sclerosis. The total cost for this category was $15,360.00. Id.

The therapies category includes the cost of a fitness center and monthly membership fee at a yearly cost of $588 for the estimated duration of her life, as exercise helps the Princess' balance, combats fatigue, and builds strength. 2010 Tr. 182 (Reavis). The total cost for this category was $15,052.80. PX 418.

The Court is persuaded that Plaintiff has established that Defendant's breach required her to receive the medical treatment, supplies, and services encompassed by her life care plan. The Court finds that Ms. Reavis' computation of each element of the plan is supportable and conservative. Plaintiff has established the cost of her life care plan with reasonable certainty.

49

## Physical Pain and Suffering, Emotional Distress, and Inconvenience

Plaintiff seeks to recover damages for several categories of nonpecuniary losses, including damages for past and expected severe physical pain, mental anguish or emotional distress, and inconvenience. Pl.'s Post-Trial Brief, 80. Plaintiff cites the humiliation of having to urinate into a bucket and eat her notebook and further claims that she suffered mental anguish when her captors told her that her mother and daughter had been killed. Id. at 79.

"Under the traditional contract law approach, '[i]t is well established that, as a general rule, no damages will be awarded for the mental distress or emotional trauma that may be caused by a breach of contract.'" Bohac v. Dep't of Agriculture, 239 F.3d 1334, 1340 (Fed. Cir. 2001) (citing John D. Calamari & Joseph M. Perillo, The Law of Contracts § 14.5(b), at 549 (4th ed. 1998)); see John A. Sebert, Jr., Punitive and Nonpecuniary Damages in Actions Based Upon Contract: Toward Achieving the Objective of Full Compensation, 33 UCLA L. REV. 1565, 1584 (1986) ("Traditional contract law provides very limited opportunity for a plaintiff to recover for nonpecuniary loss that may result from contract breach, such as emotional distress, inconvenience, and annoyance."). The Federal Circuit has recognized a narrow exception in cases regarding contracts of innkeepers and carriers, contracts for the delivery of messages concerning death, and contracts on the handling of dead bodies. These exceptions are cases in which "breach of the contract is particularly likely to cause serious emotional disturbance." See Bohac, 239 F.3d at 134; see RESTATEMENT (SECOND) OF CONTRACTS § 353 (1981); 3 DAN B. DOBBS LAW OF REMEDIES § 12.5(1) (2d ed. 1993); Pratt v. United States, 50 Fed. Cl. 469, 482 (2001) ("Except in limited circumstances related to common carriers and innkeepers not applicable here, the court cannot award damages for the emotional consequences of a breach of contract because such consequences are speculative as a matter of law.") (citing Bohac, 239 F.3d at 1340); see also Rodriguez v. United States, 69 Fed. Cl. 487, 494 (Fed. Cl. 2006); Hall v. United States, 69 Fed. Cl. 51, 57-58 (2005) ("Although the court has jurisdiction to adjudicate this claim because it is ultimately one arising in contract, the court has no authority to award Plaintiff damages for 'emotional distress and pain and suffering.'"). The Federal Circuit has further recognized that "damages for mental suffering are usually refused absent wanton and willful misconduct. Ordinary negligence does not suffice." Bohac, 239 F.3d at 1340 (citations omitted).

The Restatement of Contracts also permits recovery of emotional distress damages in breach of contract actions where the breach caused bodily harm. RESTATEMENT (SECOND) OF CONTRACTS § 353 (1981) ("Recovery for emotional disturbance will be excluded unless the breach also caused bodily harm or the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result."). Comment a. to section 353 of the Restatement provides:

> Damages for emotional disturbance are not ordinarily allowed. Even if they are foreseeable, they are often particularly difficult to establish and to measure. There are, however, two exceptional situations where such damages are recoverable. In the first, the disturbance accompanies a bodily injury. In such cases the action may nearly always be regarded as one in tort . . . .

50

Cmt. a, RESTATEMENT (SECOND) OF CONTRACTS § 353 (1981).  There is a dearth of precedent in this Circuit addressing the availability of emotional distress damages for breach of contract in cases of physical injury.[57]  See Agredano, 82 Fed. Cl. at  451-52 rev'd, 595 F.3d 1278 (Fed. Cir. 2010) (finding that Plaintiff was not entitled to emotional distress damages because "the court does not believe it is in a position to determine from scratch, as it were, a 'reasonable compensation' for 'emotional distress' as requested by plaintiff" but awarding costs of physical, psychiatric, and financial injuries suffered); Mastrolia v. United States, 91 Fed. Cl. 369, 385 (2010) (concluding that Plaintiff adequately alleged the Postal Service's breach of a settlement agreement and physical discomfort, among other damages, stemming from the breach, but dismissing Plaintiff's claims for pain and suffering and emotional distress).

Although Plaintiff suffered physical injury as a result of Defendant's breach of contract, Plaintiff has neither articulated an amount of damages attributed to emotional distress nor proven this category of damages to a reasonable certainty—other than the costs of future psychiatric treatment and related medication that this Court awards as part of her life care plan.[58]

**Costs and Interest**

Plaintiff alleges that she is entitled to recover costs and interest from the date of her kidnapping.  This Court may award interest against the United States "under a contract or Act of Congress expressly providing for payment thereof."  28 U.S.C. § 2516(a) (2000).  Plaintiff's implied-in-fact contract did not provide for recovery of interest, and Plaintiff has not alleged any statutory basis for recovery, hence the Court denies Plaintiff's claim for interest.

Although this Court has the authority to award reasonable attorneys' fees and expenses pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d)(2) (2012), Plaintiff's

---

[57] The Court of Federal Claims engaged in an extended discussion of nonpecuniary damages in Elk v. United States, 87 Fed. Cl. 70 (2009).  In Elk, the Court awarded Plaintiff, a female Sioux Indian, emotional distress damages for an assault by an Army recruiter.  This award, however, was pursuant to Article I of the Sioux Treaty, not a contract.  Since the Treaty incorporated tort liability concepts, the case was not one "in which damages for emotional disturbances should be viewed as a form of consequential or incidental damages for a breach." 87 Fed. Cl. at 90.

[58] Although Dr. Mata diagnosed the Princess with post-traumatic stress disorder ("PTSD") following her captivity, Plaintiff did not seek the costs of that treatment.  2010 Tr. 243 (Princess).

Plaintiff filed two pre-trial briefs, on March 1, 2010 and on July 19, 2011, before each phase of the trial on damages.  In an account of the Princess' medical treatment provided in the first pre-trial brief, Plaintiff references the medical records and diagnosis of Dr. Mata.  Pl.'s Pre-Trial Brief 8, March 1, 2010.  However, Plaintiff did not argue that she was entitled to damages for this condition.  Plaintiff's post-trial brief, filed January 26, 2013, references Plaintiff's visits to Dr. Mata after her release, but does not include Dr. Mata's diagnosis.  See Pl.'s Post-Trial Brief 67, Jan. 26, 2013.

request at this juncture is premature.  EAJA provides that a party seeking an award of attorney's fees and other expenses shall submit a detailed fee application to the court within 30 days of final judgment in the action.  The fee application shall (1) show that the party is a prevailing party and eligible to receive an award under EAJA; (2) set forth the amount sought, including itemized statements showing actual time expended and the rate at which fees and costs were computed; and (3) allege that the position of the United States was not substantially justified.  28 U.S.C. § 2412(d)(1)(B).

### Conclusion

The Court directs the Clerk of Court enter judgment in favor of Plaintiff awarding Plaintiff damages in the amount of $1,145,161.47.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**